**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 9/9/08.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
MARKEM CORPORATION,             *
          Plaintiff,            *
                                * 07-cv-06-PB
          v.                    * May 29, 2008
                                * 9:40 a.m.
ZIPHER LTD., et al.,            *
          Defendant.            *
                                *
* * * * * * * * * * * * * * * * *

TRANSCRIPT OF CLAIMS CONSTRUCTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Plaintiff:    Kurt L. Glitzenstein, Esq.
                      Peter J. Kirk, Esq.
                      Fish & Richardson, PC
                      225 Franklin Street
                      Boston, MA 02110

                      Daniel M. Deschenes, Esq.
                      Hinckley, Allen & Snyder, LLP
                      43 North Main Street
                      Concord, NH  03301

For the Defendant:    J. Michael Jakes, Esq.
                      Finnegan, Henderson, Farabow,
                        Garrett & Dunner, LLP
                      901 New York Avenue, NW
                      Washington, DC 20001-4413

                      Bryan K. Gould, Esq.
                      Philip R. Braley, Esq.
                      Brown, Olson & Gould, P.C.
                      2 Delta Drive, Suite 301
                      Concord, NH  03301-7426

Court Reporter:       Diane M. Churas, CSR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1442

2

```
 1                      IN OPEN COURT

 2          THE CLERK:  The Court has for consideration

 3  this morning Civil Action 07-cv-6-PB, Markem Corporation

 4  versus Zipher Ltd., et al., for a claims construction

 5  hearing.

 6          THE COURT:  How do you want to proceed?

 7          MR. GLITZENSTEIN:  Good morning, your Honor.

 8  Kurt Glitzenstein for plaintiff Markem Corporation.

 9  Your Honor, at the status conference that we had last

10  February, we had talked about proceeding first with a

11  tutorial in order to help orient the Court to some of

12  the technical issues and the context for the claim

13  construction issues.  So our proposal on this proceeding

14  today would be to start with that, and for that we have

15  here today Dr. Pedro Landers, Peter Landers, from Markem

16  Corporation to address some of those issues, and then

17  once we have gotten through that and defendants have a

18  chance to respond, then we would proceed to the claim

19  construction issues, the argument section of the

20  proceeding.

21          MR. JAKES:  Your Honor, that's fine with us.

22  We also have someone here to help us with the tutorial,

23  Professor Kuc from Yale University is here, and he would

24  respond after Markem's witness.

25          THE COURT:  All right.  I probably explained
```

1    my view about Markman hearings to you at the last

2    conference, but let me reiterate.  I think that it is a

3    mistake for judges to offer interpretations of claim

4    language that the judge doesn't need to offer to decide

5    the dispute and, in fact, I think that I'm

6    constitutionally constrained not to do that.  I have the

7    power to decide cases and controversies.  I don't have

8    the power to offer advisory opinions.  So unless

9    somebody explains to me today why the dispute between

10   the parties concerning the construction of a particular

11   term is potentially determinative of the case, I'm not

12   going to construe the term.  So I hope that you will be

13   prepared to do that, and the way to do that, obviously,

14   is to show me what the allegedly infringing product is,

15   and why, if one party's construction is adopted, it

16   doesn't infringe, and why, if the other party's

17   construction is adopted, it does, and unless you can

18   really do that, I probably won't give you an answer to

19   your question and I will focus only on those terms that

20   I think will decide the case.  If they won't decide the

21   case, I'm not going to give you an interpretation.

22            I also have to tell you, and I looked at

23   several of your disputes, they don't seem to me to be

24   real disputes.  So I'm not going to adopt Version A over

25   Version B when I don't see any difference between

1   Version A and Version B.  So unless somebody can

2   demonstrate to me that there's a meaningful distinction

3   between the two terms, you're not going to get an

4   instruction on this.  So as you go through this, just be

5   prepared on those points.  Otherwise, you won't get what

6   you're hoping to.

7            MR. JAKES:  We're prepared on that, your

8   Honor.

9            THE COURT:  All right.  You want to call your

10  person?

11           MR. GLITZENSTEIN:  Yes, your Honor.  Thank

12  you.  Your Honor, we've asked Dr. Pedro Landers of

13  Markem whose title is the Director of Product

14  Development to provide the Court with some background

15  information about the two products in this case.

16           THE COURT:  How would you like to do it?  You

17  can sit there, you can stand up, you can sit at the

18  witness stand, whatever you want to do.

19           MR. GLITZENSTEIN:  We've got a little

20  presentation that will include some videos and some

21  other graphics just to sort of supplement Dr. Pedro's

22  discussion this morning.  We're comfortable doing it in

23  any way.  I think Dr. Landers is probably more

24  comfortable standing on his feet and sort of expounding

25  on these issues.

5

1          THE COURT:  That's fine.

2          MR. GLITZENSTEIN:  But we do have a little bit

3  of show and tell here in terms of some ribbon and some

4  printers in addition to the video; so it might be a

5  little bit challenging for everybody to see what's going

6  on.  So what I would suggest we do is start out with the

7  camera here and see if that works and maybe flip between

8  the camera and the Powerpoint presentation that we have

9  got if that's possible.

10         THE COURT:  Yep.  Okay.  Perfect.

11         MR. GLITZENSTEIN:  Let's do that then.

12         THE COURT:  Go ahead.

13         MR. LANDERS:  Good morning, your Honor.  Peter

14  Landers, Director of Product Development at Markem

15  Corporation.  I was formerly the Engineering Manager of

16  the Markem Corporation in Nottingham UK and was

17  responsible for the projects to develop the SmartDate5

18  and the 18 Series.  Prior to that I had various

19  positions in what would probably be best described as

20  automation industry, both as a practicing engineer and

21  as an engineering manager.  So that gives you my

22  background relative to the accused products.

23         So what I would like to do is, firstly, take

24  you through very quickly the context of thermal transfer

25  over-printing world just to give you some background,

1   place it in the industry that it is founded in, and I'd

2   like to give you some views of the machines.

3           So, firstly, I would like to show what thermal

4   transfer over printer actually shows.

5           THE COURT:  Let me make sure I've got

6   everything enabled correctly.  So if you want something

7   from the document camera to be shown, if you'd tell me

8   I'd like to enable the document camera, I can do that.

9   Otherwise, I will stick with what's on the screen now

10  which is the part from the laptop and is part of the

11  tutorial.  Do you want the document camera on now?

12          MR. LANDERS:  Document camera, please.

13          THE COURT:  All right.  Make sure I've got

14  this.  All right.

15          MR. LANDERS:  So shown on the document camera

16  for everyone other than --

17          THE COURT:  That one, let me turn -- Joyce, is

18  that one actually turned on?

19          THE CLERK:  Yes, it is.

20          THE COURT:  So we've got to turn the jury box

21  on.

22          MR. LANDERS:  So thermal transfer

23  over-printing is the process of adding variable data to

24  pre-prepared packaging material typically in food and

25  other fast-moving consumer goods industries.  More often

7

1     than not, the variable data is a manufactured date or a

2     use by date.  That's hence the term over-printing.  We

3     don't print on a completed bag as I'm showing on the

4     camera there.  Rather, printing is done on the packaging

5     material which is provided in roll format.

6            I've got a small part here and I've got some

7     more if you want to hand that up.  Each section is a

8     separate packet, and we print immediately before this

9     material gets folded into a packet around in this case a

10    self-fed roll.  So that is really what over-printing is.

11            Can we go back to the presentation now.

12            THE COURT:  Yes.

13            MR. LANDERS:  Probably to put the whole thing

14    in context, it would be -- I've got a short video

15    showing a SmartDate5 operating in an adjusted

16    environment, and this really shows the environment in

17    which these printers work.  They are not desktop

18    printers.  They are industrial devices.

19            If you could run the video, Peter.  So you can

20    see here the substrate at the top of the screen being

21    fed through the machine and the thermal transfer printer

22    is printing upwards.  I have some further videos to show

23    the detail workings.  This is much more to show context.

24    So that gives you the context.  I can move on?

25            MR. GLITZENSTEIN:  Yes.

1           MR. LANDERS:  Okay.  So what I now want to do

2    is look at the three accused products.  The SmartDate 5

3    hardware-wise, both versions are the same.  This is a

4    current version which has a different sort of thermal

5    mode in it, and as you can see it matches the machine in

6    the video.  Because of the construction of this machine,

7    it's rather hard for me to show you the elements of the

8    printer.  So I will then proceed to the 18 Series which,

9    hopefully, fits on the camera and I can take you through

10   the elements of the printer.  If you can switch the

11   camera, please.  Zoom out.

12           Okay.  We have the front of the thermal

13   transfer printer which you can see two spools, the

14   supply spool and a take-up spool, and the ribbon goes

15   from the supply to the take-up via a movement roller

16   here, a dancing arm which acts as a tension sensor which

17   is moved by the tension in the ribbon and on the rear.

18           THE COURT:  Let me come down and look at it

19   directly, and everyone else can look at it on the

20   monitor but just speak up loud enough so the court

21   reporter can hear you.

22           MR. LANDERS:  So tension sensor is forward by

23   a dancing arm which has a sensing element with a full

24   effect sensor on the rear.  The ribbon then passes

25   around the thermal transfer print head which can be

1    advanced to meet up with the packaging material as it

2    goes by, and that thermal printer transfer head

3    transfers ink from the ribbon onto the substrate, the

4    packaging material.  It's a one-use ribbon so all the

5    ink is transferred unlike, for example, a typewriter

6    ribbon.  That's probably not a good analogy anymore.

7    The ribbon is then passed around two more passive

8    rollers to the take-up.

9            THE COURT:  How does this sense tension?

10           MR. LANDERS:  The tension in the ribbon moves

11   the dancing arm, rotates the dancing arm around that

12   pivot, and hidden away, unfortunately, is a tension

13   sensor which is made up of magnets that holds that

14   sensor that measures the displacement to the magnet from

15   that sensor which is then sensed by the electronics in

16   the controller.  So as the tension -- I can wind tension

17   in, you'll see the sensor move.

18           THE COURT:  All right.

19           MR. LANDERS:  If you'd like to stand I can

20   show you the same features on the SmartDate 5.  It is

21   just not as simple because they are separated between a

22   cassette which is provided for easy loading of the

23   ribbon and supply, take-up, passes around a series of

24   rollers, one of which is a movement roller equivalent to

25   the 18 Series, but also around a roller that can move up

1    and down in response to the tension in the ribbon that

2    interacts with the sensor in the body of the printer,

3    which is a small plunger here.  That roller comes in

4    contact so it can sense the movement of that roller and,

5    likewise, there is a print head that can be displaced to

6    affect the printing.

7            THE COURT:  All right.  Anything else you want

8    me to see while I'm here?

9            MR. LANDERS:  I think everything else is

10    probably able to be seen from a distance.

11            THE COURT:  All right.

12            MR. LANDERS:  Thank you.  So that is the

13    printer side.  Obviously, the other part of the equation

14    is the film transfer ribbon itself.  As you can see when

15    I was showing the printers, it is a thin shape with an

16    ink coating, and this is stretched between rollers and

17    between the spools, and as you can see the -- it's

18    plastic.  There is some elasticity in this ribbon.  If

19    you apply too much tension, it will deform and

20    eventually it will break.  So that just shows you the

21    ribbon.

22            Yeah, could we please go back to the -- next

23    line, please.  Now, what I would like to now show you is

24    the detailed operations of a SmartDate 5.  I've taken

25    two short training videos that we have generated to show

1  the detail operations of this.  It's easier than seeing

2  it statically on the physical printer.  I need to

3  explain a slight complication in that there are two

4  modes of operation, one where the substrate -- the

5  packaging material is stopped between -- while the goods

6  are being packaged, and we take advantage of that

7  stationary period to print, and that is called

8  intermittent mode.  So if you could run the video,

9  please, Peter.

10       What we have here -- so we have here -- rather

11  than the packaging machine, we have the printer mounted

12  in a test rig.  The white material is equivalent to the

13  packaging material, and we can see that the printer is

14  printing, and what we've done for clarity is to cut away

15  the metal in the front, and you can see the two ribbon

16  spools rotating and then the print head moving to form

17  the image, and then the spools are rotated again to move

18  fresh ribbon -- remember, it's a one-strike ribbon --

19  into place for the next image, and you can see here the

20  image has been placed down and there is the waste ribbon

21  being taken away.  You can just about see the negative

22  image of the print on the waste ribbon.

23       THE COURT:  This device uses two stepper

24  motors that operate in a push/pull mode?

25       MR. LANDERS:  That's correct.  One step motor

1    for the supply spool, one for the take-up.  Would you

2    like to see anything on that again or should I go on to

3    the continuous?

4              THE COURT:  You can go ahead.

5              MR. LANDERS:  Okay.  Could we go to the next

6    video.  In continuous mode, the packaging machine does

7    not stop the substrate during the packaging and,

8    therefore, we have to print on the material as it moves.

9    So the same rig, this time the packaging material is

10   going over a roller and the printing cycle when we get

11   the metal cut away is complicated by the fact that we

12   need to accelerate the ribbon to match the speed of the

13   packaging material, which means we overwind the ribbon

14   and we have to wind it back at the end of each print

15   cycle to make sure that we minimize the use of ribbon.

16             THE COURT:  What do you mean to overwind the

17   ribbon?

18             MR. LANDERS:  You have to accelerate and

19   de-accelerate the ribbon to match the substrate speed,

20   which means you have used up more ribbon than the

21   actual --

22             THE COURT:  Oh, you're going back over the

23   unused portions again.

24             MR. LANDERS:  But you have to wind it back so

25   the unused portion is immediately opposite the print

1    head when you do the next print so you minimize, again,

2    wasting ribbon.

3          So that's showing the operation of the two

4    printers.  So I think that's really the background of

5    the print cycle.  Any other questions you have on that

6    before I proceed?

7          THE COURT:  No.  Okay.

8          MR. LANDERS:  So as you previously asked, both

9    the ribbon drive motors are stepper motors.  Stepper

10   motors turn in discreet steps and, therefore, sweep out

11   a fixed angle for each step when it's commanded to by

12   the controller.

13          Now, this has the consequence that a different

14   -- for each phrase, specific number of steps, depending

15   on the diameter of the spool rolls, you will get a

16   different amount of ribbon fed, and we have a diagram

17   here to show that, but, for example, a nearly empty roll

18   of ribbon, one revolution will feed that much ribbon

19   (demonstrating) for a -- in this case nearly full.  One

20   roll feeds that much ribbon.

21          THE COURT:  Is the way a stepper motor

22   operates, is the arc that's affected by each step, it's

23   constant for that motor and it can only operate by going

24   one degree or whatever?

25          MR. LANDERS:  For that motor and control

14

1    configuration, yes.  It's baked into the design.  So

2    different motors can have different step angles, but

3    also you can choose to step --

4              THE COURT:  You can't adjust the step angle --

5    once you've developed your stepper motor, that same

6    motor for part of the time go one degree and another

7    time go half a degree.  It just goes in a series of

8    constant degree steps.

9              MR. LANDERS:  Yes.  For all intents and

10   purposes, yes.  So you get with the SmartDate 5 ribbon,

11   which is a full roll, somewhere around a hundred

12   millimeters diameter, and the empty roll is somewhere

13   around 33 millimeters diameter.  You'll get a three to

14   one variability in the amount of ribbon fed.  So if we

15   think back to the video, we are winding the ribbon from

16   one spool to the other and, obviously, to maintain the

17   ribbon taut, we need to wind the same amount out of one

18   spool onto the next.

19              So if we can go to the next slide.

20              What I'm showing here is that if we have

21   different diameter spools, which we will have other than

22   at one point in the middle of a roll of ribbon, we need

23   a different number of steps to effect the same length of

24   ribbon, and when we are feeding that ribbon, for

25   example, here we've chosen ten millimeters, for a small

1   diameter roll we will need 200 steps.  For a larger

2   diameter roll we will only need 70 steps.  But to keep

3   the ribbon in sync, not only do we need to change the

4   number of steps, but we also need to ensure that the

5   step break is such that they stay in sync so that even

6   though we are doing 200 steps on one, 70 steps in the

7   other, we are doing that in the same time.  So just to

8   feed ribbon we are talking about 200 steps in whatever

9   time, say one second for the small roll and 70 steps in

10  that one second, and that isn't a good time period, but

11  it's a time period for the other one, and they start and

12  they stop at the same time so that they are feeding and

13  taking up exactly the same amount of ribbon as they go

14  through.  So that I think addresses stepper motor

15  operation.

16         Now, to make sure that we can do that, we need

17  to basically maintain a measure of the diameter which in

18  our industry job it is called the RSR, Ribbon Step

19  Ratio.  So we maintain a figure that's mapped between

20  the number of steps and distance of tape fed so that we

21  are always getting the right amount of ribbon fed.

22  However, that being said, it's a very nice theoretical

23  model, but we are dealing with real world things, and I

24  think you folks saw from the first video it's an

25  industrial environment.  The rolls are not always

1    treated as well as they should be.

2              THE COURT:  What is the source of the

3    variability?  Is it the product quality is different and

4    so it stretches not in a uniform way?

5              MR. LANDERS:  There are a multitude of

6    variations.  The first thing is that the take-up spool

7    itself is taking up ribbon that's been printed on.  So

8    there is a variability there.  The rolls as supplied are

9    not always symmetrical.  There may be some eccentricity

10   in it.  But much as we always say in our manuals not to

11   do it when the ribbon breaks because they've had a

12   problem on the line, the quickest way for an industrial

13   operator on these lines to join the tape is to tie a

14   knot in it, and as you can well imagine, that does not

15   give you a very even wind on the ribbon.

16             THE COURT:  What do the instructions say?

17   Throw out the spool?

18             MR. LANDERS:  Do not tie a knot in the ribbon.

19   These are industrial people, and the fact that we put it

20   in our manual means we know full well that that's the

21   temptation for everyone to do and my engineers do it all

22   the time.

23             THE COURT:  Is there a way to deal with the

24   problem other than to just pull the spool off and

25   discard it and put a new one on, an acceptable way to

1   deal with it?

2          MR. LANDERS:  That isn't considered acceptable

3   because it's too expensive.  Use of tape for packaging

4   is frowned upon.  But that isn't the only disturbing

5   find.  There are reasons that we just don't get it

6   right, and that being the crudest.  So we need

7   to --

8          THE COURT:  So you can't just run this by

9   measuring how much tape goes through and using a formula

10  to figure out exactly how many steps you need to have to

11  compensate for the different radiuses of the spools?

12         MR. LANDERS:  That's correct.  That's exactly

13  the message I'm trying to get across is that there are

14  things in the real world that disturb that mathematical

15  nicety.

16         So, typically, systems that work in this way

17  have to correct for these inaccuracies, and typically

18  these inaccuracies are identified by a change in the

19  tension of the tape or the ribbon.  So that if you have

20  the wrong amount of ribbon fed from one taken up by the

21  other, it will increase or decrease the tension in the

22  ribbon.  So that's how typically systems would see the

23  errors in the tape.

24         So we've -- I've put the machines down but

25  pick up 18 Series again.  I pointed out the tension

1  sensor.  Now this probably puts it into context.  You

2  can see if we increase the tension, you have a physical

3  effect on the machine that can detect that error in

4  feeding the tape.

5          THE COURT:  Let me ask you this.  You've

6  identified one circumstance in which the tension may

7  vary, and what you are really telling me is that when

8  the radius in the take-up spool differs from what would

9  be ideal for a variety of reasons, the tension will

10 differ.

11         MR. LANDERS:  Correct.

12         THE COURT:  So why not just measure the radius

13 of the take-up spool periodically and mathematically

14 derive a measurement of tension that should be there and

15 make the corresponding adjustment as to how much tape

16 needs to be added or subtracted?

17         MR. LANDERS:  As you can see, the thickness of

18 the ribbon is very thin; so you would need to measure to

19 quite a high degree of accuracy.

20         THE COURT:  Well, for example, there was

21 discussion about an optical scan, something like that.

22 You could use something like that, couldn't you, to very

23 precisely measure the radius of the take-up spool?

24         MR. LANDERS:  Not to the degree of precision

25 that just one little bit -- one thickness of tape would

19

1   make a difference.  The tape is about eight micron

2   thick, the normal tape.

3           THE COURT:  Depends on what your acceptable

4   limits of tension are.  If you're saying that they're

5   very small, then your point makes sense.  If the

6   acceptable limits of tension are not very small, they

7   are quite wide, then a gross measurement of radius may

8   be sufficient.

9           MR. LANDERS:  The acceptable level of tension

10  is quite wide, but we -- the chosen method has been to

11  look at tension because that's an easier measurement

12  than, for example, the optical.

13          THE COURT:  How does your tension sensor

14  actually work?  Tell me about how does it actually sense

15  tension?

16          MR. LANDERS:  It looks at the force applied to

17  a mechanical roller and measures how that force -- what

18  that force is.

19          THE COURT:  Excuse my ignorance on this.  I

20  think of tension as a reactive force, and if you are

21  then trying to measure it, I'm trying to think of how

22  that sensor you have on there actually measures that

23  reactive force.

24          MR. LANDERS:  It just senses the displacement

25  of the -- in the case of the 18 Series, which is the

1    most graphic, the dancing arm around its pivot.

2         THE COURT:  How far it moves can be equated

3    with a measure of tension that's on the tape?

4         MR. LANDERS:  Exactly, yes.  And on the

5    SmartDate 5 there is a piece of electric force sensor

6    which moves by a smaller amount but still moves, and

7    that movement is measured by the sensor.  So it's a

8    force against a spring and the displacement.

9         THE COURT:  Some kind of a formula when there

10   is that kind of displacement that that is the measure of

11   tension.

12        MR. LANDERS:  Exactly.  Okay.  So I think what

13   I would like to now do is to move on to just go through

14   this tension correction system and I will start with the

15   original SmartDate 5 which does it different from the

16   current SmartDate 5 and the 18 Series.

17        Now, I think you had seen from the videos that

18   the printer stops while it's waiting for the next bag to

19   be in the right position.  So there is a period when we

20   are not printing, we are not winding ribbon; so that the

21   ribbon system is stationary.  At that point on both the

22   -- all the SmartDate 5 and the 18 Series we measure the

23   tension in the ribbon with the sensor we've discussed.

24   Now, we now have a tension in the ribbon.  We compare

25   that with the target tension and generate a tension

21

1    error value.

2            If I can have the next slide.  Now, this is

3    on -- the initial version of the SmartDate 5 is then

4    compared with a dead band, historicist band to say do we

5    need to make any corrections to the tension.

6            THE COURT:  Can I ask you an unrelated

7    question?  I'm trying to make sure I understand stepper

8    motors, which I had no familiarity with before this

9    case.  If you had the stepper motor going, but you're in

10   one of these stopped modes where tape isn't moving, and

11   I were to try to take my hand and turn the spindle,

12   could I turn the spindle on the stepper motor?

13           MR. LANDERS:  No.

14           THE COURT:  And why can't I?

15           MR. LANDERS:  Because there is still a force

16   to hold the spindle in place.

17           THE COURT:  If we remove the power from the

18   stepper motor and I attempt to turn the spindle, could I

19   turn the spindle?

20           MR. LANDERS:  Yes, there is a residual

21   magnetic, what's called the D10 force; so because of the

22   magnetic nature of the motor, you will feel each step

23   but you would be able to on a normal stepper motor

24   overcome that force.

25           THE COURT:  I would or wouldn't?

1          MR. LANDERS:  You would.

2          THE COURT:  I would.

3          MR. LANDERS:  But with power applied it is

4    held in that position.

5          THE COURT:  So energizing the motor has the

6    effect of applying some kind of resistance to the

7    spindle so I couldn't turn it easily?

8          MR. LANDERS:  It holds the spindle in place up

9    to a certain force.  And with the step motors on these

10   printers, if you have a full roll of ribbon, you can

11   overcome that, but to all intents and purposes it is

12   held stationary.

13         THE COURT:  And if that were not true, what

14   would happen to the tension on the tape between the

15   movements of the stepper motor?

16         MR. LANDERS:  It would relax to zero force.

17   As I said, there is a residual magnetic --

18         THE COURT:  So that the capacity of the

19   stepper motor to maintain that resistance is vital to

20   keeping the tension on the tape at a predetermined

21   level.  Even if it's not stepping, that it's standing

22   still, it's required to maintain a particular tension

23   level.

24         MR. LANDERS:  It's required to hold the

25   tension to the level it was set before, yes.  Once you

1    stop the motor, the tension is held.

2         THE COURT:  If you pulled the plug on the

3    thing and then tried to measure the tension at that

4    point, it would be only whatever that magnetic force

5    that you talked about, the residual magnetic force.

6         MR. LANDERS:  To all intents and purposes,

7    slack.

8         THE COURT:  Okay.  Sorry.  Go ahead.

9         MR. LANDERS:  So we've measured the tension

10   while the printer is not active and created this error

11   signal, and we've compared it with the historicist band

12   and said if it's within this particular band, we will

13   not bother to make a correction because the tension's

14   okay.  If it's outside that band, we will make a

15   correction.  We'll make that correction by just feeding

16   the tension error into an algorithm, a control algorithm

17   and calculate that we need to correct tension.

18        THE COURT:  And it's through some combination

19   of steps on both motors that you would make a tension

20   adjustment?

21        MR. LANDERS:  Just simulate that, yeah.  So we

22   make that calculation that we need to adjust the

23   tension.  If you could go back one slide.

24        So for example, if we use this scenario, the

25   determination of the algorithm would be -- for example,

1  we have a tension error and then we wish to add four

2  steps to the stepping motor that's got the small

3  diameter.  So we would want to move the small diameter

4  motor by 204 steps and maintain the motion of the larger

5  diameter of the 17 steps.

6          The way that this system is set up, we made

7  that correction on one motor and both motors will move

8  to move the tape to the fresh ribbon position.  One

9  motor will stop and the motor with the added steps will

10  continue to feed in the correction.

11          THE COURT:  All right.

12          MR. LANDERS:  So again, on the early version

13  of the SmartDate 5, the original version, the

14  calculation of the number of steps takes account of the

15  radius of the spool so that we -- no matter what the

16  state of use of the ribbon roll, we would endeavor to

17  feed the same length of tape for a given tension error

18  signal.  So that calculation uses the known or estimated

19  radius of the ribbon spools to make that calculation.

20  So really, that describes the tension control for the

21  original version of the SmartDate 5.

22          Now for the current version of the SmartDate 5

23  there are two very specific differences.  The first

24  difference is that there is no green band.  If we could

25  go to that graphic.  There is no do nothing zone.

1    Whatever the tension error is, we will do the

2    calculation, and in the very rare occasion that the

3    tension is actually exactly right, the calculation will

4    come up as zero steps, but the normal mode is that we

5    always calculate some steps to correct the tension.

6            The second difference, and if we could go back

7    two slides please, we do not take account of the

8    diameter of the ribbon.  We just calculate a number of

9    steps.  So for a given error in tension, we will have

10   for a nearly empty spool one length of tape fed, but for

11   the same tension error, the correction with the larger

12   spool would be anything up to three times the size of

13   that correction.  So those are the two key differences,

14   no green band, no dead zone, and tension correction is

15   not modified for the diameter of the ribbon spools.

16           THE COURT:  In the original version it's not

17   and in the newer version it is?

18           MR. LANDERS:  In the original version we take

19   account of diameter and it has a dead band.  In the new

20   version it has no dead band, no historicist band, and no

21   account is taken on --

22           THE COURT:  Why don't you account for the

23   diameter of the spool in the new version?

24           MR. LANDERS:  It was an unnecessary

25   complication.  The accuracy is -- of the whole system is

1    such that it didn't make the system any better.  So we

2    took it out.

3              THE COURT:  All right.  Theoretically, you

4    would think it would make it better?

5              MR. LANDERS:  Yes, but as we discussed

6    earlier, there are a number of disturbing factors.  It's

7    an unideal system.  So the control system isn't that

8    accurate and therefore this was, you know, like the

9    classic school boy error of adding all those significant

10   digits to the mathematical equation when they aren't

11   really applicable.  They're not significant.  So it just

12   didn't help; so we took it out.

13             Of the 18 Series we never had a dead band, and

14   that was one of the prompting to take it out of the

15   SmartDate 5.  People who generated the control algorithm

16   did not put that in and it wasn't necessary.  However,

17   we do correct for the radius of the ribbon on the 18

18   Series.

19             So I think that really sort of gives you what

20   I wanted to present.  Can I answer any questions for

21   you?

22             THE COURT:  Some things may come up but not at

23   the moment.  I'd rather take my -- initially address my

24   more pointed questions to counsel and then you can fill

25   in.

1          MR. LANDERS:  Thank you.  I'm very grateful

2     for that.

3          THE COURT:  Do you want to have your expert --

4     do you have more to present by way of this tutorial, or

5     do you want the other side to present now?

6          MR. GLITZENSTEIN:  The latter, your Honor.  We

7     don't have anything additional on the tutorial.

8          THE COURT:  Do you want to have your expert

9     say something in addition to what's been said?

10         MR. JAKES:  Yes, your Honor, if we could,

11    please.  Professor Roman Kuc is here.  Professor Kuc may

12    be more comfortable up on the witness stand.

13         THE COURT:  That's fine.  Yeah, whatever.

14         (Professor Kuc took the stand, not sworn.)

15         MR. JAKES:  We are not going to do this

16    strictly as a Q and A, but I have a few prompts to get

17    Professor Kuc going.  Professor Kuc, could you introduce

18    yourself to the Court.

19         PROFESSOR KUC:  Good morning, Your Honor.  I'm

20    Roman Kuc.  I'm a Professor of Electrical Engineering at

21    Yale University.  I'm also the Director of the

22    Intelligent Sensors Laboratory, and I'm also the

23    Associate Dean of Engineering Education and Engineering.

24         So my background in stepper motors is that

25    I've done -- I've taught courses in how to design robots

1    with stepper motors, mobile robots where position is

2    very important, robot arms where positioning is very

3    important.  I teach courses at different levels.  I

4    teach courses to non-science majors on how technology

5    works, how information is stored digitally.  I teach

6    courses on how to use micro-controllers to control

7    robots and actually motors, read data from sensors.  I

8    teach senior projects where electrical engineers use

9    stepper motors to control robot arms, do particular

10   tasks, and I also do -- advise senior students on

11   theoretical topics as well.

12          My background is I have a Bachelor of Science

13   in Electrical Engineering from Illinois Institute of

14   Technology.  After finishing that degree, I joined Bell

15   Laboratories, and then after Bell Laboratories I went to

16   finish my degree at Columbia University for Ph.D. and

17   then came to Yale where I've been for about 30 years.

18          One of my first projects at Bell Laboratories

19   was to design a tape drive system, magnetic tape system

20   to store data, and that tape system encapsulated very

21   fast manipulation of the tape, speeding it up, slowing

22   it down, positioning it so you could read the data

23   reliably.

24          Prior to that, during high school, I also

25   repaired typewriters, and one brand of typewriter used

29

```
1    tape film very similar to the one that's used in these
2    transfer printers, but they transferred the type by
3    impact.  But they also had a supply reel and a system
4    that drove the tape from the supply to a take-up reel,
5    and then the take-up reel that took up the used tape.
6              And so I'm familiar with the problems of not
7    advancing the tape sufficiently so that when you type
8    you don't get a full print to advancing it too far to
9    being wasteful for the ribbon.  So I'm familiar with the
10   electrical, mechanical aspects of the devices, and the
11   operation of the devices.
12             MR. JAKES:  Your Honor, we have Professor
13   Kuc's CV.  If I can hand that up to you?
14             THE COURT:  I tend to be more influenced by
15   whether what people say makes sense to me than what
16   their background is, but I will take it.
17             MR. JAKES:  I understand.  Professor Kuc,
18   could you give us a little bit of background on thermal
19   transfer printers?  We've heard a little bit already.
20             PROFESSOR KUC:  Okay.  So here we have a
21   thermal printer set up in a packaging facility.  We see
22   the wrappers that are passing through.  Here's the
23   printer that prints the information on it.  These things
24   work 24/7.  If the printer goes down, the packaging
25   stops.  So it's important to have high reliability, and
```

1  we have a bunch of different types of environments this

2  can work in.  So it has to be a good design to work in a

3  variety of adverse environments.

4         Here we see the -- here's a close-up of a

5  printer.  This is the Videojet DataFlex Plus that is

6  manufactured by Zipher, and so here we see the wrappers

7  going past this printer.  The ribbon is one use.

8  There's a print head.  Rather than a typewriter where

9  you impact it, the print head has a series of small

10  heating elements.  As the element is heated up and put

11  in contact with the ribbon, the ink comes off the ribbon

12  and onto the substrate, which could be a packing

13  material or a label.

14         So here is sort of a schematic of this device

15  in operation.  We see a label here that has nothing in

16  it.  It goes into the printer, and then we have maybe a

17  bar code or some date or expiration date information on

18  it.  So again, it's a one-time use ribbon, and there's a

19  thermal transfer of the print onto this device and

20  that's what this device does is it prints these things,

21  prints this information onto these labels.

22         MR. JAKES:  Professor, could you tell us about

23  the two different modes of operation.

24         PROFESSOR KUC:  Sure.  There are two main

25  modes of operation of these devices in the industry.

1    The first is the intermittent printing, and so here we

2    see the bags.  They  move up along this direction

3    possibly and it stops.  And during the time when the

4    wrapper stops, the ribbon is in a fresh position

5    printing.  It's held stationary by the stepper motors

6    and then the print head moves in contact with the ribbon

7    with the heating elements causing the dots of printing

8    to be put on the labels and then the head retracts.  The

9    substrate moves and the ribbon moves to put a fresh

10   section of ribbon under the print head for the next

11   print cycle.

12           MR. JAKES:  This is a video.

13           PROFESSOR KUC:  Oh, yes, so let's show the

14   video here.  And so we see this operation.  Now, during

15   this time since the substrate is moving, it's important

16   for the substrate to hold the ribbon so it doesn't move

17   as the head moves across the ribbon.

18           MR. JAKES:  And the other mode of operation?

19           PROFESSOR KUC:  The other mode is continuous

20   operation where the substrate, the labels move

21   continuously.  And so what happens in that case -- so

22   you have the label moving.  The ribbon has to be

23   accelerated to move along with the substrate.  And then

24   you have this print head, and the system calculates when

25   the box or location of the printing label has to occur,

1   actually is under the printer.  The printer head comes

2   down then, just comes down and doesn't move, and the

3   tape and the substrate move along with it and then it

4   lifts up.

5           Now while the substrate keeps on moving, the

6   ribbon now has to back up and then it gets in -- it sort

7   of slows down first, and then because of the time it

8   takes to slow up, some fresh ribbon has gone past it,

9   the printer moves that ribbon backwards and puts it in a

10  position where you have fresh ribbon under the print

11  head of the next print cycle.

12          THE COURT:  Why do people do intermittent

13  printing if you can develop machinery that will work the

14  continuous printing effectively?  Is it any more

15  efficient to do continuous printing?

16          PROFESSOR KUC:  So with intermittent, you see

17  it's on the order of two times per second where these go

18  eight times per second.  So you are right, your Honor,

19  this is a more efficient way of doing it, but in some

20  cases the packing process causes the thing to stop and

21  so you might as well use that occasion to print on

22  stationary substrate.

23          THE COURT:  So the tape is in continuous

24  printing, the tape is moving back and forth?

25          PROFESSOR KUC:  Yeah, it's moving around all

33

1    over the place, because otherwise it would be wasted.

2              THE COURT:  We'd have a lot of dead space

3    where it isn't used?

4              PROFESSOR KUC:  That's right.  That's right.

5    Correct.

6              THE COURT:  Go ahead.

7              PROFESSOR KUC:  This next slide gives you an

8    indication of what's happening inside the tape drive.

9    You have a supply reel that contains a fresh ribbon

10   that's mounted in there.  It goes past some rollers,

11   past the print head, and then onto a take-up spool here,

12   and a take-up spool is usually controlled by some sort

13   of a motor.  It could be a DC motor, it could be a

14   stepper motor, but that provides the -- it provides the

15   torque.

16             THE COURT:  What are the advantages and

17   disadvantages of a DC motor versus a stepper motor in

18   this kind of machine?

19             PROFESSOR KUC:  A DC motor fundamentally works

20   differently than a stepper motor.  A stepper motor gives

21   you positioning, but it gives you sort of discreet steps

22   in positioning.  A DC motor is really a velocity device.

23   You put a battery across a DC motor like in a fan and it

24   turns.  The idea here is when you have intermittent

25   printing, you want to hold that printer -- the tape

1    steady and when you want to -- in continuous printing

2    when you do the accelerations, the step motor does that

3    as well with these high accelerations.  So it's really a

4    cost trade-off.  These motors are not that expensive and

5    it offers a good way of designing these systems.

6              So the tape drive has to do two different

7    functions.  The first is the tape transport and the

8    other one is a tension control.  So for the tape

9    transport, the tape drive has to position -- the tape

10   drive has to position the fresh ribbon under the print

11   head for print operation.

12             Now, in order to do that, it's got to -- in

13   some cases it's got to accelerate it up to the substrate

14   speed.  Then it has to hold it steady in some cases for

15   the printing operation.  It's got to decelerate it.

16   It's got to move this ribbon all around so that you get

17   the ribbon in the right place for printing.

18             THE COURT:  Earlier devices that used slipping

19   clutches, how did they work?

20             PROFESSOR KUC:  I will explain that shortly.

21   The tension control as was mentioned earlier is that you

22   need to maintain the correct tension.  If the tension is

23   too big, it stretches or in some cases it breaks.  That

24   brings down the whole line, and then you have to go

25   repair it.  If it's too loose, the print quality

1    decreases.  Sometimes the tape gets jammed in the

2    mechanism and also brings the system down.  So

3    maintaining the tape tension is a major concern in this

4    printer.

5         So you mentioned -- let's look at a drag

6    clutch system.  In that system you have basically one

7    motor, either a DC or a stepper motor and that is

8    driven.  It drives the take-up reel to take up the used

9    ribbon.  In the meantime, the supply reel is attached to

10   a device that provides a little friction to prevent it

11   from free rolling and that's a clutch.  It could be some

12   sort of material like a brake or a felt that keeps the

13   ribbon from free rolling.

14        Now, what happens is any time you have a

15   material that sort of moves against each other, there's

16   wear and there needs to be some sort of a periodic

17   adjustment.  You start out with a fresh one, just like

18   fresh brakes, and after awhile they wear down.  But what

19   happens in the tension control, that -- see, this

20   operation does tape transport and tension together in

21   one operation and so the tension control is not as well

22   controlled in here.

23        Further, because the clutch gives you only a

24   particular type of resistance, think of a screwdriver,

25   if you think of screwing a screw, the screwdriver -- if

1    you have a screwdriver with a big handle, it's easier to

2    screw in than with the little screwdriver.  It's tough.

3    So what happens is that the same with the tension,

4    varies when you have the same type of clutch with the

5    same resistance.  This is not a very good system.  It

6    served the purpose, but things could be done better, as

7    we'll see.

8            MR. JAKES:  Your Honor, may I approach?  I

9    have a SmartDate 3 printer that has a dry clutch system

10    in it.  I don't want to scratch up the bench, so I will

11    leave it right there.

12            PROFESSOR KUC:  So this is a -- if I can show

13    this to you.

14            THE COURT:  Yeah, go ahead.

15            PROFESSOR KUC:  This is a SmartDate 3 version

16    by Markem.  And so here you see that there is a cassette

17    that contains the tape.  Here we have a take-up reel.

18    Now, you will see inside the printer there is this

19    little slot.  That's where the motor is.  And if you

20    want to turn that a little bit, you can tell that's a

21    stepper motor because that residual -- there's like

22    little steps in there.  We'll talk about that more

23    shortly.

24            Now that motor engages this.  This is the

25    take-up reel.  Now that reel goes past here.  Now, in

1    these devices you want fast acceleration.  Now, as I

2    said before, this is the clutch here.  There's no motor

3    connected to it.  It's a mechanical clutch.  You're not

4    going to get fast accelerations here.  What they have

5    done here is put this shuttle in here.  You see when

6    this shuttle moves, the print head is here.  The tape

7    moves very quickly and easy without actual movement of

8    the motor.  So this is how they got around the --

9    enabling the fast movement of the tape.  You can see

10   this tape is very thin and delicate.  But the problem is

11   you have a mechanical system, and mechanical systems are

12   prone to failure and there tends to be maintenance

13   problems.  So this is a clutch system.

14           THE COURT:  Okay.

15           PROFESSOR KUC:  Now, let me answer a question

16   that you asked before about why don't we use an optical

17   sensor to determine the diameter.  Let's take a look at

18   a take-up reel.  You see it's not really ideal.  And so

19   the question is what is the diameter here?  It's

20   compliant a little bit.  It's got these up and down

21   variations.  So measuring it in a non-contact way are

22   going to give you diameter values that are accurate.

23           THE COURT:  Okay.  Good.

24           MR. JAKES:  You talked about the drag clutch

25   system.  I will come and get that from you.

1              PROFESSOR KUC:  So a variation of the drag

2      clutch system is the pull drag system.  So the

3      mechanical clutch has been replaced by a DC motor that's

4      energized to go in the other direction to provide this

5      respective force.  So notice what you have here.  You

6      have motors that turn in the same direction, in this

7      case counterclockwise, and this take-up motor is

8      energized in that direction, but this drag system, the

9      motor's actually energized in the opposite direction of

10     motion.  So here we have a similar system that has the

11     advantage that you don't have a mechanical clutch to

12     worry about, but it still has -- the disadvantages of

13     the old single motor systems in that tape transport is

14     not very efficient and tape acceleration is not what you

15     get, and if you don't have the tape acceleration, the

16     number of printings that you can make as you said in

17     continuous operation is actually reduced.

18             MR. JAKES:  Professor Kuc, could you tell us

19     about stepper motors.  Do you have an example of one up

20     there?

21             PROFESSOR KUC:  Yes, sir.  I built a little

22     demonstration to show you how a stepper motor works.

23     There's a stepper motor, similar to the type that's used

24     there.  It's a little bit smaller.  It has a hundred

25     steps per revolution.  The first thing you feel with

1    that is sort of that residual pulsation.  And most DC

2    motors typically have two wires.  This one has six and

3    you could have four, but there are many more wires into

4    the stepper motor to control it.

5           Now, your Honor, here I've built a little

6    system here.  So first, inside is a stepper motor of the

7    type I've shown you, and on the outside what I tried to

8    do is model a take-up reel or supply reel.

9           First of all, why don't you twist that reel

10   and you will see there's very little resistance to it.

11   So now let's turn the power on.  There is a switch

12   there.  So now it's been energized.  Now you can feel

13   the holding torque.  That motor's driven to be

14   stationary at that position.

15          Now, there's a button on there that gives you

16   single steps.  Every time you push the button down and

17   release it, that motor steps one step.  That's the idea

18   of the stepper motor.  It gives you only a set number of

19   steps that you have to work with, but those steps are

20   repeatable and you can stop it there.  And so now I have

21   a switch here that also gives you continuous operation,

22   and so these lights indicate the energy, how the coils

23   in the stepper motor are energized.  So now if you

24   continue that and now you switch the direction.  Now

25   just hold onto this tape here and you will see that with

1  each step you have a certain amount of ribbon that's put

2  out, and you can rewind it.  In other words, if you

3  release the tension a little bit, it becomes a little

4  bit of a problem that the tape sort of gets off the reel

5  and things like that.

6          So stepper motor is very ideal to this

7  application.  So the graphic shows that the stepper

8  motor is a digital version.  Digital systems have

9  discreet steps rather than continuous steps.  And so --

10          THE COURT:  What is it that causes it to move

11  in discreet steps?  Is it little bursts of power, is

12  that how that works?

13          PROFESSOR KUC:  So the way it works is you

14  have a bunch of magnets inside the -- on the thing that

15  rotates and you have other sets of magnetic poles that

16  can be energized by applying the currents respectively,

17  and so that's what those lights show is what combination

18  of coils are connected and it jumps from one to -- to --

19  to another.

20          MR. JAKES:  Okay.

21          PROFESSOR KUC:  So the advantage of this is

22  that when it's still, it's got a holding torque to keep

23  the ribbon in place.

24          Now, I think that it's important that a

25  stepper motor -- when you design with a stepper motor,

1  you think in terms of steps.  But for the ribbon

2  application you have to think in terms of lengths of

3  ribbon for this thing to operate.  You have to add a

4  length of ribbon or subtract a length of ribbon.

5          So it's important to note that the stepper

6  motor corresponds to a certain length of ribbon.  That's

7  the corresponding.  Just like with the tape, there's a

8  step.  You are going to get a certain amount of ribbon.

9          THE COURT:  But depending upon how big the

10  diameter is.

11          PROFESSOR KUC:  It depends upon the diameter,

12  yes.

13          MR. JAKES:  Professor Kuc, have you had a

14  chance to examine or look at any of the Markem printers

15  that are involved in this case.

16          PROFESSOR KUC:  Yes, I've looked at the

17  SmartDate 5, the SmartDate 5 Advanced, and the Series

18  18.  I've seen their instruction manuals.  I've seen the

19  device specifications for the SmartDate 5 and the Series

20  18 and I've seen the code that does the firm ware for

21  those three devices.

22          MR. JAKES:  If you can look at the SmartDate

23  5, for instance.

24          PROFESSOR KUC:  The SmartDate 5 -- we have

25  one.

1                MR. JAKES:  May I approach, your Honor?

2                THE COURT:  Yes.

3                PROFESSOR KUC:  Here's the SmartDate 5

4    printer, and then you remove the tape cassette.  Now, it

5    has two places where motors connect.  So we have two

6    two-stepper motors.  So what it does is it has a -- it

7    measures tension.  It takes the tension error and it

8    calculates a distance that needs to be added or

9    subtracted to maintain the tension.  From that distance

10   they calculate the number of steps that a motor has to

11   turn, either this one or this one.  And then depending

12   on whether tension has to be added or subtracted, they

13   energize that motor.  If tension has to be added, then

14   they add those steps to the take-up reel to increase the

15   tension.  If tension has to be reduced, they add those

16   steps to the supply reel to reduce the tension.  Those

17   added steps add or subtract.

18                THE COURT:  Do each of those stepper motors

19   step to the same amount, same degree?

20                PROFESSOR KUC:  Yes.  They use the same

21   stepper motor for both.  They do what's called

22   micro-stepping and gets 3,600 steps per revolution.  So

23   those are the steps that they have to work with.

24                So as I mentioned before, there is a

25   historicist.  As long as the tension is within the

43

1    particular band --

2              THE COURT:  You referenced measuring tension.

3    What do you want to say about how it measures tension?

4              PROFESSOR KUC:  So if I can go to the next

5    slide.

6              THE COURT:  Okay.

7              PROFESSOR KUC:  Now, if you look at the

8    Advance, so the Advance as mentioned before of the

9    SmartDate 5 is exactly the same hardware, just a

10    different firm ware.  So what they do -- so they have

11    these two stepper motors.  Now they measure the tension

12    error.  How do they do that?  They have this little

13    rocker arm or it was actually some sort of -- this

14    little device that moves.  So if you have -- it's at

15    some position, and as the tension increases, it pulls

16    this arm.  Now, there is a sensor in there that tells

17    you about the arm position.  Now that position is

18    measured by the micro-controller through a device called

19    an analog to digital converter.  It basically takes a

20    reading and it produces a value that corresponds to the

21    actual tension.

22              One of the problems is that these analog to

23    digital converters give you like the stepper motor

24    finite values.  The stepper motor gives you finite

25    steps.  The analog digital converter gives you finite

44

1    value.  So, for example, let's say this tension position

2    is 12.3.  The analog to digital converter is going to

3    give you a reading of 12.  So it's going to give you

4    digital values.  So there's a little bit of

5    approximation.  Sometimes when they talk about

6    estimating diameter, I don't know if there's even a good

7    measure of what the data really is in terms of what it

8    means for this.  But the thing works, and so they take

9    that tension error and here they calculate a number of

10   steps which is equal to some tape length, some sort of

11   tape length, and then they put the -- if the tension

12   needs to be increased, they add those steps to the

13   take-up reel when they need to increase the tension, and

14   to reduce the tension, they add those steps.

15            THE COURT:  They would do that in intermittent

16   printing, but in continuous printing, isn't it a more

17   complicated operation?

18            PROFESSOR KUC:  The potential is the same in

19   both.

20            THE COURT:  The way the stepper motor's used

21   would be different.

22            PROFESSOR KUC:  It's the same stepper motor.

23   The problem -- the thing is there is much more for these

24   stepper motors to do in the transport part, but the

25   tension part is basically the same.  But you're right,

45

 1    since with the intermittent printing --

 2         THE COURT:  They might just take it up to

 3    reduce tension, take it up fewer steps than they would

 4    otherwise take it up.

 5         PROFESSOR KUC:  Um-hum, because there are

 6    different requirements on the head.  So those increased

 7    number of steps in these motors corresponds to adding or

 8    subtracting a length of ribbon to the ribbon between the

 9    reel.

10         MR. JAKES:  And finally, I think we have the

11    18 Series or the S18.

12         PROFESSOR KUC:  I don't have a series of 18 up

13    here, but you saw where it had two stepping motors.  It

14    had a rocking arm, and the same sort of thing, when the

15    arm would bend -- it's basically a spring.  If you have

16    a lot of tension, you draw the spring further.  If it's

17    a little spring, it doesn't draw the spring down as

18    much, and you are looking at the position where the

19    spring attaches and so that's where they get their

20    tension measurement.  They calculate the tension error.

21    They calculate a length of tape to be added or

22    subtracted from the distance from the tape between the

23    reels.  They then calculate the number of steps that a

24    motor has to turn.

25         THE COURT:  In doing that calculation though,

1    they don't try to take account of what the diameter is

2    of the spool?

3         PROFESSOR KUC:  In the 18 they do.  In the

4    SmartDate 5 Advance they don't.  And the way -- the

5    way -- I think what they are doing is just like their

6    expert witness said, you've got a certain number of

7    steps that, let's say, go four millimeters.  They said

8    you have 200 steps to do that.

9         When he talked about tension adjustment, he

10   said you only have to adjust four steps.  So the point

11   is tension adjustment is a small thing.  What they did,

12   they just didn't take the error.  They took the error

13   and divided by four.  Why did they divide by four?  What

14   that gave them is an average length of tape that would

15   work, and that tape could work on either spool.  So the

16   spool diameters vary, according to Mr. Landers, to a

17   factor of three.  So let's say it goes from five

18   millimeters to 15 millimeters, there would be a

19   difference.  If you set it at ten millimeters, you are

20   only about five millimeters off.  So the fractional

21   amount is not that significant.  The important thing is

22   you are putting a length of tape that is related to the

23   tension error.

24        MR. JAKES:  Thank you, Professor Kuc.  I think

25   that's it.

1          THE COURT:  Thank you.  If you can stay around

2   and probably there will be some questions for you.

3          All right.  I need to give my reporter a

4   break.  How long do you anticipate argument will be on

5   this?

6          MR. GLITZENSTEIN:  From our perspective, your

7   Honor, I think probably anywhere from 45 minutes to an

8   hour depending on the questions you might have.

9          THE COURT:  So we might be able to take --

10          MR. JAKES:  45 minutes.

11          THE COURT:  So maybe we'll be able to finish

12   up by lunchtime if we get back.  All right.  Well, let's

13   take a short break and we'll come back and have

14   argument.

15          (Recess taken.)

16          THE COURT:  All right.  We'll go ahead with

17   argument.  I'd like to work off one claim -- one term at

18   a time; so why don't we start -- in this case we'll do

19   drive and drivable.  Let's hear what you have to say

20   about it and then I will hear what the other side has to

21   say on it.

22          MR. GLITZENSTEIN:  Yes, your Honor.

23          THE COURT:  Why does drive and drivable matter

24   in this case?

25          MR. GLITZENSTEIN:  Drive and drivable matter,

48

```
 1    your Honor, for one reason in particular, and that is,

 2    that the final element of the claim which begins with

 3    the -- we've got the claim there on the easel -- which

 4    begins with the language "said controller," when you get

 5    down to the end, the claim says very specifically that

 6    the controller after it does this calculation has to

 7    control the motors to drive the spools.  You add or

 8    subtract the calculated length of tape to or from the

 9    tape extending between said spools.

10             So what the claim requires, your Honor, is

11    that the particular length correction that was

12    calculated previously in that same element be added to

13    or subtracted by virtue of controlling the motors to

14    drive the spools.

15             THE COURT:  There is no question in the

16    products that were shown to me that -- your argument is

17    what do you say drive means?

18             MR. GLITZENSTEIN:  Drive means rotate, your

19    Honor.

20             THE COURT:  You're saying your product doesn't

21    rotate?

22             MR. GLITZENSTEIN:  In order to affect a given

23    tension adjustment, when the system determines that

24    there is an error and it runs through this algorithm

25    that Dr. Landers explained and comes up with a number,
```

1   that number is then translated in different ways for

2   different products.  If that number is translated into a

3   different number of steps -- I'm sorry, is translated

4   into a number of steps and that number of correction

5   steps is applied to only one of the two motors.  So one

6   of the two motors is rotated to try to get the tension

7   back to where you want it to be.  We don't dispute that,

8   your Honor.

9           The issue comes down to the fact that the

10  claim very clearly requires that both be rotated.  Not

11  only does the claim make that clear, your Honor, by use

12  of the word plural.  It says drive the motors, but, in

13  fact, this was a key point during prosecution and they

14  conceded that, yes, indeed, you've got to drive motors.

15  You've got to rotate the motors, both motors, in order

16  to accomplish this tension correction.

17          And that's why this is a central issue in the

18  case, and it cuts across all three of the accused

19  products in this case, which are the early version of

20  the SmartDate 5, the current version of the SmartDate 5,

21  and the 18 Series.

22          THE COURT:  So you agree that one of the

23  spools is rotated in all of your products for the

24  purpose of adding or subtracting the calculated length

25  of tape.  You say that your product doesn't involve

1    rotation of both spools to achieve that end and,

2    therefore, if your definition is adopted rather than

3    their broader definition, you don't infringe.

4              MR. GLITZENSTEIN:  That's correct, your Honor.

5              THE COURT:  Isn't it true though that your

6    product, particularly with respect to continuous

7    printing, does rotate both spools to add or subtract the

8    calculated length of tape?  You've got -- both spools

9    are being rotated a certain number of steps, and the net

10   effect of that is both to make the necessary advancement

11   of the tape to achieve efficient printing and to make

12   the necessary tension adjustment.

13             MR. GLITZENSTEIN:  In the continuous and the

14   intermittent print cycles, there are -- the movement of

15   the tape is sort of separated from the correction of the

16   tension measurement as it was explained this morning.

17   So in both continuous and intermittent, the way the

18   software algorithm works is it first says I want to move

19   the tape a certain distance.  How many steps does it

20   take for that to happen?  Then there's a separate piece

21   of the algorithm that calculates this number of steps,

22   and in the intermittent mode it will add the correction

23   number of steps to one of the two motors.  If the

24   tension is too high, it adds it to one motor.  If the

25   tension is too low, it adds it to the other motor.  The

1  same thing holds true for the continuous.  The only

2  difference is --

3            THE COURT:  In all cases, intermittent or

4  continuous, both spools are, in effect, being rotated a

5  certain number of steps to achieve the efficient

6  printing and tension adjustment simultaneously.  Your

7  point is that the tension adjustment -- even though the

8  two things occur simultaneously, the tension adjustment

9  is only made to the one spool, not to the other.

10           MR. GLITZENSTEIN:  They actually don't occur

11  simultaneously with regard to the tension adjustment.  I

12  think that's maybe the best way --

13           THE COURT:  I'm not understanding what I just

14  had presented to me.  I was under the impression that

15  whenever the next movement of the tape, when there's a

16  tension adjustment required, the next movement for

17  printing purposes, that the tension adjustment just gets

18  built into it and you just add and subtract a certain

19  number of steps on both, at the same time advance the

20  tape to where it needs to be to affect the printing, and

21  make the tension adjustment.  Are you saying that

22  doesn't happen?

23           MR. GLITZENSTEIN:  What I'm saying is the time

24  period over which that occurs is not simultaneous in the

25  following sense, your Honor.  Let me sort of contrast

1   with what happens if there's no tension correction at

2   all because I think that's probably an easier baseline

3   for me to work from.  In that situation, both motors

4   start at the -- at the same time; both motors stop at

5   the same time.  If there is an adjustment to the steps

6   in order to affect the tension change, one of the two

7   motors continues to rotate after the second motor stops.

8            THE COURT:  That's almost semantical, but I

9   understand your point.  If you were trying to measure

10  the time, the amount of rotation, the number of steps

11  required to advance the tape to a point where printing

12  can occur without a tension problem would be identical

13  on each motor; right?  So assuming there were no tension

14  problem required, you'd advance -- the tension was

15  perfect, you'd advance 30 steps on each motor, right, to

16  get to the next printing file?

17           MR. GLITZENSTEIN:  It could be a different

18  number of steps.

19           THE COURT:  Or 50 steps or 100, but each one

20  would be the same.

21           MR. GLITZENSTEIN:  When you say each one, do

22  you mean each step?

23           THE COURT:  Each motor would be advanced the

24  same number of steps.

25           MR. GLITZENSTEIN:  No, your Honor.  Sorry,

1    that's not right.

2            THE COURT:  Even when the tension is right?

3            MR. GLITZENSTEIN:  That's correct, your Honor.

4    What I mean is --

5            THE COURT:  I'm completely lost then.

6            MR. GLITZENSTEIN:  Let me try to back up

7    because I probably got you down the wrong path here.

8    Let's again start from the situation --

9            THE COURT:  No tension adjustment, you've got

10   to move the tape to get a new spot to a clean print to

11   print.

12           MR. GLITZENSTEIN:  So the number of steps that

13   you move is determined by the size of the reel, and it

14   can vary quite a bit.  So just by way of example, to

15   pick up on Dr. Lander's point --

16           THE COURT:  Now I'm with you.  All right.  So

17   that may be -- because the diameter -- we talked about

18   that -- the diameter is different, you may need a

19   different number of steps without a tension problem.

20   And your point is in a situation where there's no

21   tension problem, there may be 70 on the supply and 30 on

22   the take-up and so those would be affected.  And then if

23   there's a tension problem after that occurs or before

24   you can arbitrarily assign it an X number of steps that

25   are going to occur to adjust tension and those are

1   occurring only at one time on one of the motors and one

2   of the spools and it's not occurring at the other.  So

3   although the operation is part of one continuous

4   operation, there is some temporal difference between

5   them.  Is that your point?

6          But it's all part of one operation.  Each time

7   they do it, they calculate it and make that set of steps

8   that's required both to adjust the tension and advance

9   the tape appropriately.

10          MR. GLITZENSTEIN:  And that's right.  Your

11   Honor, the way you just phrased it is exactly right.

12   The claim breaks down the movement of the tape in order

13   to get the fresh ribbon on there as really a separate

14   component of the invention from --

15          THE COURT:  I think that's almost semantical.

16   I don't need to decide that now.  You've convinced me

17   that the term drive can matter depending upon whether I

18   adopt your interpretation, because if I adopt Zipher's

19   interpretation, it doesn't matter.  The point you are

20   making doesn't matter because under their interpretation

21   you drive if you control the tape spools, and you

22   control both spools when you are effecting a tension

23   adjustment.  You are controlling it by energizing it.

24   Even if I accept your analysis of what's actually

25   happening, you would have to concede that there is

1    control of both tape spools to affect the tension

2    adjustment.

3          MR. GLITZENSTEIN:  Your Honor, we don't

4    dispute that broad concept there.

5          THE COURT:  So you've convinced me of the

6    basic point.  I should pay attention to your

7    disagreement about this matter.  Now convince me that

8    your interpretation is right.

9          MR. GLITZENSTEIN:  With regard to drive, your

10   Honor, on the claim construction issue of whether we're

11   right or whether they're right, I think that's the

12   issue.  Is it narrow, meaning rotate?  Is it broad being

13   any type of control, even the type of control that holds

14   steady?  Because as Dr. Landers said, and we don't

15   disagree, when we are adjusting that tension at the end,

16   one motor continues to rotate, we do control the other

17   one and hold it steady.  That's the way the system works

18   in both continuous and intermittent.

19         Your Honor, with regard to the term "drive"

20   specifically, there are -- first off, I just want to put

21   the term in context.  The term actually appears quite a

22   number of places throughout the claim.  That's important

23   for purposes of claim construction.  It appears in three

24   places in the claim and, frankly, the majority of the

25   elements.  That's important because the construction of

1    this term turns on really two very simple and very

2    fundamental common sense rules of claim construction.

3            First one is that you can't say one thing

4    about what the claim means during prosecution and then

5    say a different thing litigating.  The second thing,

6    very important for purposes of drive and should really

7    just simplify this issue considerably, is that the same

8    claim term when it's found in different places

9    throughout the claim should be given the same meaning.

10    It's a very important principle.  That's reflected --

11    your Honor, we've cited the Rexnord decision.

12            THE COURT:  I do enough patent work and I know

13    the principles.

14            MR. GLITZENSTEIN:  Your Honor, I underscore

15    that because of what we submit, your Honor, is sort of

16    inconsistent treatment of the term "drive" by the

17    defendants in this case.  That's why I underscored

18    consistency.

19            THE COURT:  Just give me the inconsistency.

20    What is the inconsistency?

21            MR. GLITZENSTEIN:  The inconsistency is the

22    following, your Honor.  So just sort of summarizing the

23    claim construction positions in this case, for purposes

24    of the fourth element of the claim, the one with the

25    "wherein" that starts it off, for purposes of that claim

1    term, wherein the controller energizes both said motors

2    to drive the spools, there is no dispute here that that

3    means rotates or turns.  The parties agree that because

4    of what happened, because of the way the claim is used,

5    I guess, but really because of what happened during

6    prosecution of this patent drive means turns.

7              THE COURT:  Do you agree with respect to that

8    portion of the claim that drive means rotate?

9              MR. JAKES:  Yes, your Honor.  We use the word

10   "turn," but that clause that starts "wherein," yes.

11             THE COURT:  Okay.

12             MR. GLITZENSTEIN:  So, your Honor, point

13   number one, I guess, from our side is that, therefore,

14   applying the principle of Rexnord and many, many other

15   Federal Circuit cases, it's got to be the same thing in

16   the final element.

17             THE COURT:  But no single principle or meaning

18   is controlling in all contexts.  In statutory

19   construction, people like to have canons of

20   construction.  And for every canon of construction one

21   could come up with, I could cite you a competing one

22   that people often use.  It's a good point, valid point,

23   and important point, but it isn't necessarily

24   dispositive.

25             MR. GLITZENSTEIN:  It's certainly a very

1    strong presumption in favor of what we are trying to

2    say, your Honor.  And, in fact, the word "drive," it's

3    not a coincidence that they are in both places in this

4    claim.  In fact, the same word "drive" was part of the

5    prosecution of this case in order to get the claim

6    allowed.

7            One thing before I get there, there is another

8    point of agreement that I think is worth noting, your

9    Honor, and that's with regard to the stepper motor.

10   You've heard some discussions this morning about the

11   stepper motor.  We actually have agreed to construction

12   on stepper motor that also requires rotation, and the

13   agreed to construction is an electric motor that

14   achieves step advance of a motor shaft.  We are not

15   disputing, your Honor, that a stepper motor can be held

16   stationary.  The point of this is that for purposes of

17   this claim, the relevant way in which a motor can be

18   controlled is, again, by agreement of the parties to

19   rotate, to advance a certain number of steps.

20           So let me take you to what we consider to be

21   the important piece of the file history.  I'm having a

22   little trouble reading this on my monitor, your Honor.

23   I don't know if this is at all legible for you.

24           THE COURT:  I can read it.

25           MR. GLITZENSTEIN: Your Honor, actually and

59

1    while I'm on that subject, I do have 70 pages of

2    Powerpoint here.  I did bring extra copies if the Court

3    is interested.

4            THE COURT:  Do you think it would help me?

5    You want to hand it up?

6            MR. GLITZENSTEIN:  I would.  Thank you, your

7    Honor.

8            Your Honor, I'm on Slide 9.  The relevant

9    section of the prosecution history with regard to the

10   term "bribe" concerned a rejection from the Patent

11   Office over a prior reference called Barrus.  And in

12   Barrus, Barrus also used stepper motors.  And in Barrus

13   one of the stepper motors would be energized to rotate

14   the take-up spool and the stepper motor for the supply

15   spool would also be controlled, but it would be

16   controlled in a special way.  It would be controlled to

17   provide a selective amount of resistive torque or drag.

18           So the specifics of Barrus are that they would

19   have the output of the stepper motor coupled up to some

20   resistors.  The controller would actually control the

21   resistors so that when the take-up spool pulled on the

22   supply spool, the supply spool would provide a selective

23   amount of resistance depending on what the controller

24   told it to do.  This was one way that Barrus figured out

25   how to accommodate changes in the diameter of the

60

1    spools.

2              But the key point with regard to Barrus is

3    that both motors were controlled, but only one motor was

4    actually driven to rotate and take up the tape from the

5    supply spool to the take-up spool.  And that was really

6    the basis on which they distinguished Barrus

7    successfully and got the claim allowed.

8              THE COURT:  Yeah.

9              MR. GLITZENSTEIN:  This discussion

10   highlighted, it's fairly lengthy, but we highlighted, if

11   you could --

12             THE COURT:  I've got the point.  I will wait

13   to hear their response, but I fully understand your

14   point.

15             MR. GLITZENSTEIN:  So they actually

16   distinguish Barrus, your Honor, on two bases, and I want

17   to underscore that it's both the way in which Barrus

18   drove the motor in order to move the fresh tape under

19   the print head.  That's the second to the last sentence

20   of the passage that we quoted here, but the last

21   sentence also distinguishes Barrus on the way in which

22   tension is maintained in Barrus.  They say that Barrus

23   teaches that only one of the motors is energized to

24   drive a spool of tape in the direction of tape

25   transport, the other being controlled to provide drag.

1    So they say one is powered to rotate, the other one is

2    still control.

3            Now, the claim -- and I'm going to just jump

4    ahead here to Slide 12 just to put this in context.  The

5    claim, your Honor, at this point in time contained the

6    language that I showed on this slide but without what

7    I've underlined in red.  That language that I've

8    underlined in red was actually something that the

9    examiner asked Zipher to insert into the claim.  So what

10   happened was they made all these arguments, and

11   initially the language at the time was just that the

12   controller controlled said motors to add or subtract the

13   calculated length of tape.  The examiner said,

14   essentially, I'm not going to allow that claim as it

15   stands.  I heard your arguments over Barrus.  It was the

16   subject of a lot of discussion, including an interview

17   down at the Patent Office.  I've heard your discussion

18   over Barrus.  You've got to add the words -- after the

19   words "control the motors," you've got to add the words

20   "to drive the spools."

21           So clearly, the examiner is saying it's not

22   just a matter of control, it's a matter of control to

23   drive.  Zipher had just told the examiner, and there's

24   no dispute, that with regard to the previous element of

25   the claim that drive means turn, rotate, and the

1    examiner came back and said I want to see that word

2    "drive" in the final element of the claim as well.  And

3    the examiner consulted with Zipher's lawyers.  Zipher's

4    lawyers agreed.

5              I'll just back up to the previous slide.  We

6    put this on our papers and I won't belabor the point,

7    but he said you've got to have this in the claim, and

8    they accepted it.  That's acquiescence and they're stuck

9    with it now.  And, in fact, the examiner here stated why

10   do you allow the claim?  He said he allowed the claim

11   because of the requirement that the controller controls

12   the motors to drive spools to add or subtract the

13   calculated length of tape.  That's part of what he

14   thought was important.

15             Your Honor, where there's no dispute that

16   drive was added to the fourth element -- that drive in

17   the fourth element of the claim means turn, and where

18   the word "drive" here at the state part of the

19   prosecution history we submit has got to be the same.

20             THE COURT:  I've got it.  Okay.  What's your

21   response on that?

22             MR. JAKES:  First of all, your Honor, we don't

23   say "drive" means turn.  We say drive has a broader

24   meaning.  It means accelerate, decelerate, hold steady.

25   It can mean any of those things.  In the particular

1    clause wherein the controller energizes both said motors

2    to drive the spools in a --

3              THE COURT:  Is there a difference between turn

4    and rotate?

5              MR. JAKES:  No, I don't think so.

6              THE COURT:  So you say "drive" means rotate in

7    the clause above, but you say "drive" means control in

8    the clause below.

9              MR. JAKES:  No, we don't.  We say drive has

10   the same meaning throughout.

11             THE COURT:  So it means rotate?

12             MR. JAKES:  Drive in a tape transport

13   direction means something in addition to drive, and if I

14   could just give you an example.  Driving a car.  It's a

15   common phrase.  You drive a car.  That means you start

16   it, you stop it, you accelerate it, you brake.  You say

17   you drive to Boston.  We understand what that means.

18             THE COURT:  I used this with my clerk.  I said

19   suppose we are at a stop light on a hill and we are

20   trying to keep the car from rolling backwards, right,

21   engine not driving the car.  You're trying to keep it

22   from going backwards.  I used that very same thing.

23             MR. JAKES:  You used that understanding of the

24   term.  If I said drive a car in reverse, are we using a

25   different meaning for drive?  No.  But when I say drive

1    the car in reverse, it doesn't mean braking.

2         THE COURT:  Certainly drive can mean control

3    in the sense that I drive a vehicle.  I'm not powering

4    the vehicle.  I'm not pushing it up the hill.  I'm

5    controlling it.  But that isn't the term, the meaning

6    you've given to the term above in the same claim, and it

7    is arguably not the meaning that was used to distinguish

8    the prior art.

9         MR. JAKES:  We've given the term "drive" the

10   same meaning throughout, but when you put it in context

11   and say drive in a tape transport direction, that

12   doesn't mean holding steady.  Drive itself can mean

13   holding steady, but when you say drive in a tape

14   transport direction, that implies movement and in a

15   particular direction, and that's why we say that

16   particular clause can mean turn or rotate both spools.

17        THE COURT:  Because that requires tape

18   transport, that there actually be tape transport, and

19   that can only occur through rotation.  You say in that

20   context "drive" means rotate, but down below where drive

21   doesn't explicitly require rotation, you think that it

22   can mean something else.  And so your view was control,

23   and in the upper one it's control by moving in the

24   direction, by rotating, and down below it can include

25   other forms of control like leaving stable.  How do you

1    distinguish the prior art, which apparently -- or your

2    explanation, how do you distinguish the prior art at the

3    time you were obtaining the patent and the examiner's

4    requirement that you include this language specifically

5    to address a problem with a prior patent in which only

6    one spool was moved?

7            MR. JAKES:  Well, if we could just look at

8    what Markem's counsel put on the screen.

9            THE COURT:  Which one do you want?

10           MR. JAKES:  Well, we're looking at currently

11   it's Slide 11.  The part that's highlighted at the

12   bottom really does just address the claim language,

13   controls the motor to drive the spools to add or

14   subtract the calculated length of tape.  There's nothing

15   there other than repeating the claim language.  But if

16   we can turn back to Slide 9 where the highlighted

17   language is.

18           But where Barrus was distinguished, what you

19   really have to look at there is the words "tape in the

20   direction of tape transport."  Barrus is being

21   distinguished in that it only teaches one of the motors

22   to energize -- to drive a spool of tape in the direction

23   of tape transport.

24           THE COURT:  What does "drag" mean in that

25   context?

1          MR. JAKES:  Drag?  It's like the drag clutch

2     system or a pull drag system, which was the other one we

3     used in the motor.

4          THE COURT:  So it encompassed both do you

5     think?

6          MR. JAKES:  I think Barrus was a pull drag

7     system, but there was count contrary, either force or

8     respective force --

9          THE COURT:  Pull drag means the DC motor is

10    going in the actual opposite direction?

11         MR. JAKES:  It's being driven in the opposite

12    direction.  It actually rotates in the same direction or

13    the tape wouldn't move.

14         So this is addressing the tape transport

15    aspect.  It doesn't have anything to do with the tension

16    control, and that's why the word is in there and the

17    direction of tape transport --

18         THE COURT:  Isn't he saying that in order to

19    overcome Barrus, you need to actually have driving of

20    spools, plural, in order to overcome Barrus and you need

21    that rotation of spools, plural, not control of spools,

22    plural?

23         MR. JAKES:  For tape transport, yes, not for

24    tension control.  That's the wherein clause.  Wherein

25    the controller energizes both said motors to drive the

1    spool in a tape transport direction.  and that's what

2    this is exactly saying.  It talks about in a tape

3    transport direction.  Remember Professor Kuc said there

4    are two functions?  There's the tape transport and then

5    there's the tension adjustment, and we are talking about

6    tape transport here, and certainly energizing and

7    driving both motors in a tape transport direction

8    doesn't distinguish the prior art.  But that's different

9    than the tension control.

10            THE COURT:  Yeah, I'm having some trouble with

11    that.

12            MR. JAKES:  Well, if I could, your Honor, if I

13    could put on the document camera here the interview

14    summary.  Markem's counsel made the point that the words

15    "drive the spool" were added by the examiner and that

16    was somehow to distinguish the prior art.  If you look

17    at the interview summary, and this is Exhibit 4 and the

18    page is 11630.

19            THE COURT:  If you can maybe just enlarge it

20    just a little.  That's good.

21            MR. JAKES:  If you look to the second to last

22    sentence in the beginning paragraph it says, the

23    examiner requested and Mr. Nelson agreed to make minor

24    changes to Claim 68 to improve the style of the claim.

25            That's the amendment to drive the spools that

1   we are talking about.

2            THE COURT:  This is Mr. Nelson's memo of what

3   was said to him?

4            MR. JAKES:  That's correct.  This is the

5   attorney's summary of the interview and the summary

6   record.

7            THE COURT:  Wouldn't you expect the attorney

8   to summarize things in a way that is most beneficial to

9   his client?

10           MR. JAKES:  Well, to the extent they are

11  incorrect, the examiner has the chance to comment on it.

12  But here I can show you, here's the examiner's interview

13  summary and it says, discussion regarding the status of

14  Claim 68 and additional languages have been discussed to

15  more clearly define the scope of Claim 68.

16           It doesn't say anything to drive the spools is

17  necessary to overcome the prior art because the prior

18  art is distinguished by that wherein clause.  Wherein

19  the motors drive the spools and a tape transport.

20           THE COURT:  When a drag device is used, isn't

21  it a tension controlled device?

22           MR. JAKES:  It is, but it's different than

23  what's in the invention.  The invention eliminates the

24  drag device whether it's a drag pull motor, whether it's

25  a drag clutch.

1           THE COURT:  But that last sentence is that the

2    purpose of the drag control device is to control

3    tension, and the examiner's concern was that the prior

4    art had a device in which spools were controlled to

5    control tension.  One spool was driven in a tape

6    transport direction, the other spool was controlled by

7    drag, and he said you can't have a device that only has

8    one spool that is driven in a tape transport direction.

9    You have to have driving of both spools in a tape

10   transport.

11          MR. JAKES:  And we do have that for tape

12   transport.  That's in the claim.

13          THE COURT:  That's that last clause that you

14   are adding.  I don't understand the significance.  It's

15   getting by me.

16          MR. JAKES:  Well, there is something

17   significant about using both motors and both spools

18   turning in the same direction for tape transport.  It

19   eliminates the drag.  You will have faster acceleration,

20   faster deceleration, more precise positioning, and

21   that's the distinguishing of the prior art.  Now you get

22   rid of a drag clutch because both motors are turning in

23   the same direction.  You have to do tension control, but

24   that's done differently, and that's not the basis on

25   which the prior art was distinguished.  It was

1  distinguished on tape transport, both motors engaged in

2  tape transport to drive the spools.

3          THE COURT:  All right.  Anything else you want

4  to say on this drive and drivable?

5          MR. JAKES:  Well, the terms are not

6  synonymous.  I think if you look at the specification,

7  there are certainly different ways that the term "drive"

8  is used.  It can be used to mean decelerate.

9          Markem says there is nothing in the

10  specification that talks about holding steady.

11          THE COURT:  Well, an argument that Markem

12  didn't make, at least one that I thought it could have

13  made, is if your definition is right, you use the term

14  control in the claim, and if you wanted drive to mean

15  control, you would have said control, especially where

16  you use drive in a way early in the patent than you mean

17  rotate, and I have a lot of trouble with that.

18          MR. JAKES:  Control is the next best synonym.

19  What we really wanted to use was the term "drive"

20  because drive does have a broad meaning.  Your Honor, I

21  do disagree that drive means rotate.  Drive in a tape

22  transport direction means rotate in the context of this

23  claim, but if you just take the word "drive" out, drive

24  still has a broader meaning that can mean holding steady

25  and stopping and starting.

1              THE COURT:  It can have a broader meaning, but

2    we want ordinarily to require our drafters to use terms

3    in a consistent way, and I assume you would at least

4    concede this was not perfect drafting of what you're

5    saying is true because you don't teach drafting to use a

6    term in the same claim in different ways.  That's just

7    not the way any drafter of a claim would set out to do

8    it.  You might inadvertently accomplish that end, but

9    you don't -- that's not sound drafting.  You don't draft

10   it that way.  If you mean control you say control,

11   especially where in context you've got a different

12   meaning to the term "drive" earlier in the claim.

13             MR. JAKES:  I still disagree we have a

14   different meaning for the term drive.  It's like in my

15   example.  Driving to Boston and driving in reverse, the

16   word "drive" hasn't changed meaning, but certainly the

17   contention of those phrases implies something different.

18   So drive in a tape transport direction doesn't require

19   movement and rotation.  Driving the spools for tension

20   control does not, and we chose the word "drive", and the

21   fact that we are having this discussion, perhaps we

22   should have chosen a different term, but drive captures

23   how these spools are operated, how they are controlled,

24   how they are driven.  And control --

25             THE COURT:  Why don't you show me the other

1  language in the specification that you think allows for

2  drive to encompass a broader meaning than Markem

3  suggested?

4          MR. JAKES:  Okay.  We need 4B up and if you

5  could get Slide 38.  Slide 38 has a couple of examples

6  where "drive" is used to mean something certainly

7  broader than rotate.  And the first example from Column

8  20, the supply motor is driven to cause deceleration.

9  In the second example from Column 23, we are talking

10 about driving the ribbon.  Certainly that doesn't mean

11 rotate, rotating a ribbon.  But it says you can advance

12 it at a constant speed, stop it.  Intermittent printing

13 is an example of driving the spool where there actually

14 isn't any motion required.

15         If you look at the term "rotate" in Column 4,

16 it's actually used in the sense of rotate meaning turn

17 or actually applying movement.  So drive and rotate are

18 certainly not used synonymously in the claim.

19         Two very good examples though, in discussing

20 the prior art at Column 2, the '552 patent -- the '572

21 patent, our patent says the two spools are driven.  Then

22 if you go on to read what it means by the two spools

23 being driven, the take-up spool is driven by the motor,

24 the supply spool motor is fed at a low level drag

25 current to maintain ribbon intention, meaning that the

1    driving -- the spool is actually in the opposite

2    direction and it will rotate in the same direction to

3    move.  But when the two spools are driven -- and one

4    example there is a drag current to maintain an

5    intention.  It's not to rotate.  The second example also

6    discussing the prior art '558 patent, the word "driving"

7    is used, one driving the take-up spool and one driving

8    the supply spool.  That refers to the DC motors in that

9    particular patent, and in one case that supply spool DC

10    motor acts as a brake and yet it's being used with the

11    word "drive".

12        THE COURT:  Does it act as a brake by moving

13    in the opposite direction?

14        MR. JAKES:  No, it doesn't actually move in

15    the opposite direction.  It just slows down the movement

16    during the tape transport.  But it's being driven in the

17    opposite direction.  The force, the electrical force

18    from the motor is in the opposite direction so it's

19    actually being driven in the opposite direction.  It

20    will rotate or turn in the direction of tape transport,

21    but when it says "driving," meaning using the brake.

22        THE COURT:  I see your point.

23        MR. JAKES:  So driving is not used to mean

24    rotate in any sense of the word.  In addition, we did

25    discuss the intermittent mode.  In an intermittent mode

1    certainly spools have to stop.  They have to be held

2    steady.

3           One thing Markem did say, I believe, that

4    holding steady is not disclosed anywhere in the

5    specification.  I don't think that's right.  First of

6    all, the operation of the stepper motor as your Honor

7    saw, it does require electrical power to hold it steady

8    in the first place.  It spins freely when it's turned

9    off, and that's something a person skilled in the art

10   would know.  It doesn't have to be stated in the

11   specification.

12          Second, inherent in the intermittent printing,

13   the spools have to be held steady at some point.

14   Holding steady is also disclosed in the specification.

15   And finally, the specification does describe the tension

16   control adjustment using one or both motors, and in that

17   case one motor must be held steady.  There is really no

18   other way to do it.  So whether or not the words "hold

19   steady" are actually appearing in the specification, the

20   concept of holding steady through a stepper motor

21   certainly does.  So the term "drive" certainly doesn't

22   mean rotate.  It does mean something broader than that.

23   We could have used the word "control," but control fit

24   with the motors.  That's really what was happening

25   there.  Spools are being driven and that can mean stop,

1  start.

2          THE COURT:  Yeah, but you are talking about

3  driving up above.  You're talking about using the term

4  "drive" which you say means control in a sense that in

5  context you concede that the entire phrase means to

6  rotate.

7          MR. JAKES:  Yes.

8          THE COURT:  And when you do that and you have

9  available to you and, in fact, use in the claim another

10  term that precisely captures what you now say you meant,

11  one would expect you to use that term, control, and you

12  didn't.

13          MR. JAKES:  Control is actually not as precise

14  as drive.  It's the best synonym we have.

15          THE COURT:  I'm sure you're saying that now,

16  but if, in fact, what you're telling me, drive is like

17  I'm driving my car and that means I'm controlling it, it

18  isn't -- if you are trying to explain to someone who

19  doesn't know what cars are but knows about engines and

20  knows about control, and you said drive the car, you

21  would tell the person, no, the engine is driving the

22  car.  The operator is controlling the car.  That would

23  be the precise way to describe it.

24          An imprecise way would be to say I'm driving

25  in the car.  If you are trying to describe what the

 1  respective responsibilities of the motor and the

 2  operator are, you wouldn't think of the operator as

 3  driving the car unless it was Fred Flintstone with his

 4  feet pushing the car as he goes up the hill, and that's

 5  the problem I have with what you are saying.

 6          What you really meant was control you now tell

 7  me.  Control is, in fact, more precise.  Control does

 8  capture what you say you meant, but you use control in

 9  the claim itself and use drive in a context in which it

10  meant rotate.  So now you want me to take "drive" in a

11  claim where you used it in the context that collectively

12  using your approach meant rotate and want me to say that

13  it means something where you use the term "control," the

14  more precise term elsewhere.

15          That's the problem I'm having with your

16  analysis.  I concede that there are references in the

17  specifications that I'm going to have to look at

18  carefully because there's not absolute precision with

19  how the term "drive" is used there.  So I take your

20  point on that.  But, in general, I've got a problem with

21  you on drive.

22          MR. JAKES:  Actually, your Honor, I may have

23  misspoke.  I think drive is actually more precise than

24  control.

25          THE COURT:  I know you say that.  I think the

1    opposite.  I think control is more precise than drive,

2    given the meanings that you are suggesting drive has.

3           MR. JAKES:  And the natural context of driving

4    a car is something everyone understands and the context

5    of this patent driving the spools is the same thing.

6           THE COURT:  Not where you have a controller

7    who would be the driver of the car.  The controller is

8    what you are talking about as a separate thing from the

9    -- what drives.  You have a controller and you have a

10    driver and it's the motor which drives the tape spools.

11    And there's something else, a controller which controls

12    the operation of the motor.

13           So they are different things in this and

14    you're saying it's really the same.  It's like the

15    controller is the same in both cases.  I just think that

16    the terms are not -- I think the problem I'm having with

17    your analysis is, first, I don't understand your attempt

18    to distinguish counsel's argument about prior art, and

19    my own reading of the totality of the claim suggests to

20    me that drive means rotate.  I didn't understand why

21    that was significant until he explained it to me just

22    now.  But that was my initial impression having read the

23    materials, and I'm still inclined to that impression.  I

24    will study it very carefully and think it through, but

25    my inclination is to say that drive means rotate.  But

1    anything else you want to say on that particular subject

2    and then we'll go on to the next one?

3            MR. JAKES:  I would just reemphasize, if you

4    look carefully at the prosecution history, that the

5    prior art is being distinguished on the tape transport

6    and driving both spools or turning them for tape

7    transport, not for tension adjustment.  Those two things

8    are handled separately.

9            THE COURT:  I will take a very hard look at

10   that because it's not something that I had looked

11   closely at up till now.

12           MR. JAKES:  And if you look at the

13   specification, it does say, and this is a critical

14   point, that the tension adjustment can be accomplished

15   by one or both motors adding step adjustments, and for

16   there to be one motor, the other one has to be held

17   steady, and that is certainly an embodiment that is

18   described in the patent, and you would have to find that

19   we didn't claim that embodiment; that we only claimed a

20   specific preferred embodiment where both spools rotate

21   at the same time in order to do the tension adjustment.

22   That's certainly not required by the specification and

23   it's not required to distinguish the prior art.

24           THE COURT:  So you're saying the specification

25   discloses embodiments in which tape is added by stepping

1    one motor and leaving the other energized but not

2    stepped?

3              MR. JAKES:  That's right.  On our Slide 46 it

4    says the step adjustment can be made to either or both

5    of the motors to add a short section of ribbon.

6              THE COURT:  You say that's contrary to what's

7    claimed; right?

8              MR. GLITZENSTEIN:  Two points, your Honor, on

9    that.  Yes, first and foremost.  The claim is not

10   directed to the either/or piece of that package that

11   they have just quoted.  It's directed to the both part

12   of that package.  The claim requires plural.  If not in

13   the first instance, directed to either or both.  The

14   second point, your Honor --

15             THE COURT:  Normally, people are saying don't

16   limit the claim to the embodiments.  Now you're saying

17   disregard the embodiments when construing the claims.

18   Construe the claim more narrowly than what's disclosed

19   in the embodiments.

20             MR. GLITZENSTEIN:  Not at all, your Honor.

21             THE COURT:  I'm not understanding.

22             MR. GLITZENSTEIN:  This is a very selective

23   quotation here.  That column obviously does include

24   those words either/or both of the motors.

25             THE COURT:  Where are we?

1          MR. GLITZENSTEIN:  Column 22 if my memory is

2     correct.

3          MR. JAKES:  Column 22 beginning at Line 17.

4          THE COURT:  All right.  Why do you think the

5     quotation is selective and not important to the

6     analysis?

7          MR. GLITZENSTEIN: It is selective and not

8     important to the analysis, because if you continue down

9     to the bottom of that same column, it talks about both

10    motors as being an advantageous approach to implementing

11    the tension correction.  I'm looking specifically at

12    line 66 where it talks about the motor feed system

13    splits the correction evenly between both motors in

14    order to avoid large gaps between prints or

15    over-printing of the ribbon.

16         You heard earlier today, your Honor, about how

17    avoiding gaps is actually an important consideration

18    when you're running one of these printers or designing

19    one of these printers.  And, in fact, when you split the

20    correction between the two motors -- and I've got a

21    little graphic that I can use to demonstrate this point,

22    but if you split the correction and you rotate both

23    motors in order to increase the tension in the tape, you

24    wind up maintaining the position of the ribbon better

25    than if you were to rotate only a single one of the

1   motors.  So actually, the patent clearly identifies

2   using both motors just as the claim says, using both

3   motors and rotating both as an advantage over just doing

4   a single motor.

5          THE COURT:  So you're saying you could do it

6   by either/or, but we are doing it by both and that's an

7   advantage over the prior art?  That's how you're saying

8   that should be interpreted?

9          MR. GLITZENSTEIN:  They are saying it's an

10  advantage over doing it by one.  Yes, we are.  They are

11  clearly saying that splitting it is advantageous.  There

12  are other passages that talk about how precisely you

13  want to position that fresh tape right by that print

14  head.  They say there is an advantage to splitting it

15  both.  So very simply they did what many, many patent

16  owners do, they claimed their preferred embodiment.

17         THE COURT:  The last response by you on this

18  and then I've got to move on.  Is there anything else

19  you want to say?

20         MR. JAKES:  Yeah, we are talking about the

21  preferred embodiment, an exemplary embodiment, not the

22  invention.   The invention is broader than that.  That's

23  why it says one or both.

24         THE COURT:  I will look at that carefully

25  before I make up my mind on it.  Let's talk about the

1   next term, calculates and calculated.  Let's take those

2   together.

3          MR. GLITZENSTEIN:  Your Honor, may I be heard

4   for literally 30 seconds on one technical point that was

5   made that concerns the specification and it also is this

6   same quote?

7          THE COURT:  Go on.

8          MR. GLITZENSTEIN:  Counsel said that the only

9   way to achieve tension adjustment using a single motor

10  is by holding the other one steady.  I just want to

11  underscore that is not in the record.  I could think of

12  ways to do it.  You could physically lock down that

13  first motor with a clamp.  You could also just spread

14  the total number of correction pulses so that both

15  motors start and end at the same point.  It was the

16  point we were talking about earlier.  Instead of having

17  it continue on past the end, you just have it start and

18  stop at the same point.  There's no evidence for that.

19  That seemed to be an impact on the consideration of the

20  issue.  I just wanted to emphasize it.

21         THE COURT:  All right.  Let's talk about

22  calculate and calculated.  You say performs a

23  mathematical operation to determine and mathematically

24  determine.  What do you mean by mathematical operation?

25         MR. GLITZENSTEIN:  Ordinary meaning for that,

1    your Honor.  Any mathematical operation, addition,

2    subtraction, square root, whatever there is, we think

3    that's a term that a jury is well aware of.  The concern

4    that we have with their construction is simply we submit

5    that it actually takes a term that is reasonably clear

6    to a lay juror and that is one of the goals here

7    clarifying.  Takes it and actually makes it harder to

8    understand.  Our objection really is, is this derived by

9    processing?  We certainly agree that derives can be

10   calculations.

11          THE COURT:  You have a lot of people use the

12   phrase "mathematical calculation."  You would say that's

13   redundant; right?  You're saying if you do a

14   mathematical calculation, all calculations are

15   mathematical so you shouldn't say mathematical

16   calculation.  What about algorithms aren't necessarily

17   mathematical; right?  You can have an algorithm that is

18   a set of instructions that uses logic -- that's why I

19   asked you what mathematical meant.  I don't think of an

20   algorithm as necessarily being mathematical.  It can be

21   a set of instructions that you deduct in logic that

22   don't involve arithmetic calculation.

23          MR. GLITZENSTEIN:  Your Honor, with regard to

24   the context in which this term is found in the claim, we

25   submit that it actually is mathematically oriented

1    because it talks about calculating a length of tape in

2    order to maintain tension in the tape between

3    predetermined limit values.  Given its fair reading,

4    this is a numerically oriented passage of the claim.

5    Certainly, the specification, I'm not suggesting you are

6    limited to it.  The specification is loaded with math.

7              THE COURT:  Why does it matter to this case?

8              MR. GLITZENSTEIN:  I was just going to put my

9    chips on the table on that one.  This is really a

10   clarity issue for us.  We just think that derives by

11   processing is just harder to understand and we don't

12   exactly know what the metes and bounds are.

13             THE COURT:  Well, the problem I have with that

14   definition is that it means derives.  Because I don't

15   know if derives by processing, derives by any means

16   other than irrational means or something.  It's hard for

17   me to get a grip on what they really mean there.  They

18   just say derives by processing and they give several

19   examples, but I don't see where you can get from the

20   language of the claim or the specification a meaning

21   that limits it to a mathematical determination.  Say,

22   for example, they used a look-up table.  You would say

23   that is not a calculation?

24             MR. GLITZENSTEIN:  We would say that look-up

25   tables are not calculations.

1          THE COURT:  How do you get to the numbers that

2   are in the look-up tables?

3          MR. GLITZENSTEIN:  Well, the numbers that are

4   in the look-up tables --

5          THE COURT:  Made up by calculation.  They are

6   just done by calculation that occurs previously.

7   Somebody calculates it and it goes into a look-up table.

8          MR. GLITZENSTEIN:  The use of information out

9   of a look-up table though, that's really what this is

10  directed to.  Can a look-up table be a calculation of a

11  length?  The act of consulting a look-up table to get a

12  length of tape, is that the calculation?

13         THE COURT:  If the values in the look-up table

14  are derived from the calculation, then yes.  Because you

15  are doing it in steps.  You've done the calculations to

16  prepare the look-up table, then you have the look-up

17  table, then you consult it and determine the length of

18  tape to be added.  Therefore, the process by which you

19  get to the result involves mathematical calculation.

20         MR. GLITZENSTEIN:  There's a mathematical

21  calculation to get some set of data to be consulted.  In

22  your hypothetical, that's certainly true.

23         THE COURT:  Do you use a look-up table?  Is

24  that why this is in your product?

25         MR. GLITZENSTEIN:  We actually don't use a

1    look-up table, your Honor, and so I did want to say that

2    this is really more a clarification issue.

3              THE COURT:  How do you do it other than by a

4    mathematical determination?

5              MR. GLITZENSTEIN:  We use a formula, your

6    Honor.

7              THE COURT:  So you do it with mathematical

8    determination.

9              MR. GLITZENSTEIN:  We do.

10              THE COURT:  So why should I care?

11              MR. GLITZENSTEIN:  The important thing here is

12    it does affect the scope of the claim for purposes of

13    prior art, and it also affects essentially what this

14    invention is about.

15              THE COURT:  I haven't looked at the underlying

16    dispute here, but you're basically -- your principal

17    argument is a noninfringement argument, I assume?

18              MR. GLITZENSTEIN:  Yes, it is, your Honor.

19              THE COURT:  So that's how you are going to win

20    is by demonstrating noninfringement.  I'd rather focus

21    on the argument that you think entitle you to a judgment

22    of noninfringement because I've got enough to do here,

23    and determining things in the abstract that I don't need

24    to determine is not something I really want to spend a

25    lot of time doing.

 1          MR. GLITZENSTEIN:  Your Honor, this is

 2    certainly not an issue that we see as a dispositive one

 3    in this case.  It's in here because it's purely a

 4    clarification issue.  We just want to know what it

 5    means.  We think we are right with regard to the scope,

 6    but at this stage of the case for purposes of disposing

 7    the case on noninfringement grounds, it's not something

 8    that we rely on.

 9          THE COURT:  I appreciate it.  Did you want to

10    say anything on the calculates and calculated issue?

11          MR. JAKES:  Your Honor, the only thing I would

12    say is that by limiting it to a mathematical operation,

13    all you're doing is really shifting the focus from one

14    word to another.  We'd be back arguing over whether or

15    not something is a mathematical operation.

16          THE COURT:  Can you give me an example of the

17    way in which a calculation would be done here without a

18    mathematical calculation?

19          MR. JAKES:  A look-up table.

20          THE COURT:  To me -- suppose you did it by

21    measurement, observation.  I don't think of that as

22    calculation in the same sense, but I do think

23    calculation, although the sentence that comes

24    immediately to mind is a mathematical operation.

25          MR. JAKES:  That would be one example.

     1              THE COURT:  But there are certainly other

     2    types of calculation that people engage in that doesn't

     3    explicitly involve a mathematical -- when you sit down

     4    and figure out how to persuade me of something, you are

     5    engaging in a form of calculation that isn't explicitly

     6    mathematical, but the problem is then what does it mean?

     7    It means any -- you give it a very broad meaning which

     8    is any derivation by process.

     9              MR. JAKES:  That's right.  We do have a

    10    controller that is doing the process thing, and as your

    11    Honor suggested, an algorithm may or may not have

    12    something that someone would call a mathematical

    13    operation, but it could be a series of program steps

    14    where you --

    15              THE COURT:  First do A, then do B, take value

    16    C, then do D, but not do anything mathematical.

    17              MR. JAKES:  You may not find the divide

    18    instruction or the multiplying instruction.  What it's

    19    doing effectively is a derivation of the value that it

    20    needs through these steps.  That would be within the

    21    ordinary meaning of calculate as well.  So limiting to

    22    mathematical processing, as I said, it just shifts the

    23    debate as to whether or not something is a mathematical

    24    operation and unnecessarily narrows it.  Derive by

    25    processing, that's what we came up with.  It's not

1    really a critical term, but limiting it in this way to

2    exclude things like look-up tables or other

3    implementation details doesn't seem necessary.

4          THE COURT:  I will hold judgment on what I'm

5    going to do with respect to that.  Tension, is there

6    really a meaningful difference between the two of you on

7    this concept of tension?  I think of tension as a

8    reactive force induced by stretching, but I think both

9    of you say the same thing.

10          MR. GLITZENSTEIN:  I don't see this as a

11    dispute of substance at all, your Honor.  I think there

12    are two ways to look at tension.  The dictionaries seem

13    to have both.  One is a number.  The other is sort of

14    the physics characteristic, which is maybe the one that

15    your Honor was suggesting.

16          THE COURT:  Well, you can measure that

17    reactive force.  You have a weight on a string and you

18    want to see how much tension is put on the string by the

19    weight.  I assume you could hang a spring scale to it or

20    something.  Wouldn't that give you a measure of the

21    reactive force?  I certainly haven't done physics in a

22    long time.  But you would get a numerical value for

23    tension, depending upon how you measure that reactive

24    force.  But that's the force that comes from stretching.

25          MR. GLITZENSTEIN:  There is a force that sort

1    of exists because I guess you've got molecules or

2    something holding each other together, pulling each

3    other apart, whichever it is.  And then you've got a

4    number to try to capture what that is.  The dictionaries

5    do -- I think they are pretty evenhanded in all candor

6    about the treatment of adding.  We're just, again, sort

7    of echoing the point I made with regard to calculate.

8    The issue of tension appears in this final element, and

9    in a mathematical -- not mathematical, poor choice of

10   words -- in a numerical sort of context, the goal is to

11   maintain the tension between some values.  So in looking

12   at the dictionary definition, we gravitated more to the

13   one that was a value rather than property.

14             THE COURT:  Did you want to say anything about

15   tension?

16             MR. JAKES:  Your Honor, just a couple of

17   things.  First of all, I don't think there's a

18   meaningful dispute as far as noninfringement.  The real

19   thing is that we say tension is a condition and they say

20   it's a measure, and the claim language itself if you

21   look at it doesn't talk about measurement.  It talks

22   about maintaining tension.  So, for example, the dry

23   clutch system maintains tension in the tape without

24   measuring it.

25             THE COURT:  But it's at predetermined limits.

1          MR. JAKES:  Our claim doesn't go beyond that,

2     but I think if you look at the other terms that Markem

3     wants to construe, they tend to take measurement of

4     tension and then add that to the last clause along with

5     other things; such as, when the tension has to be

6     measured, how it has to be measured, does it have to be

7     measured during tape transport?  So I think that's

8     really just a prelude to one of their other arguments to

9     say tension requires a measurement.  It just requires

10    maintaining it, and I think it's just part of their

11    effort to limit our client's preferred embodiment.

12          THE COURT:  Let's go to the next one which I

13    think is important to your analysis, predetermined limit

14    value, and your position at least at first blush seems

15    sensible to me.  So maybe I ought to have Zipher's

16    response to it and then your response to Zipher's.

17          The problem I'm having with your

18    interpretation is the word "between" in your claim.  How

19    do you deal with that.

20          MR. JAKES:  Your Honor, we'll agree with an

21    upper and lower limit.  It just seems like it's implied

22    with that.  If you remember in the prosecution history,

23    we actually took out upper and lower limits.  There's an

24    implication that they really shouldn't be there, but

25    when you look at the word "between," I'm not sure you

1    can really get around that.  So I don't think that there

2    really is any difference once you put in upper and

3    lower.  The parties agree it means an acceptable level

4    of tension.

5         THE COURT:  You've got a problem with one of

6    their products.  We don't have to get into it today, but

7    they are saying they don't have to determine upper and

8    lower limits in their product, one of their products.

9         MR. JAKES:  I think actually for the same

10   reason that the claim has upper and lower limits, their

11   product will as well.  There's always going to be some

12   point where they don't adjust.

13        THE COURT:  That's more as a summary judgment

14   issue.

15        MR. JAKES:  In that region they will be

16   between the upper and lower limits.

17        THE COURT:  Now, in the next several claims

18   because we don't have a lot of time here, the one that

19   struck me after what I heard today -- and I wish I heard

20   all this stuff before because it could have helped me in

21   preparing for the hearing.  But if you go to the table

22   that you gave me, the chart, if you go to the -- page

23   four, the second one down, said controller calculates a

24   length of tape to be added to or subtracted from tape

25   extending between said spool in order to maintain

1    tension in said tape between predetermined limits.

2            Markem reads into that language a requirement

3    that the tape tension is measured without contacting the

4    tape.  Based on what I saw today, that probably is an

5    important argument for you, I would assume, because your

6    product you say does mention tension by contacting the

7    tape.

8            MR. GLITZENSTEIN:  That's correct, your Honor.

9            THE COURT:  Where do you get this requirement

10   that without contacting the tape, where does that come

11   from?

12           MR. GLITZENSTEIN:  Principally, your Honor, it

13   comes out of the specification and it comes out of

14   Column 4 of the specification beginning at Line 27 and

15   this is a paragraph that is talking about what they

16   refer to as exemplary -- I'm sorry, your Honor.

17           THE COURT:  Four, 20?

18           MR. GLITZENSTEIN:  Four, Line 27.  So in this

19   paragraph, your Honor, they call it a brief description

20   section, but this is essentially what a lot of patents

21   call a summary of the invention.  This is a patent that

22   does discuss what's referred to, and we acknowledge it,

23   an exemplary embodiment.  We submit that this is

24   actually the embodiment to which they're really

25   directing the claims of this patent, and it talks about

1    -- earlier in the patent it talks about the importance

2    of measuring and monitoring tape, and it continues at

3    Line 32 and says, tension in the tape being transported

4    is determined by control of the drive motors.  Tension

5    is determined by control of the drive motors and,

6    therefore, is not dependent upon any components which

7    have to contact the tape between the take-up and supply

8    spools.

9              THE COURT:  That doesn't exclude the

10   possibility of a tension measuring.  You can't escape

11   from an infringement by adding some additional element

12   that's not in the claim; right?  I mean, if you infringe

13   all of the elements of their claim and then you add

14   another element to it, it doesn't make you

15   noninfringing.  You're infringing.  You have a device

16   for measuring tape tension.  They don't need to have a

17   device for measuring tape tension by touching the tape,

18   but that doesn't mean your product doesn't infringe and

19   that doesn't -- I shouldn't read there, because they say

20   it isn't necessary, doesn't mean it's an element that it

21   need not be present.  That's the problem I'm having with

22   your argument.

23             MR. GLITZENSTEIN:  The question comes down to

24   whether this is an inherent aspect of this invention,

25   and that's really the issue and the law on this.

 1    There's not a lot of law on this point, your Honor.

 2    It's the Honeywell case and the Microsoft case we cited

 3    in our papers.  There's case law where the specification

 4    places sort of an inherent level of significance on a

 5    particular feature.  It does become part of the claim,

 6    and in the Honeywell case, just by way of example, the

 7    claim term there was look ahead distance, and the

 8    question was whether that inherently required some

 9    assessment of time.  And the appellate court there

10    looked very closely at the specification and said based

11    on the importance that time plays as part in discussing

12    that feature of the invention throughout the

13    specification in view of the treatment of the issue in

14    the specification, we are therefore going to construe

15    the term to require a time feature that was not

16    expressly in the claim.  We absolutely agree that what

17    I'm suggesting to you is not -- these words are not in

18    the claim.  This is something that comes out of the

19    importance of tension to this claim and the way and

20    prominence in which they discussed their particular way

21    of measuring tension in this sort of synopsis here of

22    the invention.  The Microsoft case that I referred to,

23    very similar case.

24                THE COURT:  The issue is whether that feature

25    is inherent in what it is they are claiming or whether

1   what they're really saying here that this is a possible

2   benefit of our invention is that it may allow for this

3   without contacting the tape.  If it's the latter, your

4   argument fails on that point.

5           MR. GLITZENSTEIN:  If it's the latter, your

6   Honor, that's absolutely correct.  This particular

7   feature of the disclosure, the ability to monitor

8   tension without contacting the tape was not only a sort

9   of additional aspect but was actually the centerpiece of

10  the UK litigation between the parties here.

11          I know you've got some background on that.

12  But in the UK case, the original UK litigation, this is

13  where they placed all the emphasis.  They said it's all

14  about -- what we really invented was figuring out a way

15  to evaluate the tension without contacting the tape.

16  They then turned around, and having put those features

17  in a lot of their UK claims, they then subsequently in

18  the U.S. tried to get them out.

19          Our position is given the prominence in the

20  specifications -- and we are not relying here on the

21  expert evidence on the UK decision, but by way of some

22  context and background for the Court, this was a

23  significant feature of the UK case as well and was

24  something that they placed a lot of emphasis on.  And in

25  view of that, it is something and, again, throughout the

1    specification there is a lot of discussion about the

2    benefits and advantages of having a system that doesn't

3    contact the tape, simpler and easier.

4          THE COURT:  I understand all that.  The

5    argument you are making is one that I haven't used

6    before.  It seems to me to be a somewhat difficult

7    argument conceptually, and I haven't read the cases that

8    you've cited.  So I will read those cases and think

9    about it.  My general reaction is that something like

10   this is often included in a summary of the invention as

11   one of the benefits of the invention, but it isn't a

12   claim limitation, and even if it's the central benefit

13   of the invention, it's the claim terms that circumscribe

14   the invention and it's not the benefits of the

15   invention.  So the claim isn't limited to what things

16   that actually achieve the particular things that are

17   specified in the brief description as the benefits of

18   the invention.

19         MR. GLITZENSTEIN:  I think as a general

20   proposition that is the law, your Honor, and I think

21   there are a few cases that say where something is sort

22   of touted, this is more than just a benefit of the

23   invention.

24         THE COURT:  Inherent in the way to achieve the

25   innovation that is at the core of the claim, this is the

1    innovation.  And it's inherent in what's claimed and has

2    to be a part of it.

3            MR. GLITZENSTEIN:  That's right, and they

4    can't now have a claim that they say covers the thing

5    that essentially was distinguishing with this package.

6            THE COURT:  All right.  What did you want to

7    say about that?

8            MR. JAKES: I believe your Honor has the law

9    exactly right and it doesn't apply in this context.  You

10    read limitations from the specification into the claim.

11    That's exactly what they are doing.

12            THE COURT:  I don't even construe this as a

13    limitation.  Sometimes you will see certain embodiments

14    that are identified and people make the mistake of

15    arbitrarily limiting the claim language to the disclosed

16    embodiments, and even with the change in claim

17    construction law that occurred in the last few years,

18    the Federal Circuit still said don't be doing that.  But

19    I don't even see this as going that far.  This seems to

20    be language that is saying our invention is great

21    because one of the things that's good about it is you

22    won't need to have contact with the tape surface

23    anymore, and that's sort of one of the benefits of it.

24    It doesn't limit the scope of the claim, unless this

25    argument is something that's so inherent of the nature

1    of what is claimed that it's an essential part of it

2    and, therefore, should be read into the claims.

3           MR. JAKES:  That's right, your Honor.  This is

4    really a preferred embodiment.  It's described as an

5    exemplary embodiment.  In fact, if you look at our Slide

6    51, Markem tries to add in various things, including the

7    tape has to be measured, the motor control has to be

8    used to measure the tape, has to be done without

9    contacting the tape.

10           THE COURT:  Do you have a product that does

11    operate without measuring tension on the tape?

12           MR. JAKES:  Well --

13           THE COURT:  Contacting it.

14           MR. JAKES:  Yes, we have a product that works

15    as described in the specification that uses the control

16    of the motors, the current that is used to drive the

17    motors to derive a measure of tension.  There's no

18    direct measurement.

19           THE COURT:  How does that work given the

20    problems that people were specifying for me earlier that

21    there's so much variation in the diameter of the tape

22    spools that you can't do that?  I thought that's what

23    was being said to me.

24           MR. JAKES:  Well, what you are measuring is

25    the tension.  You're not measuring the diameter of the

1    spools.

2             THE COURT:  But how can you get to the tension

3    measurement just by power on the motors without knowing

4    something about the diameter of the tape spools?

5             MR. JAKES:  Your Honor, I can't explain

6    technically why that is, but I understand that the force

7    that is necessary to adjust the tension or to measure

8    that tension can be determined from the current that is

9    used to supply the motors, and Professor Kuc --

10            THE COURT:  That's what I was trying to ask

11    before of the experts.  I thought you were saying that

12    you really can't do that reliably to measure the tension

13    simply by knowing the amount of energy that's being

14    supplied to the stepper motors.  And one of the reasons

15    that you can't is there's so much variability in the

16    product and in the diameter of the tape spools; so just

17    by knowing how much -- how many steps you are stepping

18    one way or the other doesn't tell you anything about the

19    -- doesn't tell you enough about the tension of the

20    product to allow for its tension to be measured in that

21    way.  You say your product does.

22            MR. JAKES:  It can be done.  It's described in

23    the patent specification, but that is just an exemplary

24    embodiment.  If you look at the language there on Column

25    4 where this is described, where the tension and the

1    tape is being transported, it's determined by control of

2    the drive motors.  It's not dependent upon any

3    components.  That's in the paragraph that starts "in

4    accordance with an exemplary embodiment."

5              THE COURT:  Yes, I understand.

6              MR. JAKES:  It's not in the plans.

7              THE COURT:  I understand.  Okay.

8              MR. JAKES:  Your Honor, could I address the

9    Honeywell case briefly?

10             THE COURT:  Yes, go ahead.

11             MR. JAKES:  Markem's counsel said that they

12   were looking at the term "look ahead distance."  That's

13   very different than what's going on here.  In that case

14   you are actually trying to interpret what the term "look

15   ahead distance" means.  These limitations or features

16   that they are trying to read into the claim, there's not

17   a hook in the claim language.  They are not saying that

18   word means these things.  They're just saying they

19   should be inserted.

20             THE COURT:  If that's what the case is saying,

21   that's a much more conventional question.  I agree that

22   sometimes when interpreting claim language, you have to

23   look at what is inherent in the way that the claimed

24   invention functions to give meaning to the claim

25   language.  I can buy that argument.

1        MR. JAKES:  That's what it is.  Figuring out

2   what look ahead distance means is not the same thing as

3   inserting words.

4        THE COURT:  Let me ask Markem, since you are

5   trying to get a declaration of noninfringement here,

6   what other terms that we haven't yet discussed that you

7   think are really important to have construed here?

8        MR. GLITZENSTEIN:  We've touched on the issue

9   of plural versus single and whether the use of the terms

10  motors and spools in the last element is one or two.

11  That actually is a central issue as well to the case.

12       THE COURT:  And I didn't understand that at

13  all until today when you got up and made your

14  presentation.  So it was useful today for me to

15  understand that.

16       MR. GLITZENSTEIN:  So there is -- I mean, just

17  to sort of summarize very quickly on that, and there's a

18  legal point that was in the briefing that I thought I

19  might address as well on this, and that is, the claim

20  language itself really should be the start of any point

21  for this question since it uses plural terms; namely,

22  motors and spools for this correction step.  That should

23  be the end of it.

24       Defendants have cited a couple of cases.  That

25  one is the Dayco case and the other is the Versa case

1    where they say, well, sometimes plural can mean not one

2    or more, not more than one, excuse me.  In fact, the

3    Dayco case makes it very clear that -- just as a matter

4    of straight up claim construction, Dayco states that

5    when there is a plural term used, it says -- the quote

6    from Dayco at 132728, in accordance with standard

7    dictionary definitions we have held that, quote,

8    plurality, closed quote, when used in a claim refers to

9    two or more items absent some indication to the

10   contrary.  In both Dayco and Versa the Federal Circuit

11   went on and said, because of the peculiar way those

12   claims were drafted, that there were other pieces of the

13   claim that the Court relied on to conclude that, in

14   fact, those plural terms shouldn't be construed in that

15   way.  Those conditions just simply don't apply here,

16   your Honor.  There is nothing in these claims that would

17   suggest in any way that motors plural and spools plural

18   don't, in fact, refer to both the spools.

19            In fact, to the contrary, the rest of the

20   claim is all about driving the motors -- or controlling

21   the motors, excuse me, driving the spools and doing so

22   in a particular direction; namely, a tape transport

23   direction.  Also, just to echo the point I was making

24   earlier about Barrus, in Barrus both motors are

25   controlled.  Their theory of infringement in this case,

1    your Honor, is even if you are going to construe drive

2    to mean rotate because we rotate one spool and keep the

3    other one steady, that still meets this requirement of

4    controlling said motors  to drive the spools.

5              THE COURT:  How?  How does it meet that?

6              MR. GLITZENSTEIN:  I don't think it does.

7              THE COURT:  If drive means rotate and spools

8    mean spool, how does it?

9              MR. GLITZENSTEIN:  I don't believe it does and

10   I think the words of the claim and the law and the

11   prosecution history and the specifications all stand

12   against them on this point.  I don't understand the

13   theory; that is, their theory, and that's why I wanted

14   to just underscore it here.

15             They do say in their second claims

16   construction briefing that even it -- or maybe it's

17   their first, I'm sorry, I can't recall.  But they say

18   even if "drive" means rotate having a system where only

19   one motor rotates and the other is held steady would

20   still be covered and, again, we don't think that can be

21   reconciled with the intrinsic record at all.

22             THE COURT:  All right.  Let me hear your

23   response on that.

24             MR. JAKES:  Your Honor, we just focus on the

25   word "drive," and if it's given the correct meaning, the

1    rest of it follows.

2            THE COURT:  I think that's right.  Your

3    argument rises or falls on that is primarily -- are

4    there any other terms that you in particular want me to

5    focus on here in the analysis?  Because I do think this

6    seems to me that the key issue is the drive.  The

7    meaning of drive in this context is probably what's

8    going to be most important to the analysis, and I want

9    to try to focus most of my effort on trying to

10   understand that and all of your arguments concerning

11   that.

12           But if there are other terms here that you

13   think are particularly important that you need to have

14   me address.

15           MR. JAKES:  No, your Honor, I don't.

16           THE COURT:  All right.  Does anyone want to

17   say anything else about any of the matters that we have

18   discussed today?

19           MR. GLITZENSTEIN:  Your Honor, I had just one

20   last term that I wanted to put before the Court, and

21   that is, it's the issue length.  The claim talks -- in

22   the final element number five talks about the controller

23   calculating a length.  And our construction of this is

24   just simply to use the term "length."  We think there's

25   some ambiguity with the term "length," but we are

1   perfectly happy to --

2           THE COURT:  Where are you exactly on the

3   claims construction chart?

4           MR. GLITZENSTEIN:  In the claims construction

5   chart, be at page four, the second element.  Again, we

6   think there's some ambiguity with the issue of what

7   length means, but we are happy to table that until

8   invalidity considerations.

9           But the particular point I wanted to direct

10  the Court to is we think that "length" is a term that

11  needs no construction.  We think that people know what

12  "length" means.  They are trying to change the word

13  "length" to "amount," and "amount" can mean really

14  anything as far as -- it creates the possibility of

15  confusion as to what the scope of it is.  So we submit

16  that the word "length" really needs no construction here

17  and it should be preserved.

18          THE COURT:  What are you getting at there?

19          MR. JAKES:  Your Honor, we are more than happy

20  with length.  They said the term couldn't be construed;

21  so we gave it a meaning.

22          THE COURT:  Oh, this is in anticipation of an

23  argument.

24          MR. JAKES:  They made their argument that it

25  was indefinite, that somehow it had no meaning.

1          THE COURT:  We'll save that for a later date.

2          MR. JAKES:  Couldn't be construed and we are

3    going to give it a meaning, but we are more than happy

4    with the word "length" as it is.  We think that's

5    perfectly understandable.

6          MR. GLITZENSTEIN:  I misunderstood the

7    motives.

8          THE COURT:  All right.  Did you want to say

9    anything else?

10          MR. JAKES:  No, your Honor, I've said enough.

11   Thank you.

12          THE COURT:  I really appreciate the quality of

13   the presentations today.  The tutorial was very helpful.

14   I know it's expensive to bring people in like this, but

15   I assume there's a lot at stake for you and it certainly

16   was helpful to me.  Counsel's arguments were very well

17   presented, very informative, and I will look very

18   carefully at all of the arguments in your brief and the

19   additional arguments that you've presented today.

20          If I've expressed a tentative view, you need

21   to understand it's just a tentative view.  I oftentimes

22   change my mind during the course of working through

23   something; so nobody should bank on me standing by

24   anything I said today.  I will look at each issue and

25   consider every argument that's been made as to matters

1    that I think are potentially determinative of the case.

2            As to other matters, you are likely to find me

3    putting in a footnote in my decision saying I will

4    reserve judgment on that issue until it becomes relevant

5    to me at a later date and if we need to, we can revisit

6    those issues.  I think we will all be better served if I

7    spend my efforts focusing on what I think are the most

8    hotly disputed claim terms and really trying to get

9    those right, to give you as much guidance as I can as to

10   how we are going to proceed from here.

11           I will get to work on that and probably be 60

12   to 90 days.  I'm reasonably confident I will get it out

13   before Labor Day when my clerk leaves; so he's not going

14   to be allowed to leave until we're done with this.  I

15   will get a decision out as soon as we can.

16           (Concluded at 12:35 p.m.)

17

18

19

20

21

22

23

24

25

109

1

2                        C E R T I F I C A T E

3

4            I, Diane M. Churas, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9                                      ___
                        DIANE M. CHURAS, CSR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25