**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 11/7/12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
MARKEM-IMAJE CORPORATION,       *
                                *  07-cv-06-PB
     Plaintiff and              *  July 30, 2012
     Counterclaim Defendant,    *  10:00 a.m.
                                *
          v.                    *
                                *
ZIPHER LTD. and                 *
VIDEOJET TECHNOLOGIES, INC.,    *
                                *
     Defendants and             *
     Counterclaim Plaintiffs.   *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Plaintiff:    Kurt L. Glitzenstein, Esq.
                      Christopher R. Dillon, Esq.
                      Fish & Richardson (MA)

                      Daniel M. Deschenes, Esq.
                      Hinckley, Allen & Snyder (NH)

For the Defendant:    Kara F. Stoll, Esq.
                      Elizabeth D. Ferrill, Esq.
                      Finnegan, Henderson, Farabow,
                       Garrett & Dunner, LLP

                      Philip R. Braley, Esq.
                      Olson & Gould, PC

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1454

1                    BEFORE THE COURT

2              THE CLERK:  Court is in session and has for

3        consideration a motion hearing in Markem-Imaje

4        Corporation versus Zipher, Limited, et al., Civil Case

5        Number 07-06-PB.

6              THE COURT:  All right, let's take each of the

7        three arguments one at a time.  So I will hear from

8        Markem first on the first argument.

9              MR. GLITZENSTEIN:  Good morning, Kurt

10       Glitzenstein for Markem-Imaje.  Would you like to hear

11       the IPXL method apparatus issue first, your Honor?

12             THE COURT:  Well, that's the way you presented

13       it in your brief, so why don't you go that way.

14             MR. GLITZENSTEIN:  Thank you, your Honor.  Mr.

15       Dillon, Chris Dillon will be arguing that for

16       Markem-Imaje.

17             THE COURT:  All right.

18             MR. DILLON:  Your Honor, we have a paper copy

19       of this presentation.  Can we hand that up to you as

20       well?

21             THE COURT:  Sure.

22             MR. DILLON:  And I'm going to be starting on

23       tab one.

24             Your Honor, with respect to the IPXL issue,

25       this is not a question of a dispute of law.  For the

1   most part, the parties are in agreement regarding the

2   holding of IPXL and although we differ regarding

3   characterization of the case, the disputed issue here is

4   whether Zipher's apparatus claims actually contain

5   method steps.  So this is more akin to interpretation of

6   the claims.  We need to look at the claims that are at

7   issue and see whether in fact they do contain method

8   steps.

9          It is indisputable that the language that we

10   are challenging is found in method claims.  The same

11   language is also found in methods claims within Zipher's

12   patent.  The issue here is whether those method steps in

13   the method claims have the same meaning when you place

14   them in the apparatus claim, and we say they do.  The

15   language needs to be interpreted consistently.

16          Zipher's position is that when a method step

17   language from the method claim is imported into an

18   apparatus claim, that it has a different meaning, that

19   it describes the capabilities of the apparatus.  And

20   this is an argument that the Federal Circuit has

21   rejected several times.  The language --

22          THE COURT:  Where have they rejected that

23   argument?  I haven't seen it rejected anywhere.

24          MR. DILLON:  In three cases, your Honor.  In

25   IPXL, in Katz and in Rembrandt.  In Katz there was a

4

1    method step --

2              THE COURT:  I mean, you can say that, but they

3    didn't reject the specific argument that the capability

4    of an element of an apparatus is not necessarily a

5    method step.  All of those cases that you cite involve

6    instances in which the alleged method step specify a

7    process, a part of a process that the user would engage

8    in.  There isn't anything in those opinions that suggest

9    that specifying a function for an element of an

10   apparatus is a method step.

11             MR. DILLON:  Your Honor, with respect to the

12   Rembrandt case, in that case there is no user that was

13   performing the step.  The method step was transmitting

14   the trellis encoded frames.  And the parties admitted

15   that that would be done by a transmitter section.

16             THE COURT:  The problem -- let's get to the

17   underlying problem of IPXL.  The underlying problem that

18   IPXL tries to address is the problem of combining

19   apparatus and method, because apparatus claims are

20   infringed by making or using the apparatus.  Method

21   claims are process claims.  They are infringed by

22   employing the process, right?

23             MR. DILLON:  That's correct.

24             THE COURT:  Okay.  And the problem is if you

25   combine those, as you can't tell -- someone who's

1    potentially subject to an infringement action can't

2    really tell whether they can be liable for building or

3    whether they can only be liable for using, and that's

4    the principal problem, isn't it?

5            MR. DILLON:  That's correct, your Honor.

6            THE COURT:  And so when we try to -- we can

7    try to read these decisions in light of the principal

8    problem that we're trying to address, the standard in my

9    mind becomes, the challenge becomes identify a means by

10   which you can distinguish acceptable functional claiming

11   from method claiming which can't be combined in an

12   apparatus claim.

13           What is your proposed standard, because I

14   assume you would acknowledge that it is an acceptable

15   practice in an apparatus claim to include functional

16   claiming.  Do you agree?

17           MR. DILLON:  Yes, your Honor.

18           THE COURT:  Okay.  So what is your standard

19   for distinguishing acceptable functional claiming from

20   impermissible method claiming in an apparatus patent?

21           MR. DILLON:  And I think in this instance and

22   all instances you have to look at the specific language

23   of the claim.  And what I propose, your Honor, is to go

24   through the specific claims and point out --

25           THE COURT:  Give me the standard by which one

6

1    distinguishes it, and then we'll go, I agree, ultimately

2    everything has to be resolved in the context of the

3    individual case, but how does the Federal Circuit

4    articulate the standard, because clearly from your

5    position the Federal Circuit needs to give all of us

6    some clearer guidance about what IPXL, how it applies

7    and how it doesn't apply to functional claiming, because

8    this is functional claiming, and the question is, you're

9    saying this is functional claiming that is also method

10   claiming.

11           MR. DILLON:  I think the problem with these

12   claims, your Honor, is that it contained apparatus

13   elements and they also contain method steps.

14           THE COURT:  No, but it's functional claiming

15   that you say is a process, is a method.  That's the

16   problem.

17           MR. DILLON:  No, I think what I'm trying --

18           THE COURT:  It describes the capacity of that

19   particular disclosed structure, a capacity, a function,

20   and not a process.  So you've got to tell me when what

21   looks like functional claiming as opposed to the issues,

22   say, in IPXL and Rembrandt and other cases, I mean, I

23   look at MEP on one side and I look at the cases you cite

24   on the other side, and there's a way to reconcile those

25   cases, and the way to reconcile them is to ask what is

1    being identified is a process that one must engage in in

2    operating the machine or one is identifying a capacity

3    of the machine.  And that seems to me to be the way to

4    look at this case and say, if it identifies a process of

5    operating the machine, it's going to be more likely to

6    be deemed a method step.  If it's identifying a capacity

7    of the machine, a function is a capacity that's

8    identified as a particular capacity that's desired, it

9    is not a method step, and that's how I would distinguish

10    them.  But the problem is, when I apply that test to

11    your argument, you lose.  So what's the, what test are

12    you proposing?

13           MR. DILLON:  Your Honor, I'd like to look at

14    it with you with respect to each of the claims.  I think

15    in the broad strokes I don't disagree with you.  That

16    the question is whether this is describing in the claims

17    a method of operation.  If it is, the claims are

18    invalid.  If it's not, if it's using language that we

19    see typically where using functional language like

20    adapted to or configured to where functional language is

21    describing the apparatus, that's different.  These

22    claims don't have that language.  These claims have

23    language within them that are identical to the method

24    steps in the method claims.

25           THE COURT:  Yeah, I know you made that point

8

1   but that doesn't really carry any weight with me.  I

2   mean, I'm just saying that they use energize in both

3   doesn't tell me anything.

4           MR. DILLON:  I agree with respect to

5   individual words, your Honor, but what I want to do is

6   walk you through the individual claims, the method

7   claims --

8           THE COURT:  Okay, by showing me that they also

9   say the same thing in method claims is not going to help

10  me be persuaded by your argument.  So, if you want to do

11  that, it's just a waste of time.  Help me understand why

12  what they've included in their apparatus claim is in

13  fact a method step.  Don't just do it by telling me,

14  look how that language is similar in their method claim,

15  okay, that's just a waste.

16          MR. DILLON:  And I agree with that.  I think

17  you have to look at the entire element to understand

18  whether or not it's a method step or whether it's just a

19  functional description of a particular component.

20          THE COURT:  Okay, go ahead.

21          MR. DILLON:  So I think, you know, starting

22  with the '572 patent, this is a patent here where we see

23  both of those, the capability and the method.  And the

24  language in green here is directed towards the

25  capability.  The controller adapted to control

1    energization of said two motors such that tape is

2    transported in at least one direction between spools of

3    tape mounted on the spool supports.  That language is

4    directed to capability.  So it's a controller that's

5    been adapted in a particular way to perform the control

6    of the energization.

7         The next step there highlighted in red is a

8    method.  It says wherein the controller energizes both

9    said motors to drive the spools in a tape transport

10   direction.  If you look at the language in red, there's

11   no additional capability described in the red that's not

12   already described in the green.  And so if this was

13   interpreted as --

14        THE COURT:  But if it said energization means,

15   would that be a method step?

16        MR. DILLON:  No, but that's not what it says,

17   your Honor.

18        THE COURT:  I understand that's not what it

19   says.  But you see the problem you're getting into is

20   that, and you won't fall into this trap by acknowledging

21   it, but that's functionally what you're doing, is you're

22   basically trying to take all kinds of functional

23   claiming and make it all improper by saying it's a

24   method step.

25        MR. DILLON:  I don't think this is -- I think

1    the question is not whether it's functional claiming,

2    the question is whether this is a method step or whether

3    this is just further description of the apparatus.  And

4    here, the only thing that's additionally described in

5    the red has already been described as part of the

6    apparatus up above.  We're saying here, there's a

7    controller.  We see the controller in the green.  Up

8    above it says the controller has been adapted to control

9    energization.  Here we say it actually energizes.  Up

10   above it says said two motors.  Here it says it

11   energizes both said motors to drive the spools and tape

12   transport direction is just what's --

13          THE COURT:  Isn't that obviously the general

14   clause with two more specific clauses that follow it

15   that explain what it is?

16          MR. DILLON:  But the red part, your Honor, if

17   it's not red it's an operational step, doesn't describe

18   any additional capability than what's already described

19   in the green.  It would be a redundant and superfluous

20   clause.  And as a matter of construction, we don't read

21   patents to have meaningless clauses.  This is an actual

22   energization that's required here.  And when we look at

23   the method claim in the top right here, there is a

24   method claim in the '094 patent that uses the same

25   language as a method step.  It says the controller

1    energizes the motor so as to advance the tape in the

2    tape transport direction.  That language undoubtably in

3    the method claim is a method step.  And when you take

4    the same language, the controller energizes the motor as

5    to advance the tape in the tape transport direction, and

6    you put it back into claim one of the '572 patent, it

7    remains a method step.

8            THE COURT:  So in the context of the method

9    claim it's a method step, in the context of the

10   apparatus claim it's a functional claiming element.

11           MR. DILLON:  But it doesn't describe any

12   additional capability that's not already described in

13   the green language.

14           THE COURT:  I know, you said that before.  It

15   doesn't really persuade me.

16           Okay, what else have you got?

17           MR. DILLON:  There are two additional steps in

18   this '572 patent regarding calculates and controls.  The

19   same thing applies.  Here we see that there's method

20   claims that use very similar language to describe that

21   particular step as a method step in the patents.

22           And our position is that, at least in the

23   appeal with respect to the '572 patent where Markem took

24   the position that the patent could require, Zipher's

25   position was it required the mere capability, Zipher

1    took a contrary position and said that this claim, the

2    one at issue, '572/1, requires actual operation.

3              THE COURT:  Okay.

4              MR. DILLON:  So when we look at the IPXL test,

5    I mean this is as close as a bright line test as we get

6    from the Federal Circuit, where it says, you know, a

7    single claim, that's claim one, which contains an

8    apparatus, and clearly it's says a tape drive comprising

9    structural elements, and the issue here is whether these

10   are method steps.  And when you look at the plain

11   meaning of this language, wherein the controller

12   energizes both said motors to drive the spools in the

13   tape transport direction, that's an operational step.

14   It's used as an operational step in the method claims.

15   It doesn't use the conventions that are ordinarily used

16   when you're trying to change, when you're trying to

17   describe something as a functional capability of a piece

18   of apparatus.  For example, it doesn't use wherein the

19   controller is adapted to energize as we see up above.

20   It doesn't use configure to.  It doesn't use capable of.

21             THE COURT:  How do you describe MEP?  I mean,

22   this makes quite clear that if you're dealing with

23   capabilities, you're not dealing with method step;

24   right?  Isn't MEP the closest case that we have here?

25             MR. DILLON:  I don't think so, your Honor.

1              THE COURT:  Why not?

2              MR. DILLON:  Well, for one thing there's not

3    much of a discussion of the system claim in the MEP

4    decision.

5              THE COURT:  Well, yeah, I want to be clear.

6    Katz doesn't correctly characterize MEP, right, because

7    if you look at Katz on this point, it talks about the

8    fact that it was a method claim that was being analyzed.

9    But they were both, there was a method claim and an

10   apparatus claim.

11             MR. DILLON:  That's correct, your Honor.

12             THE COURT:  And the language I'm referring to

13   is the apparatus portion of the opinion, and so Katz I

14   think, kind of skipped too lightly over MEP which is

15   the, in my mind, is the clearest discussion and

16   distinction that IPXL was trying to get at.  And that's

17   why I look at it and say, unless you can take it out of

18   MEP, you're wrong.  And so unless you can show me this

19   is something other than capability, and I understand

20   you've got two arguments that you've made, so you know

21   that I've heard them, your first argument is they use

22   the same language in the method claim, therefore it must

23   be method step, which I am unpersuaded by.  And your

24   second argument is in the introductory clause of that

25   claim element they specify a capability, and therefore

14

1   when they refer to it again later on, that must be a,

2   not a capability but an operational step because

3   otherwise it would be redundant.  Those are your two

4   arguments.

5          MR. DILLON:  With respect to that claim, your

6   Honor, and the plain language of the step, which is a

7   method step, it says wherein controller energizes both

8   said motors.  It doesn't say where it's configured to or

9   adapted to, or any of the functional language we usually

10  see.

11         THE COURT:  Okay.

12         MR. DILLON:  I think rather than going through

13  the claims, your Honor, given the position, I'd like to

14  switch and jump ahead to the Federal Circuit decisions.

15         THE COURT:  Okay.

16         MR. DILLON:  I think it's worth talking about

17  Katz.  You know, here with respect to Katz you had a

18  capability that's described in the claim, and that is

19  the digital input means.  And so with respect to the

20  method step, the one that was challenged, there the

21  claim that was challenged was, wherein, in the method

22  step that was challenged with, wherein said certain of

23  said individual callers digitally enter data including

24  at least caller information data through said digital

25  input means.

1         Now, you could read the digital input means

2    and say what's occurring here is just simply a

3    functional characteristic of the digital input means.

4    It has to be capable of having individual callers

5    digitally enter the data --

6         THE COURT:  The key language in Katz is that

7    the language the court was considering was directed to

8    user action, not system capabilities.  That's the key

9    defining basis on which that portion of the Katz opinion

10   rests.

11        MR. DILLON:  I think, your Honor, that that is

12   certainly, that user, human interaction is part of the

13   Katz claim, but that's not a distinction that the

14   Federal Circuit has --

15        THE COURT:  This is what they say.  I'll quote

16   the actual language to you.  I'm surprised you haven't

17   read the opinion closely.  Katz seeks to distinguish

18   IPXL on the ground that the term wherein does not

19   signify a method step but instead defines a functional

20   capability.  We disagree and hold that the district

21   court's ruling, like the language used in the claim at

22   issue in IPXL, I'll leave out the parenthetical, the

23   language used in the Katz claim is directed to user

24   action, not system capability.

25        So they just threw that in there for the fun

1    of it, it doesn't really mean --

2              MR. DILLON:  No, your Honor, I disagree.  I

3    believe that that was important to what Katz said.  But

4    the key was that it was directed to operation.  And does

5    Katz require a human?  Well, if that were the case, then

6    in the subsequent Federal Circuit decision of Rembrandt

7    --

8              THE COURT:  So really you're relying on

9    Rembrandt, not --

10             MR. DILLON:  Rembrandt and HTC both support

11   that you don't need a user.  Rembrandt is the claim --

12   let me get the quote up here, your Honor.  This is the

13   claim here in the beginning, the Federal Circuit goes

14   through and identifies the first four of the five

15   elements as structural, and with respect to the last

16   element says, the part transmitting the trellis encoded

17   frames is a method step.  And transmitting the trellis

18   encoded frames was understood by the parties, the patent

19   owner, and by the alleged infringer as being a step that

20   was performed by the transmitter section.  It was not

21   performed by a user or a human.  And so although I would

22   agree that IPXL and Katz both had a human involved in

23   the method claim, that is not a requirement of the IPXL

24   rule.

25             THE COURT:  Well, I wouldn't read that in as a

1    requirement or not.  What I'm focusing on, is it

2    describing a capability slash function, or is it

3    describing operation.  That's the determinative factor.

4    But there's no question that Katz rested on the

5    distinction that said that, and I gave you the quoted

6    language --

7             MR. DILLON:  Your Honor, I understand.

8             THE COURT:  I'm not saying that that's

9    necessarily the determinative thing.  It obviously is

10   very important in trying to identify whether something

11   is operation or function.  And clearly we don't have

12   user using in this case.  We have claim element

13   operating, according to your theory, and the claim

14   operating is an operational step.  And, you know, I

15   understand that's your theory, but the other competing

16   view is that it describes what a function or capability

17   of the controller is in this case, and it doesn't look

18   to me like what it's talking about is practicing the

19   invention by operating it, it talks about what the

20   components of the invention are, including the

21   functional aspect of the disclosed structure.  That's,

22   you know, that's how I'm inclined to see it after

23   looking at it and reading these cases.

24             But I'll certainly consider your argument

25   that, and I'm going to ask them to respond to your two

1    arguments that because the same language is in the

2    method claim, it must be a method step, and because the

3    introductory clause identifies a function that further

4    references to it, must describe operation, not function.

5         MR. DILLON:  I'd like to point out one other

6    case in addition to Rembrandt, your Honor.  Here we see

7    transmitting the trellis encoded frames.  I made my

8    point on that.  That doesn't require a human.  In HTC we

9    had a similar situation.  The Court of Appeals

10   ultimately upheld this claim as valid in HTC.  It said

11   that the key here was when we look at the steps on the

12   left-hand side, the steps two through seven, the storing

13   step, holding, there was no doubt that these steps were

14   method steps in the decision of the Federal Circuit.

15   The issue is whether these were performed by the

16   unclaimed network or whether they were claimed by the

17   mobile station.  And the decision rested solely on

18   whether or not it was the mobile station or the network.

19   There was no doubt these steps here were method steps,

20   and again, not performed by a human, these were

21   performed either by, the issue is whether it was

22   performed by the mobile station, a piece of equipment,

23   or the network.  And ultimately the court ruled here

24   that these were performed by the network.  They were

25   there for part of the preamble, and then IPXL did not

1    apply to invalidate the claims, but the court again

2    affirmed as part of its decision here that method steps

3    that are performed by equipment are just as invalid

4    under IPXL as if performed by a user.

5            THE COURT:  Okay.  The problem I have with

6    Rembrandt is of all these decisions it's the skimpiest

7    in terms of its reasoning on this point.  It doesn't

8    even -- it just says the conclusion, it is a method,

9    therefore it violates.  It doesn't explain why it's a

10   method.  To the extent the other cases explain why

11   something is a method or why it isn't, Rembrandt just

12   declares its a method and then we move on.  So I must

13   infer from the declaration of it being a method and your

14   statement, if it's correct, that transmitting is not

15   something that is done by a user, that it has some kind

16   of broader meaning that's present in IPXL or Katz, both

17   of which involved user actions.  Those are the clear

18   cases.  And MEP is a clear case of it not being an

19   apparatus claim with functional claiming that's not a

20   method step.  Rembrandt declares this to be a method

21   step but doesn't explain why.  Do you agree it doesn't

22   provide any explanation?  It's just a statement of

23   conclusion.

24           MR. DILLON:  I believe there are two.  With

25   respect to Rembrandt, the transmitter, there the last

1    step transmitting the trellis encoded frame, there is

2    discussion in the case about what performs that.  And if

3    you look at the decision --

4              THE COURT:  I'll have to go back and reread

5    that because I didn't pick up, I didn't consider

6    Rembrandt to be a very helpful case to me because when I

7    look, usually you look to say holding why, okay.  Here

8    we have holding.  It is a method step.  But no why.  Do

9    you agree?  Is there any why in there where they,

10   because I read these opinions, if you look at the point

11   where they reach the conclusion, they simply, claim '236

12   reads, and has transmitted the trellis encoded frames.

13   And then it says claims four through 11 depend on three.

14   The first four elements of three recite apparatus

15   elements.  The final element is a method.  This court

16   has held that reciting both an apparatus and a method

17   renders a claim indefinite under 112.2  applying this

18   doctrine the district court correctly held the claim was

19   invalid for indefinite.  That's the full extent of the

20   court's reasoning on this point.  There is no other

21   reasoning on this point in the opinion.

22             MR. DILLON:  Your Honor, the reason for that

23   is the parties didn't dispute that this was a method.

24   Where the dispute was is whether you could change, add

25   language to, and the patent owner wanted to have this

1    claim construed as a transmitter section transmitting

2    the trellis encoded frames, and the court declined -- we

3    dropped the claims to add that language.  And that

4    discussion, I believe, follows the part that you're

5    reviewing there.

6              THE COURT:  Right.  So that, you're saying

7    that wasn't even an issue in the case --

8              MR. DILLON:  The parties admitted --

9              THE COURT:  -- whether it was a claim or a

10   functional claiming part of the apparatus.

11             MR. DILLON:  Because again, if you look at the

12   language, transmitting the trellis to the --

13             THE COURT:  But if the parties don't argue

14   something and the court doesn't analyze it, how much

15   weight can I give to the conclusion you want me to reach

16   from an opinion?  It's certainly not holding in the

17   opinion.  It's simply the court's just noting that the

18   parties don't disagree on a particular point and as a

19   result of that lack of disagreement, it's an improper

20   IPXL combination of method and apparatus.  That's what

21   you're saying Rembrandt is.  It's a meaningless opinion

22   for me.

23             MR. DILLON:  I disagree, your Honor.  I think

24   it's meaningful because the court didn't think that it

25   was necessary to further explain that a method required

1    --

2         THE COURT:  Yeah, I fully understand that you

3    can't have an apparatus claim that includes method steps

4    in it.  I understand that much, okay.  So what this

5    opinion tells me is, where the parties don't dispute an

6    apparatus claim contains a method element, it violates

7    IPXL, and I understand that.  If that's all it is, that

8    doesn't tell me anything that's useful to me.  It

9    doesn't answer the question we're struggling with which

10   is a different question, right?  The question we're

11   struggling with is given that that is true, is the

12   functional claiming here a method step or is it

13   permissible functional claiming that can be in an

14   appropriate case a part of an apparatus claim, Rembrandt

15   doesn't tell me anything on that point because as you

16   acknowledge, the parties conceded that what was at issue

17   there was a method step.  Now, if you say, well, you

18   should defer to the parties' judgment, if they are

19   willing to concede it it must be so, well, that doesn't

20   tell me anything, or the Federal Circuit didn't step out

21   and correct them and say even though the parties

22   conceded it's a method step, it's not.  Well, that's not

23   the way the judges work.  We have enough problems that

24   we have to solve.  We don't go out and try to solve

25   problems that the parties aren't disagreeing about, you

1    know, so I guess I can't put much weight on Rembrandt is

2    what I'm coming down to.

3              MR. DILLON:  Well, again, I would say that, I

4    can't speak to whether the parties at some point

5    disputed that, but the Federal Circuit did not think

6    that that was a serious issue of dispute and certainly

7    its opinion was directed to the issue of whether or not

8    you could add the structural element transmitter

9    section.  The court thought it -- and even if it had, if

10   it added transmitter section, that was not adding a

11   user, that was adding a transmitter section.  The method

12   step there, you know, the issue is whether or not its

13   capability of a piece of apparatus, this language by

14   itself is not a capability of an apparatus, and this

15   language itself is the method.

16             And I think, again, I'd like to go back to one

17   of the claims, your Honor.  We've looked at the '572,

18   but I would also like to look at the '605 because I

19   think this is another claim that really explains why

20   these are method steps.  We see on the left-hand side

21   here -- actually -- okay.  So this is '605, claim one.

22   On the left-hand side we had the apparatus.  We see the

23   tape drive, the preamble that then begins comprising to

24   stepper motors, to tape spool supports, and then it says

25   a controller controlling energization.

 1          And then on the right side it says with the

 2     controller energizing both motors to selectively rotate

 3     one of the motors from one or more angular steps in a

 4     direction of rotation to rotate its respective spools,

 5     and goes on and describes there the rotation that occurs

 6     and discusses the monitor monitoring, and then it says

 7     with the controller controlling the number of steps each

 8     motor advances.  And what's described in this claim here

 9     is a method of operation.  It's describing a first

10     printing operation that needs to occur, it then

11     describes the transport of the ribbon to place a second

12     region of the tape adjacent to the first region, it then

13     has a second printing operation that occurs, and it says

14     that this must be done for efficient usage of the tape.

15          And so, if I can skip ahead again, this is

16     identical language that's found in the method claim.

17     The position that Zipher took on this was that this was

18     the plain meaning should be given to this term, so why

19     does it matter.  Well, I mean, I would say it's black

20     letter law that if this is a method step the claim is

21     invalid.

22          But there is an inherent ambiguity also that

23     is attendant in this claim.  You see here that many

24     aspects of this claimed operation that are described in

25     the '605 patent are actual steps taken by the user.  The

1    user will decide the size of the image that's going to

2    be printed on the ribbon.  The user is going to

3    determine the width of the ribbon that's going to be

4    used.  And the user is going to set the gap between the

5    successive prints.  And so it's unknown whether there is

6    sufficient use of tape, and Mr. Glitzenstein will talk a

7    little bit more about that --

8              THE COURT:  Let's hold off on that --

9              MR. DILLON:  Yes, till later.  But the issue

10   is, whatever that standard means, it can't be determined

11   until after this print operation actually occurs.  This

12   is not describing the capability of a controller.  This

13   is describing a printing operation.  And when you look

14   at the language that's used, we're not seeing words like

15   a controller adapted to be able to have these specific

16   functional capabilities.  We're describing here in the

17   '605/1 the actual operation of the frame.  And that's --

18             THE COURT:  You're thinking, your point is

19   that someone reading this patent would be confused about

20   whether they can permissibly build this or whether they

21   only infringe by using it.  Your position is that's what

22   you think a reasonable person reasonably skilled in the

23   art reading this patent would say, I don't know, I might

24   be able to build this, but I might not.  Maybe I'll only

25   infringe if I use it.  That's your point.

1          MR. DILLON:  I have two points, your Honor.

2    One is that that's not the legal test.  But secondly, as

3    to this specific patent --

4          THE COURT:  But that's what the purpose, I

5    understand what the legal test is, but I thought we

6    acknowledged at the beginning of the argument that why

7    do we have this, according to the Federal Circuit, and I

8    defer entire to the Federal Circuit, in IPXL they

9    explain why this is a problem.  And the explanation that

10   they give is because a person can't really tell whether

11   they infringe by making the machine or by using the

12   machine.  And that's an important thing for people to

13   know.  And so we want to keep the categories of patents

14   distinct and we don't want people mixing them up, and

15   that's the reason why.

16          So, in trying to answer a difficult

17   application of the standard, I recognize that that's not

18   the standard, it is useful to ask, why do we have the

19   standard?  And if this is the reason why we have the

20   standard and we have to apply it to your case, it's

21   useful asking, given that there may be some apparent

22   difficulty in applying the standard, let's look at it in

23   light of its purpose, okay, and I'm not seeing how

24   there's any reasonable possibility here that somebody

25   looking at this would be confused about this.  They

1  would know that if I build something with this capacity

2  I infringe.

3              MR. DILLON:  But, your Honor, on that very

4  point, is that when it's built at the manufacturer's

5  facility, or is it as the user configures it to use in

6  full actual operation, or is it actual operation.  Those

7  are three different points because many of these

8  parameters are set by the user.  How wide is the tape.

9  What is the gap between the tape that's set by the user.

10  How big is the image that's used.  So how it's actually

11  configured by the end user is different than how it

12  would be as it left the factory.

13              And, so, knowing this is important to being

14  able to resolve whether there's infringement of the

15  manufacturer versus the user as is configured versus the

16  actual operation of the --

17              THE COURT:  I wish you had put some of these

18  things in your briefs, so, I mean, you don't have a clue

19  about this argument that you're raising now, there's not

20  a hint of this argument in your brief.  Is there?  If it

21  is there, show we where it is.

22              MR. DILLON:  I don't believe we, this is the

23  response --

24              THE COURT:  I mean, you just come in and try

25  to, you know, I mean, your arguments, to the extent

1     they're even interesting to me, are all new arguments

2     that are not set forth in your brief.  That's, I guess,

3     the struggle I'm having here.

4               MR. DILLON:  Your Honor, we did have --

5               THE COURT:  I think you've got some real --

6     look, I think you're doing a really nice job of arguing

7     a really weak argument.  I don't know if we should spend

8     a lot more time arguing it, but it is frustrating to me

9     that you're drawing out all these arguments that aren't

10    in your brief at all, and you would think if those were

11    the principal basis for arguing your point, it would be

12    in your brief somewhere.  Because I did read your brief

13    like 40 times.  I spent about, I probably spent over a

14    week of my time, more than 40 hours just getting ready

15    for this argument, and it's a little frustrating for me

16    when people pop in with new things that they, if they

17    were important, they should have put in their brief.

18              MR. DILLON:  Your Honor, may I just remind

19    you, we were not allowed to file a reply brief here --

20              THE COURT:  Yeah, but why did you need to know

21    what they were going to say in response?  I could have

22    predicted what they would say in response.  They didn't

23    say anything unusual or unpredictable.  You set this

24    stuff out in your principal argument and -- so I'm

25    understanding, and I'll have to hear what they have to

1    say about it, but what you're really saying here is how

2    you energize and how you control are things that are

3    determined entirely by the user.  It's not the

4    capability of the machine, it's that the user actually

5    energizes and actually controls and all that.  Is that

6    the argument that you're making?

7         MR. DILLON:  Your Honor, you asked me a

8    specific question as to why this matters, and that's why

9    I was trying to address this.  And yes, I do think it

10   makes a difference.  I think that when you look at --

11        THE COURT:  Am I correct that you are saying

12   that the controller controlling, it's not the controller

13   that controls, it's the user that controls.  It's the

14   user that energizes.  It's the user that calculates.

15   It's not the controller.

16        MR. DILLON:  No, I'm not saying that.  What

17   we're saying, your Honor, is that some of the parameters

18   that would be used by the controller are set by the end

19   user, and so there would be a factory machine that

20   leaves the factory, but what the end user does with it,

21   the end user chooses what size spool to put on the

22   ribbon.  The end user decides what the gap is going to

23   be.  There's a default that the user sets that the end

24   user will decide, you know, what size image to put on

25   it.  And I apologize that we didn't anticipate this as

1  being the court's concern and we'd certainly be willing

2  to submit supplemental --

3            THE COURT:  No.

4            MR. DILLON:  Okay.

5            THE COURT:  You have one shot.  You get 50

6  pages.  You should be able to identify what your

7  principal arguments are in 50 pages.

8            MR. DILLON:  But, your Honor, I want to just

9  keep getting back to the language in the method claims.

10  I know that the court has indicated it's not a very

11  persuasive point, but I'd ask that you'd reconsider that

12  point after this hearing because when you take the same

13  language, and as a matter of claim instruction, the same

14  language in a method claim where it's admittedly a

15  method step, it has to be, it's in a method claim, it's

16  going through, if you look at the method claims in

17  Zipher's patents, the same language is appearing again

18  in the --

19            THE COURT:  If they had said a method claim

20  whereby one of the steps you use the following structure

21  with the following function, that would, you couldn't --

22            MR. DILLON:  That's not the situation, though,

23  your Honor.

24            THE COURT:  That's effectively what it is.

25            MR. DILLON:  I think if you look at their

31

1    claims, and let me pull up one.

2           THE COURT:  I don't have a lot of experience

3    with method patents, but you could definitely have a

4    methods patent that has as one of its steps the use of a

5    machine.

6           MR. DILLON:  Sure.

7           THE COURT:  So, and that's what that language

8    is talking about there in the method part of the claim,

9    which isn't the claim that we're being challenged as

10   invalid here, so, I mean, that's why I haven't been

11   focusing on the method claim.  But, again, since I

12   haven't, you didn't brief it and I couldn't study it, I

13   haven't gone back to look at it exactly, but that you as

14   a method step, identify a structure and a method of

15   using that structure, it doesn't surprise me and it

16   doesn't make the disclosure of the structure in the

17   apparatus claim a method step.

18          So that's why I don't, I mean, I'll go back

19   and think about it some more, but I -- it doesn't strike

20   me as a legitimate argument.  I mean, I look at your

21   briefs here.  I'd say you have legitimate arguments on

22   points two and three here, and that's where we probably

23   ought to be spending most of our time.  This argument is

24   a, strikes me as a contrivance that is very weak and

25   that is a distraction, as a lot of things that Markem

1    does, it's a distraction from focusing on the real

2    issues.  And, so, I mean, you're doing a very nice job

3    of presenting these arguments, but I don't find them

4    persuasive.

5         So I'll think about it some more in light of

6    what you said, but I don't know that we ought to spend a

7    lot more time on it.  If there's something new or

8    different that you want to add --

9         MR. DILLON:  No, your Honor, I would ask that

10   you look at the method claims.  I think we put in our

11   brief, our opening brief, the analogous method claim.  I

12   would ask you to look at that language and look at

13   the --

14        THE COURT:  Pull up your slide where you, the

15   one argument I want to explore most carefully with the

16   other side is your argument that based on the claim

17   structure there is a disclosure of function at the

18   beginning of that claim element and that subsequent

19   references must be references to process.  So let me

20   hear what they have to say about that, and then if there

21   is something further, you can respond, okay?

22        MR. DILLON:  Thank you, your Honor.

23        THE COURT:  So what do you make of that point?

24   I know it wasn't in the brief, so you didn't have a

25   chance to prepare for it, but what's your response to

1   it?

2           MS. STOLL:  If it's okay, I'd like to pull up

3   a slide.  I think that that would be --

4           THE COURT:  Okay, but, you know, I want to be

5   sure you understand.  This slide that I wanted you to

6   comment on, you understand his point.  His point is that

7   the green language is functional language adapted to

8   control energization, and that the red language

9   therefore would be redundant and couldn't be construed

10  as language of function, it has to be construed as

11  language of process, and that's your point, right?

12          MR. DILLON:  Yes, your Honor.

13          THE COURT:  Okay, so, I need you to respond to

14  that specific argument.  Do it any way you want, but

15  respond to that specific argument.

16          MS. STOLL:  If you look at the MEP case and

17  look at the claim language there, it parallels the claim

18  here.

19          THE COURT:  Okay, let me get it.

20          MS. STOLL:  And --

21          THE COURT:  Hang on, hang on, hang on.

22          MS. STOLL:  If I could have the slides, I

23  could bring that language up for you.

24          THE COURT:  What page is it?

25          MS. STOLL:  If you look at the slides, I have

1    slides for --

2            THE COURT:  Yeah, I understand, but I'd like

3    to see it in the case, so.

4            MS. STOLL:  In the case it's on page 1375.

5    May I approach with the slides?

6            THE COURT:  You can hand them up, that's fine.

7            (Pause.)

8            THE COURT:  All right, go ahead.

9            MS. STOLL:  Okay, so in that case the claim

10   that the Federal Circuit looked at, and I'm talking

11   about the apparatus claim, had language including a

12   pipeline processor for executing instructions

13   comprising, and one of the elements was a conditional

14   execution decision logic pipeline stage.  And then later

15   in the claim, it says the conditional execution decision

16   logic pipeline stage performing a boolean algebraic

17   evaluation.  My point is simply that just because the

18   claim refers to that same structure again later in the

19   claim and uses active verbs like performing or

20   controlling, it doesn't make it a method claim.  It's

21   still a functional limitation which the Federal Circuit

22   has said identifies the capability of the structure.

23   So --

24           THE COURT:  Stop for a second.

25           MS. STOLL:  In the MEP case --

1            THE COURT:  Stop for a second.

2            MS. STOLL:  Yes.

3            THE COURT:  Yeah, the Federal Circuit didn't

4    take up this argument.  Do you agree?

5            MS. STOLL:  I agree.

6            THE COURT:  Okay.  Because I'm not finding any

7    reference to it on 1375.  I don't even see the quoted

8    language of claim seven.  I see a discussion of claim

9    seven.  So I will have to go back into the earlier part

10   of this.

11           MS. STOLL:  My point is that if you look at

12   that claim, you will see that it mentioned the same

13   structure twice with functional language following that

14   structure.

15           THE COURT:  Okay, the functional language is

16   what?

17           MS. STOLL:  So, if you look at the slide, I've

18   highlighted it, what's the functional language and

19   what's the structure.  So in the slide you'll see

20   there's the red language.  That's the structure.  The

21   conditional execution decision logic pipeline stage.

22   And then the functional capability follows it.

23   Performing a boolean algebraic evaluation.

24           THE COURT:  All right, wait.  So where is the

25   functional language first used at the beginning of the

1  claim?

2          MS. STOLL:  Where it says a conditional

3  execution decision logic pipeline stage, and it

4  continues to go on in the claim, earlier in the claim.

5          THE COURT:  Where, I'm sorry, I don't see that

6  on here.  So the phrase in your slide, a conditional

7  execution decision logic pipeline stage.

8          MS. STOLL:  Yes.

9          THE COURT:  Okay.

10          MS. STOLL:  I'll grab the case because I don't

11  have the full claim in the slide.  I apologize for that.

12          THE COURT:  The conditional execution decision

13  logic pipeline stage.  What is a conditional execution

14  decision logic pipeline stage, what is that?

15          MS. STOLL:  That's the structuring claim.

16          THE COURT:  Okay, then what's the functional

17  language in that?

18          MS. STOLL:  For the first element?

19          THE COURT:  Yes.

20          MS. STOLL:  Let me grab it.  I apologize.  I'm

21  going to grab the claim.  This is claim seven, and

22  that's on page 1371 of the decision.

23          THE COURT:  Yeah, I've got it.

24          MS. STOLL:  Okay, good.  And so it says, okay,

25  a conditional execution decision logic pipeline stage,

1   at least one instructional execution pipeline stage

2   prior to said conditional execution decision pipeline

3   stage.  And then later it says the conditional execution

4   decision logic pipeline stage performing a boolean

5   algebraic evaluation of the condition code, and said

6   conditional execution specifier and producing an enabled

7   right with at least two states.  True and false.  So

8   there are multiple functions --

9          THE COURT:  Okay, you've lost me, you've lost

10  me.  I see claim seven having as a pipeline processor

11  for executing instructions comprising a conditional

12  execution decision logic pipeline stage which is the

13  structure.  Right?

14         MS. STOLL:  Yes.

15         THE COURT:  And then I see a reference, if you

16  have the opinion, you go down one, two, three, four, the

17  fifth paragraph beginning the conditional execution

18  decision logic pipeline stage, and then specifying the

19  functional language, right?  Okay.  But I don't see the

20  earlier reference to the functional language.

21         MS. STOLL:  I understand what you're saying.

22  I'm looking at that lower paragraph and there's two

23  different functions there.  There's both the performing

24  function and also the producing function.

25         THE COURT:  Okay.

1          MS. STOLL:  And so the conditional execution

2    decision logic pipeline stage is introduced earlier in

3    the claim, and then later there's two different

4    functions.  And I had not heard this argument before

5    either, and I imagine if I look through the cases I can

6    find more instances of this.  But it reads --

7          THE COURT:  But this doesn't respond to his

8    argument.  His argument is not that disclosing the

9    structure at the beginning and then disclosing the

10   structure with function later is redundant.  His point

11   is, he says, our claim is different because it does have

12   functional language at the beginning, which this seven

13   doesn't, and therefore the later references can't be

14   simply the re-disclosure of the function, it must be

15   re-disclosure of the process.  That's his argument.

16   This point you're making doesn't respond to that

17   argument.  Not that I'm aware of.

18         MS. STOLL:  I understand.  I guess I was

19   thinking that because the fifth or sixth element down in

20   the claim seven in the opinion talks about two different

21   functions.  It talks about both performing and

22   producing.  It's not just one function, but that

23   responds a little bit to his argument, but I understand

24   your point.

25         THE COURT:  Our's has three.  Our's has

1    controlling, calculating, and I can't remember the third

2    one off the top of my head, but --

3            MR. DILLON:  Energizing.

4            THE COURT:  Energizing.  So, our's has three

5    functions.  So, I mean, I don't think his argument is

6    right, but I don't think this point in any way supports

7    the position that it's not right.  Do you have any other

8    arguments as to why his point is not right?

9            MS. STOLL:  I'm not aware of any cases that

10   hold that way, and I don't think that you can look at a

11   claim, and there's no case law that I'm aware of that

12   says you can only have a functional description of a

13   claim element one time in a claim, or else you're going

14   to convert it into a method --

15           THE COURT:  I think he would rely on cases for

16   a more general proposition.  What he was saying is that

17   you can't construe separate claim elements to basically

18   say the same thing, that would not be proper, but I'm

19   not sure that that principal, which I think is a correct

20   principal of patent claim construction, is not

21   applicable here.  But I think that's what you're relying

22   on, right, you're relying on the general principal that

23   you don't construe multiple elements in a claim to claim

24   the same thing because that would be redundant and you

25   don't do that, so --

 1             MR. DILLON:  That's correct, your Honor.

 2             THE COURT:  -- to the extent that they are

 3    doing something, they must be serving some different

 4    function, and here the function being served is to

 5    specify a process element because you already pled the

 6    structure or the function relating to the structure.

 7             MS. STOLL:  But this is a different function,

 8    and so, yes, earlier in the claim.

 9             THE COURT:  I'm sorry, could you put up his

10    slide again, because I'm not sure you're understanding

11    what he's saying.

12             MS. STOLL:  I do, I think --

13             THE COURT:  Well, then, let's put up the slide

14    because what you're saying is not responsive at all.

15    You see where it says here, a controller adapted to

16    control energization of said two motors, okay.  His

17    point is, I agree, adapted to control energization,

18    that's function.  That's what you're saying, right?

19             MR. DILLON:  Correct, your Honor.

20             THE COURT:  I agree, that's function, that's

21    not a process step.  Then he goes on to say, and because

22    they put in the next phrase, wherein the controller

23    energizes, he's saying that can't mean merely to specify

24    a controller that has the capability of energizing.

25    That must mean an instruction to a process step where

41

1    you actually energize the device, and that must be so

2    because the earlier clause already identified the

3    function.  That's his argument.  And I just want your

4    response to that argument.

5              MS. STOLL:  I have just one response I have to

6    that is that the Federal Circuit has held that language

7    like the language in this claim, wherein the controller

8    energizes both said motors with an active verb followed

9    by structure, the Federal Circuit has said, including in

10   the MEP case, that that is identifying a capability.

11             THE COURT:  Yeah, it looks like capability to

12   me.  That's the problem I have with it.  I say people

13   reasonably reading this, are not going to understand

14   this to mean a process step, they're going to understand

15   it to mean a capability that identifies the desired

16   function that that capability flows from -- excuse me,

17   the function that a particular capability that this

18   device has.

19             So, that's how I look at it, in a common sense

20   reasonable reading of the language in its entirety.  But

21   he did throw me with this new argument that wasn't

22   presented in his brief that I at least need to think

23   about, so.

24             Okay, is there anything else you want to say

25   in response to his point?

1            MS. STOLL:  I would just like to point out a

2    little bit more, point out some of the language of the

3    claims in the cases and compare that to the language in

4    our case and tell you where I think the difference is

5    between cases where the Federal Circuit has found IPXL

6    applies and cases where they haven't, and I'll be very

7    brief.

8            THE COURT:  Okay.

9            MS. STOLL:  Okay.  So, I'd like to start on

10   Rembrandt if that's okay, because we had talked a little

11   bit about Rembrandt.  So I just want to point out that

12   if you look at the Rembrandt case and you look at the

13   last element which we have reproduced pertinent parts of

14   it here with the paragraph structure as in the --

15           THE COURT:  Do you agree with his point that

16   Rembrandt is different from Katz and IPXL in that it

17   identifies a data transmitting device transmitting the

18   trellis encoded frames rather than a user?

19           MS. STOLL:  I agree that that is a difference.

20           THE COURT:  And so you agree with his follow

21   on point that therefore user operation can't be a

22   requirement for a, to make a, what appears to be a

23   functional claim in fact a method step.

24           MS. STOLL:  I agree with that.

25           THE COURT:  Okay.

1             MS. STOLL:  In the Rembrandt case, if you look

2       at the last limitation, I've identified what's been the

3       method limitation in blue.  Do you see that there's no

4       structural noun there.  It just says transmitting the

5       trellis encoded frames.

6             THE COURT:  Well, but the structure is the

7       data transmitting device.

8             MS. STOLL:  Well, the device itself is

9       actually performing that step, but there's no structural

10      noun.  If you look at our claim in contrast, you have

11      the controller energizes, the controller calculates.

12      There's structure followed by functional language that

13      describes --

14            THE COURT:  This is the transmitting device

15      transmitting.  It's very much like a controller

16      controlling.

17            MS. STOLL:  Well, I would submit that it is

18      different, and the fact that there's no structural noun

19      immediately preceding transmitting suggests that it's

20      intended to be a method step.  Of course there's the

21      other argument, too, that the parties --

22            THE COURT:  But if it's true, you can construe

23      it just as if that other language weren't there.  It

24      would be a data transmitting device transmitting, right,

25      according to your slide.  I haven't gone back to look at

44

1    it, but.

2              MS. STOLL:  I think the fact that there is a,

3    there's particular ways that claims are drafted, and the

4    fact that there isn't a structural noun before the word

5    transmitting is further evidence that it was intended to

6    be a method term, and the parties didn't dispute it as

7    you pointed out, so we really can't put a lot of weight

8    into that anyway.

9              THE COURT:  I mean, that's, I think Rembrandt

10   is entitled to very little weight because it doesn't

11   explain in any way, and it appears that the point was

12   not even contested by the parties, and therefore I'm not

13   inclined to give substantial weight to it.  Instead I'm

14   inclined to rely on Katz and MEP and IPXL which seem to

15   be the major cases that do attempt to analyze and

16   explain to people why this is so.  But let me just see

17   if I can get this actual claim language in Rembrandt.

18              (Pause.)

19              THE COURT:  Okay, if you look at the way this

20   language actually works, your slide actually hurts your

21   case because it doesn't actually construe the claim

22   correctly.  If you look on page 1339 of the opinion, the

23   actual claim language -- this is claim three, isn't it?

24              MS. STOLL:  I think that it is claim three.

25              THE COURT:  All right, so you look at it.  The

1    first sentence is a data transmitting device for

2    transmitting signals corresponding to an incoming stream

3    of bits comprising elements one, two, three and four and

4    transmitting.  So, the way you would distinguish this

5    is, this involves structure comprising and a method step

6    transmitting, and that's very different from our case,

7    extraordinarily different.  But that's not the point

8    you're making here.

9         MS. STOLL:  I'm trying to distinguish this

10   case.  I'm explaining why it is that we don't have a

11   method step.  So I'm not trying to use this Rembrandt to

12   prove that I have a method step, I'm using it to say,

13   yes, there is a --

14        THE COURT:  I understand, but the argument,

15   the way to make the argument, and I think I can easily

16   distinguish this case, is that the claim at issue in

17   Rembrandt involved a claim that was comprised of three

18   structural elements and a method step of transmitting,

19   which is very different from our case which doesn't use

20   the language comprising the following structural

21   elements and energizing, and that's the way to

22   distinguish this case.  So I agree, it clearly is

23   distinguishable and I'm not going to rely on it in

24   reaching my decision here, okay?

25        All right, what else did you want to tell me?

1            MS. STOLL:  I'm going to next talk about the

2    MEP case.  I just want to note the similarities there

3    between --

4            THE COURT:  You've got me already on MEP.  You

5    don't need to say anything.  I've read it.  I think it's

6    the most important useful case explaining IPXL.  I think

7    it's more useful than Katz, frankly, because it doesn't

8    deal with the apparatus claim in MEP, it dismisses MEP

9    and distinguishes it by only referring to the method

10   claim in MEP when what we're interested in is the

11   apparatus claim, so.

12           All right, anything else on this point?

13           MS. STOLL:  Do you have any questions for me?

14           THE COURT:  No, thank you.  All right, let's

15   go to the second argument.  You want to respond?

16           MR. DILLON:  I just want to make one short

17   point, your Honor.  I think you're absolutely right

18   about the issue there with respect to '572/1, and even

19   if you were going to go a different way on the other

20   claims, that claims is very explicit about the

21   capability and then function in first step.  And I just

22   wanted to put, this was not a new argument.  We raised

23   it on page 14 of our original brief and it was not

24   really substantively addressed much in response, and the

25   reason is, that is a very difficult claim for them

47

 1   because in the same claim you do have the same

 2   capability, the capability step followed by the

 3   functional description, and that functional description

 4   adds nothing, and that's the same thing when you look at

 5   the MEP case.  The Microprocessor case is the exact --

 6        THE COURT:  You read your brief as having

 7   included that.  I've got to tell you that I as someone

 8   who has read it many times don't read it to include that

 9   argument.

10        MR. DILLON:  Your Honor, the top of the page

11   14 it says, the former describes the capability of the

12   controller and the latter describes the --

13        THE COURT:  Okay, you've made your point but

14   it's not usually a good idea to argue with the judge and

15   tell him he doesn't understand how to read your brief

16   correctly.  You made your point for the record.  To the

17   extent you're trying to preserve some argument that I'm

18   not saying that you waived by not -- but you didn't

19   raise it clearly, you didn't raise it in a way that, I

20   mean, I'm not a stupid person, I spent 40 hours reading

21   these cases, reading these briefs.  I didn't understand

22   your argument to be made in there, so you didn't make it

23   clearly enough.  I mean, your job is to persuade me,

24   right, and if you don't make it in a way that I can

25   understand, you're not doing your job.

1          MR. DILLON:  And I apologize, your Honor, I

2     didn't mean to offend you.

3          THE COURT:  It's just not a good idea to just

4     tell me, you know, you're wrong, judge, I did make it,

5     it doesn't really serve any purpose, especially when you

6     make it, if you do, so obliquely as you did there.

7          All right, you want to make your next

8     argument?

9          MR. GLITZENSTEIN:  Your Honor, Kurt

10    Glitzenstein, I'll be addressing the second and third

11    indefiniteness arguments this morning.

12          I guess we're back up on the screen.  Your

13    Honor, we tabbed the binder and we're at tab two now.

14    And slide 54, and just to sort of set the table a little

15    bit on this issue, this is the Halliburton issue, that's

16    sort of the shorthand, I guess we could also fairly call

17    it the General Electric/Halliburton issue which is a --

18          THE COURT:  Can functional claiming be

19    indefinite even if it's not at the point of novelty?

20          MR. GLITZENSTEIN:  Oh yes, absolutely

21          THE COURT:  So whether it's at the point of

22    novelty is irrelevant.  The issue is whether it's

23    indefinite.  Functional language at the point of novelty

24    can potentially raise an anticipation problem under

25    Section 102, but that's not what we're arguing here.

1          MR. GLITZENSTEIN:  That's correct, your Honor.

2     It's the holding of the General Electric case, the

3     functional language at the point of novelty --

4          THE COURT:  Yeah, but I guess what I'm saying

5     is General Electric would also recognize that functional

6     language that is indefinite under paragraph two of

7     Section 112 is indefinite and renders the patent invalid

8     whether it's at the point of novelty or not.

9          MR. GLITZENSTEIN:  True, your Honor.  I think

10    that it's when, though, the function --

11         THE COURT:  And when functional language at

12    the point of novelty, whether novelty is relevant

13    depends on whether you're making a claim under Section

14    102 for lack of novelty, and it is true that if you have

15    a disclosed structure and a function, and the only thing

16    that distinguishes that patent from a prior patent claim

17    is the functional claiming, if the functional claiming

18    is inherent in the structure, you can't have a valid

19    patent because the prior art discloses all functions of

20    the disclosed structure, right, all inherent functions

21    of the disclosed structure.

22         MR. GLITZENSTEIN:  If I'm understanding the

23    court's hypothetical, yes, your Honor, that would be a

24    separate basis --

25         THE COURT:  All right, let me try to be clear,

1   okay.  And this is why I think you guys, you're

2   misdirecting things.  You've got a valid argument or an

3   interesting and important argument but you're

4   misdirecting it.

5            When one wants to argue that my patent, this

6   patent that I'm challenging here is invalid because it

7   doesn't do anything new and different because there's a

8   prior patent that already covers it, one brings a claim

9   for anticipation under Section 102, right?

10           MR. GLITZENSTEIN:  Yes, your Honor, we have

11  separate defenses along those lines.

12           THE COURT:  Okay.  And when one makes that

13  argument, one makes it by saying if I have a patent that

14  has a structure and a function, and one wants to say

15  that there's a prior patent that has all of the

16  disclosed structures in it, one would say the prior

17  patent anticipates the current patent because all of the

18  disclosed structures in the current patent are in the

19  prior patent, and the functional language claimed in the

20  new patent is inherent in the structures that are

21  disclosed, and because it's inherent in the structures

22  that are disclosed, the new patent is anticipated by the

23  old patent, and that's because the structures that are

24  covered by the patent include any functions that are

25  inherent in those disclosed structures.  Right?

1          MR. GLITZENSTEIN:  Yes, your Honor, that's how

2     I'd understand --

3          THE COURT:  And that's when there's a

4     potential problem of novelty and that's where the point

5     of novelty comes into play.

6          Here's my problem.  I think that you guys are,

7     you don't rely sufficiently on Swinehart in trying to

8     understand what's really going on here.  And maybe we

9     can get through this part of it quickly and get on to

10    what I think is a more interesting argument.

11         There is -- it is not a categorical rule that

12    -- well, let's start broadly and move specifically.  You

13    agree of course because the Federal Circuit has said it

14    many times, that there's nothing inherently wrong with

15    functional claiming.

16         MR. GLITZENSTEIN:  Yes, your Honor.

17         THE COURT:  Okay.  Do you agree that there is

18    not a categorical rule that functional claiming at the

19    point of novelty is always improper.  Is your position

20    categorically all functional claiming at the point of

21    novelty is categorically improper unless it's under

22    112.6?

23         MR. GLITZENSTEIN:  Yes, your Honor.

24         THE COURT:  That's your position.  I'm going

25    to spend an hour probably trying to basically beat you

1    up on that and explain to you why that's wrong, okay,

2    that is wrong, because let me try to go quickly to the

3    heart of it for me.  I thought about this a tremendous

4    amount and if you look, the treatise that I think really

5    captures this well -- see, I wish we could spend our

6    time on the important things but, you know, it's because

7    you argue things that you don't need to argue and take

8    positions that you don't need to take that we end up

9    getting distracted.  You've read the Swinehart case?

10           MR. GLITZENSTEIN:  I have, your Honor.

11           THE COURT:  All right.  It's a very, very

12   important case in describing when functional claiming is

13   acceptable and when it isn't, right?

14           MR. GLITZENSTEIN:  It is one of them, your

15   Honor, yes, I think General Electric is also another

16   one.  I think the Halliburton Energy case which also

17   discusses Swinehart and tries to address this very issue

18   is also important.

19           THE COURT:  You think Chisum is a good source

20   on patent law, don't you?

21           MR. GLITZENSTEIN:  Chisum has its strengths in

22   some areas but it's not a perfect source.

23           THE COURT:  I think -- I like Chisum on this

24   point because Chisum really says, again, what's the

25   problem with functional claiming, what are the problems.

1   And he reads the, he reads General Electric and the

2   Halliburton Supreme Court case and the Swinehart and the

3   Halliburton Federal Circuit case, it reads all those

4   cases and comes to the conclusion that there are really

5   three problems potentially with functional claiming.

6   One is the, a problem with definiteness, and we're going

7   to get -- that's what I think this case, your argument

8   is about.  The other is the problem of the, let me get

9   the exact way he describes it.  He says it's a potential

10  Section 112.1 problem of the way you describe the patent

11  in sufficient terms that it can be built, which we don't

12  have here, that's not what we're talking here.  The

13  second problem is the problem of inadequate disclosure

14  under the first part of 112 -- excuse me, I've got those

15  reversed.  It's 112.2 and 112.1, enablement and

16  definiteness.  And then finally functionality may

17  present a problem of novelty and non- obviousness.  The

18  mere recitation of a newly discovered function of

19  property inherently possessed by things in the prior art

20  does not cause a claim drawn to those things to

21  distinguish over the prior art.

22          Those are the three problems that Chisum sees

23  with potential problems with functional claiming.  Do

24  you agree that those are the three problems?

25          MR. GLITZENSTEIN:  Yes, your Honor.

```
 1                    THE COURT:  And the one you're raising is a
 2       112.2 paragraph problem of definiteness.
 3                    MR. GLITZENSTEIN:  Yes, your Honor.
 4                    THE COURT:  It's not a problem of novelty.
 5                    MR. GLITZENSTEIN:  Yes, Honor.
 6                    THE COURT:  Okay.
 7                    MR. GLITZENSTEIN:  This is a problem that
 8       flows from their decision not to avail themselves of
 9       112.6 in this case.  It's sort of the natural --
10                    THE COURT:  Now, if we set aside the problem
11       of novelty, here's why I think that the, whether
12       functional claiming at the point of novelty or not is
13       definite, is the issue.  And functional claiming, no
14       matter how definite it is, is invalid if it's at the
15       point of novelty.  What you've done is you've taken a
16       holding of the case and applied it without thought to
17       the purposes that underlie the definiteness requirement.
18       And what I'm trying to convince you of here is that
19       whether at the point of novelty or not, if the
20       functional claiming is sufficiently specific to alert a
21       person reasonably skilled in the art as to what the
22       additional structure that's implied by that function is,
23       it will be sufficient, whether it's at the point of
24       novelty or not.  So if you specify a function that
25       someone skilled in the art would necessarily know can be
```

1    done one way and one way only, and it's everybody who

2    understands that function, that whether that's at the

3    point of novelty -- if it's at the point of novelty it

4    can still be valid because it doesn't present an

5    anticipation problem, because it implies a structure

6    that is not inherent in any previously disclosed

7    structure, okay?  So if you've got a structure element,

8    a controller, okay, and the controller energizes, which

9    is the functional, part of the functional language here,

10   right, and a person reasonably skilled in the art would

11   -- and suppose the energization is something that

12   controllers had never done before, they weren't -- and

13   they don't work that way, there has to be some inherent

14   additional structure implied by that function, say, for

15   example, if you had a special purpose computer that was

16   your controller, and there was an algorithm that had to

17   be written in order to energize, and everybody knew that

18   an energization algorithm, if there's only one that

19   works, and when you specify controller energize and you

20   know a controller that includes this algorithm, and that

21   algorithm is new and not in this combination before,

22   that would be a valid patent even though it is

23   functional claiming at the point of novelty.  Does that

24   -- do you understand that at all?

25             MR. GLITZENSTEIN:  I was following up until

56

1    that last conclusion.  I do submit that in General

2    Electric the fact that the functional language, the

3    attempt to distinguish over the prior art, and here's

4    maybe some, a way for me to address the broader

5    question, but I think I see where your Honor is going

6    with the more specific question and I can move to that

7    as well.

8          So, with regard to the broader question, the

9    point of novelty is a little bit different than this

10   issue of inherency or an inherent function in the prior

11   art.  What the point of novelty is going to is, is the

12   thing that distinguishes over the prior art captured in

13   a functional way in the claim.  That was the issue --

14         THE COURT:  And I think that's the wrong

15   question.  It's not automatically, and you're not going

16   to persuade me of this, so you might as well just go on

17   because I thought about this for days and days.  It is

18   in fact my view that whether at the point of novelty or

19   not, if the functional claiming is sufficiently, implies

20   a structure that a person reasonably skilled in the art

21   would understand what that structure is, it is not

22   invalid for lack of definiteness.  It may be invalid for

23   lack of novelty if in a prior patent that structure is

24   disclosed, and what the inherent, the functional

25   language talks about is something that's inherent in

1    that device, it may be invalid under 102 but it's not

2    indefinite under 112.2, and whether that's at the point

3    of novelty or not.  So indefiniteness looks at the same

4    question it looks at with the question of insoluable

5    ambiguity.  It asks the question of whether a person

6    reasonably skilled in the art would read this claim term

7    in the context of the claim in the broader patent and

8    understand what it is so they can know what the

9    invention is and what they can do without infringing the

10   invention.  And the debate here, which is a legitimate

11   one it seems to me, is whether controller -- energizing,

12   controlling and calculating, whether those functional,

13   that functional language would be understood by a person

14   reasonably skilled in the art to identify what that is.

15   So if it's a general purpose computer is your controller

16   and everybody understands that a general purpose

17   computer can function to energize, then that's great.

18   You have no problem.  You could then come back and argue

19   anticipation.  I can show you another patent where they

20   used the general purpose computer as the controller and

21   did all of these exact same things, and it might not be

22   novel simply because you've specified the structure if

23   it's inherent in the way a general purpose computer

24   operates, but the debate here is, I mean, here you have

25   included some discussion of it in your brief, but you

58

1  spent all this time trying to argue this point that

2  there's a categorical rule that functional claiming at

3  the point of novelty is invalid; that I think is a

4  distraction, a waste of time and wrong.  And I'd rather

5  focus on what I think is the right argument, which is

6  whether at the point of novelty or not, this is

7  functional language, and functional language presents

8  real problems.  It can be used in certain cases, but we

9  have to be sure that the functional language can be

10  understood by, I don't want to not say sure, I don't

11  want to confuse anybody that I misunderstand the burden

12  of proof, patents presumed to be valid, it requires

13  clear and convincing evidence that they're not valid,

14  lack of definiteness, all of that, I'm not trying to --

15  I don't want someone to misconstrue what I'm saying as

16  having misunderstood that point, but the fundamental

17  problem here that we ought to be spending our time

18  discussing is the question of whether functional

19  language energizing, calculating, controlling tells

20  somebody reasonably skilled in the art something about

21  how to build this device essentially, and if it's so

22  indefinite that it would capture every foreseeable way

23  in which those things can be done in the future and

24  nobody can tell where the boundaries of it are, then

25  it's going to be indefinite.  But it's not, I don't just

1    look at it and say is this at the point of novelty, is

2    it functional.  Done.  I can go home.  I just don't

3    believe that that is true.  And you are making that

4    point.

5              MR. GLITZENSTEIN:  We are making two points,

6    your Honor, and I can move from, that's our broad point,

7    and I can move from the broad to the specific.

8              THE COURT:  Other than citing to General

9    Electric, how do you make this point?

10             MR. GLITZENSTEIN:  The -- I'm sorry?

11             THE COURT:  I recognize that the language in

12   the opinion, in the opinions use this at the point of

13   novelty, but why is that, that is not necessary to the

14   holding of either case, and it is in my mind not

15   determinative of the definiteness problem.

16             MR. GLITZENSTEIN:  And, your Honor, I don't

17   want to take away any of my time from the second point,

18   but to address this General Electric point, the

19   suggestion, I have read Judge Rich's dissent in the

20   Fisher case from 1962 and I do recognize that he labeled

21   this language in General Electric dicta, but of course

22   the majority in that same case relied on this very

23   language in General Electric to reach the result that he

24   was dissenting from.  But even the language itself in

25   General Electric is not dicta because in that case the

1    thing that allegedly distinguished the claim from the

2    prior art in that case was functional language.  So it's

3    not dicta in the sense that --

4            THE COURT:  The Federal Circuit has never held

5    that functional claiming at the point of novelty is, per

6    se, renders a claim per se invalid for lack of

7    definiteness.  The Federal Circuit has never held that.

8            MR. GLITZENSTEIN:  The Federal Circuit has

9    adopted the language of General Electric and

10   Halliburton, not the Halliburton oil well case, but in

11   2008, the Federal Circuit did acknowledge the continued

12   vitality of that law, and actually did acknowledge

13   Swinehart in connection with that.  They say at, again

14   it's Halliburton Energy, 514 F.3d.  If I can get the pin

15   cite on this.  It looks like it's 1255.  They do

16   continue --

17           THE COURT:  Claim language is either definite

18   enough or it's not definite enough.  Whether it's at the

19   point of novelty doesn't answer the question.  It's

20   either indefinite or definite.  And functional, that's

21   why this, at the point of novelty is a, a part of the

22   problem that deals with anticipation that's not being

23   litigated here.

24           MR. GLITZENSTEIN:  Not today.

25           THE COURT:  Well, I don't know if I'm going to

1  give you anymore chance to litigate things because I'm

2  not giving you a chance to litigate incrementally in

3  perpetuity to try to string this thing out for 20 years.

4  I've given you more time than almost any other case I've

5  worked on over the last three years and I'm not sure I'm

6  going to continue to give you time.  My inclination is

7  if you lose this invalidity challenge, we'll set the

8  case for trial, let's go, you know, try the case,

9  because help -- you're unwilling to settle, you're

10 unwilling to work on efforts to resolve things, and you

11 incrementally, you know, every time I resolve one thing,

12 you come up with more arguments.  So don't assume that I

13 am going to give you a chance to argue anything else.

14         MR. GLITZENSTEIN:  Your Honor, we do

15 appreciate the --

16         THE COURT:  Because I asked you in the meeting

17 months ago what is your strongest best most significant

18 argument, and the one you're presenting today was the

19 one you told me about.

20         MR. GLITZENSTEIN:  We laid out the three

21 arguments, in summary form we laid out the summary

22 arguments that are our motion today, yes, your Honor.

23 But just to this point, you know, as to the continuation

24 vitality of this it does, the Federal Circuit still does

25 recognize that this is a vice, the notion of pure

62

1    functional claiming at the point of novelty.  It's a

2    separate argument.  We're making two really here.  One

3    is of course the notion that the functional language

4    that we're talking about here is the void of structure.

5    This is an issue that was of course litigated previously

6    as a part of the Markman hearing in this case.  They

7    were given the opportunity to avail themselves of the

8    safe harbors offered by 112.6 as part --

9         THE COURT:  All that I concluded with respect

10   to controller was that the 112.6 did not apply to it.

11   That's all I said.

12        MR. GLITZENSTEIN:  And as part of that

13   argument they have recognized that the structural aspect

14   of the controller and monitor terms is found only in the

15   words controller and monitor.  And so they're not --

16        THE COURT:  You argue the use of the term

17   controller and monitor were equivalent to control means

18   and monitoring means, and that therefore they were

19   subject to 112.6.  That was your argument and I found

20   that unpersuasive.

21        MR. GLITZENSTEIN:  Because, your Honor, the

22   detailed level that the functions are recited in these

23   claim terms is such that the terms themselves do not

24   reflect adequate structure to perform those functions.

25   This is really just a back --

 1          THE COURT:  That's the issue we're here to

 2     discuss.  It's not an issue that was resolved at the

 3     prior hearing.

 4          MR. GLITZENSTEIN:  Oh no, I'm sort of turning

 5     to that issue now.  I mean, this whole notion that the

 6     principal, Halliburton was --

 7          THE COURT:  Let's stop.  112.6 is a device

 8     that Congress created to allow people to engage in broad

 9     functional claiming without losing the ability to

10     enforce their patent.  It just specified that if you do

11     engage in that kind of broad functional claiming, you

12     are restricted to the structures disclosed in the

13     specification.  That's what 112.6 does.  It doesn't say

14     functional claiming is otherwise improper.  It says you

15     can do functional claiming that's not subject to 112.6.

16     You agree with that, right?

17          MR. GLITZENSTEIN:  I don't read that in the

18     statute, your Honor, no.

19          THE COURT:  Wow.

20          MR. GLITZENSTEIN:  I think that --

21          THE COURT:  All right, we'll have to get out

22     some of the cases.  Let's start with MEP I guess.  They

23     specifically talk about, the Federal Circuit makes very

24     clear that one can engage in functional claiming that is

25     not subject to 112.6 without the patent being invalid.

1    If you're saying that's not true, we need to go back and

2    look at some very basic case law.

3              MR. GLITZENSTEIN:  I'm not, your Honor.  Your

4    question was whether the statute provided it, and I just

5    want to be very clear in my answer.  Swinehart and other

6    cases do make clear that some types of functional --

7              THE COURT:  Look, I have to follow what the

8    Federal Circuit says, right?  I'm not free to disregard

9    Federal Circuit precedent, am I?

10             MR. GLITZENSTEIN:  No, your Honor.

11             THE COURT:  Does the Federal Circuit make it

12    abundantly clear that one can choose to use functional

13    language that will be subject to 112.6, or one can

14    choose to use functional pleading that is not subject to

15    112.6 and it can still be a valid patent?

16             MR. GLITZENSTEIN:  Yes, of course.

17             THE COURT:  Okay.  So I have to follow that

18    Federal Circuit law.  So I have to assume that that's

19    true, right?

20             MR. GLITZENSTEIN:  Yes.

21             THE COURT:  Just because you don't see it in

22    the United States doesn't -- I mean I'm not free to say,

23    you know, Swinehart and MEP and Halliburton, Federal

24    Circuit is wrong about that, I'm just going to ignore

25    that.  I can't do that because in all of those cases

1    they acknowledge one can engage in functional claiming

2    that's without invoking 112.6.

3              MR. GLITZENSTEIN:  In certain circumstances

4    that's true.  For example, where there is sufficient

5    structure in the claim itself to perform the function,

6    that's one scenario where 112.6 would not apply despite

7    the fact that there's functional language, that's true.

8    Swinehart gives a different example of functionality,

9    which the term there of course was transparent, and the

10   CCPA in that case, not the Federal Circuit, the CCPA in

11   that case --

12             THE COURT:  But I'm bound to follow CCPA law.

13             MR. GLITZENSTEIN:  Yeah, the Federal Circuit

14   in South Corp. says that CCPA authority is also

15   precedential.  But the point with Swinehart, though, was

16   the term there was transparent.  That's functional

17   language.  It's not the functional language that we're

18   seeing here, though.  It's functional language where the

19   court went to the specification.  The question there was

20   whether there was infrared transmissivity I guess it is

21   through this particular material.  And in that case they

22   looked at the specification and there they said, well,

23   the term transparent is actually defined in the

24   specification and therefore that passed scrutiny.

25             THE COURT:  It becomes a claim construction

1    problem like any other.  You look at the functional

2    language and you ask whether a person reasonably skilled

3    in the art would understand what the meaning of that

4    language is.

5                 MR. GLITZENSTEIN:  Would understand what

6    structure would --

7                 THE COURT:  Right.

8                 MR. GLITZENSTEIN:  Now here, here we already

9    know the answer to that question.  The answer is no.

10   Because in the course of claim instruction in this case,

11   they vigorously resisted all of our 112.6 argument

12   saying as part of that that the structure, all they

13   needed to show was that the word controller and the word

14   monitor, standing alone, presented sufficient structure

15   that a person of skill in the art would understand that

16   there's something.  They've never taken the position

17   that all of the functional language in and of itself

18   would convey sufficient structure to a person of skill

19   in the art.  In fact, they said to the contrary.  They

20   said the structure is found in the controller, and the

21   word controller and the word monitor, and these claims

22   are loaded with functional language that goes well

23   beyond that, and that issue has been resolved

24   effectively by the positions that they've taken in --

25                 THE COURT:  I'm sorry, I wish issues were

67

1   resolved, but they're not.  To say that they are

2   resolved I think is a misstatement.

3           MR. GLITZENSTEIN:  From our perspective, your

4   Honor, we would submit that they've conceded that point.

5   I mean, I could take the court to the passage in the

6   claim construction hearing, it's in our brief --

7           THE COURT:  Well, I don't even understand the

8   point.  You're saying they conceded, you say they have

9   conceded by prior positions they've taken in this

10  litigation that the functional language at issue here is

11  -- does not imply any additional structure other than

12  that disclosed in the claim which is a monitor and a

13  controller.  So that's all they need to disclose.

14  There's no implied additional structure in that

15  functional language and that point is resolved.  Is that

16  what you're saying?

17          MR. GLITZENSTEIN:  That's our position, your

18  Honor.

19          THE COURT:  Okay.  Now, do you disagree with

20  that or are you saying that the controller, the

21  functional language doesn't add anything in terms of

22  structure to what is disclosed, it's like a general --

23  controller is, that's all we need in terms of structure.

24          MS. STOLL:  I don't agree with that.  I think

25  the --

68

```
 1             THE COURT:  You're saying they imply some
 2   additional structure?
 3             MS. STOLL:  Yes.  That further limits what the
 4   structure is and then have to perform that function.
 5   Additionally I don't recall that we made any admissions
 6   of that kind.  And from reading their brief, I didn't
 7   see that this was an issue.  So in some ways I'm not
 8   prepared to concede anything on that today.  And I don't
 9   think we conceded anything in our claim construction
10   briefing.
11             THE COURT:  All right, we may be not even
12   understanding each other.
13             MR. GLITZENSTEIN:  Your Honor, I've got slide
14   70 from our presentation up on the screen, and this is
15   just some colloquy from the claim construction argument
16   that goes to this issue, and this is Mr. Jakes's
17   argument to you on the left where he says I think the
18   term controller is understood in the art and people can
19   look at something and say it's a controller or it's not.
20   And in addition to that we have additional limitations
21   in these claims that specify what the controller has to
22   do.  There's nothing wrong with having functional
23   language in the claim in addition to structure.  That's
24   what they were arguing.  They said that --
25             THE COURT:  Well, I think that is true if
```

1   that's what the situation is.  I do think it is

2   acceptable to plead a controller that operates in a

3   particular way and have a claim.  And if the controller

4   is, you don't need to have a specified -- say, for

5   example, the controller is a general purpose computer.

6   If the controller performs that function without any

7   special new additional structure such as a specified

8   algorithm, then merely saying a controller that

9   energizes, that isn't invalid, that isn't indefinite,

10  there is no problem with that except you're going to

11  argue come your next brief if I give you one, okay,

12  judge, now that we've finally pinned them down to that,

13  let me show you a prior patent that has a controller

14  that's a general purpose computer and that does all

15  these same things, and therefore it's anticipated by the

16  prior art.

17          But there isn't -- do you think there's

18  something inherently wrong, if it is true, that one

19  identifies, has a claim that includes as a structural

20  element a general purpose computer that performs the

21  following function, and the function that's performed is

22  something that any general purpose computer can do.

23  That you include that functional language doesn't render

24  your claim invalid for lack of definiteness.

25          MR. GLITZENSTEIN:  And moreover, your Honor,

1  that's --

2          THE COURT:  You agree with that?

3          MR. GLITZENSTEIN:  I do.  And that's the

4  situation, your Honor, where 112.6, by its terms apply.

5  You've got some function and you've got structure

6  sufficient to perform that function.  So even applying

7  the statute quite literally you would say that's not

8  even 112.6 language.  But here that's not --

9          THE COURT:  It's not subject to 112.6.  It's

10  ordinary functional claiming which doesn't render a

11  claim invalid.  It might if, if all of the prior

12  structures were disclosed in a prior patent render the

13  claim invalid for lack of novelty, but if the specified

14  function inheres in the disclosed structure, there's

15  nothing wrong, and a person reasonably skilled in the

16  art would understand that.  There's nothing wrong with

17  that.

18          And likewise there's nothing wrong with

19  pleading functional language that does imply additional

20  structure as long as a person reasonably skilled in the

21  art looking at that language in context would understand

22  what that structure was.  The problem, and why I think

23  the argument you should be making but you're making in

24  only like one page out of your brief, is where is the

25  evidence to suggest that a person reasonably skilled in

1   the art would understand how a controller energizes a

2   motor, how a controller controls a motor, how a

3   controller calculates something.  There's no evidence

4   about that.  And a person reasonably skilled in the art

5   wouldn't understand how those things are done, and

6   that's why this is not definite enough.  It's not that

7   because it's functional claiming.  That requires special

8   consideration, but it neither renders it invalid or not.

9   It's not because it's at the point of novelty that it's

10  functional claiming.  That isn't a categorical rule

11  either.  It's a kind of pleading that requires special

12  consideration and you have to look at it carefully to

13  determine whether a person reasonably skilled in the art

14  would not only understand the function, but understand

15  the structure that's disclosed by that functional

16  claiming, and that structure can either be no additional

17  structure other than the monitor, or it can be some

18  additional implied structure other than the monitor that

19  a person reasonably skilled in the art would understand.

20  And where you win is if it's neither of those things, it

21  implies some additional structure that a person

22  reasonably skilled in the art would not understand.

23          MR. GLITZENSTEIN:  But, your Honor, as part of

24  the claim construction, they have taken the position

25  that --

1          THE COURT:  Okay, are you understanding, am I

2     at least communicating in a way that you can understand,

3     or am I just babbling on here to you?  I've set out an

4     analytical framework that is the way in which I believe

5     this problem should be analyzed.  Do you understand the

6     analytical framework that I've set out?  Have I been

7     clear enough in explaining it?

8          MR. GLITZENSTEIN:  I do.  Where I would submit

9     the law is otherwise is in the scenario, I think it was

10    your second scenario where you have a claim term which

11    is generic -- which recites some structure but not

12    sufficient structure to perform the recited function,

13    okay, to the extent that term is not construed in view

14    of 112.6, which is our situation here, on the principal

15    of Halliburton that functional language or as a

16    consequence of not reciting sufficient structure in the

17    claim itself to perform the recited function, we submit

18    that that is invalid.

19         THE COURT:  Even if, you would say that is

20    true even if the functional language is so clear to a

21    person reasonably skilled in the art that they would

22    understand there's only one structure by which that

23    function can be performed?  It's hard for you to make

24    that argument because you're going to be wrong if you

25    try to make it, I mean --

```
 1              GLITZENSTEIN:  I'm struggling, your Honor,
 2    with trying to just even get my mind around where there
 3    would be only one, you know, particularly where in that
 4    scenario it wouldn't be novel, so, at least as I'm --
 5              THE COURT:  Well, it could be novel because it
 6    depends on what the prior art is.  I at this point am
 7    blind essentially to the prior art because you haven't
 8    made your anticipation argument.  So I don't know what
 9    it is that you say requires that you -- you're making a
10    claim that I think they disagree with that it's the
11    functional language here that makes this novel.  They
12    don't agree with that.  I don't know whether that
13    argument is true or not.  You didn't brief it.  You just
14    assume it to be true.  They don't respond to it.  I have
15    no idea whether the functional language -- you say this
16    functional language doesn't make -- isn't what makes
17    this invention novel.  Is that fair to say?
18              MS. STOLL:  I so think, well, I think there's
19    differences between the prior art and the claim, and I
20    think part of it is the functional language, yes.
21              THE COURT:  Is it what is necessary to make it
22    novel?
23              MR. GLITZENSTEIN:  Your Honor --
24              THE COURT:  I do work with patent lawyers and
25    I do actually get along with them well.  We understand
```

1    each other.  I've worked with some really good ones.

2    Bill Lee is a great patent lawyer I've worked with,

3    really admire.  I seem to be able to communicate with

4    him.  So I'm not, you know, I'm not completely ignorant

5    about patent law.  I don't know why we can't have these

6    basic discussions.

7            MR. GLITZENSTEIN:  Your Honor, if I might, we

8    did raise the issue of the importance of functionality

9    to the patentability of these claims.

10           THE COURT:  She apparently agrees with you

11   that the, I thought she wouldn't agree with this because

12   it's a concession I wouldn't make if I were in her

13   position, but maybe she knows -- she's basically saying

14   this functional language at the point, is at the point

15   of novelty here.  So, if you're saying that that's --

16           MS. STOLL:  Excuse me, can I please, I want to

17   make sure I'm being clear.  I'm saying that's one of the

18   differences between the claims in the prior art.  There

19   are -- I've seen the prior art that Markem's expert is

20   relying on in this case, and that is one of the

21   differences.

22           THE COURT:  If you excise the functional

23   language, would this be patentable?

24           MS. STOLL:  There are other differences.

25           THE COURT:  So you disagree about that point?

1          MR. GLITZENSTEIN:  But fundamentally, your

2     Honor, we briefed this over five pages of our brief,

3     from around page 30 to around page 35, they had no

4     response to it in their reply brief at all.

5          THE COURT:  I don't find it to be anything

6     close to adequately briefed.  You don't cite the prior

7     art, you don't tell me which patent was infringed, you

8     don't tell me it would be anticipated by.  I haven't had

9     any discussion of that prior art.  I have no idea what

10    that's talking about.

11         MR. GLITZENSTEIN:  We based it on the prior

12    art in the intrinsic record.  There are references to it

13    throughout our brief --

14         THE COURT:  Yeah, but it doesn't come close to

15    going through the way you -- if you were going to

16    present an anticipation argument to me, you wouldn't

17    present it in those five pages.  You would lay out here

18    are the claim elements of the prior art.  Here are the

19    claim elements of our -- of this patent.  This is

20    anticipated by this.  That's how you would make that

21    argument.  I've had anticipation cases before.

22         MR. GLITZENSTEIN:  The claims, your Honor, in

23    general with regard to the structural aspects of the

24    claim, there are very few elements.  There are tape

25    spool supports, there are one or two stepper motors,

1  there is a controller and there is a monitor, and

2  everything is functional.  There is nothing in any of

3  those structural components that distinguishes these

4  claims from the prior art.

5          Your Honor, I've got, we went through this, we

6  have, you know, for example, I have up on slide 71 --

7          THE COURT:  I'm just trying to get some

8  agreement about basic things, okay?  I have an

9  analytical structure, okay, I understand we disagree

10  about this.  You maintain that categorically if a claim

11  contains functional language at the point of novelty, it

12  is per se invalid for lack of definiteness.

13          MR. GLITZENSTEIN:  That's one of our

14  positions, your Honor, yes.

15          THE COURT:  Okay.  So that's one argument on

16  which we respectfully disagree, okay.  I understand why

17  you say that because you, in my mind, mindlessly, but

18  you pick up language from Supreme Court opinions which

19  are not holding and have not been followed by the

20  Federal Circuit and are inconsistent with the Federal

21  Circuit case law in my view, so I just disagree with you

22  on that point, but respectfully so, I understand why you

23  do it.

24          So, let's set that aside.  You've noted for

25  the record that disagreement that you have with me on

1  that point.

2          But I've tried to set out this analytical

3  structure in which I think you have a reasonable chance

4  of prevailing, I don't know whether you do or not yet,

5  but if I'm right about this analytical structure, if

6  you're right about our disagreement, you prevail

7  because, well, if the issue of point of novelty is

8  conceded or adequately briefed, we can talk about that

9  if we need to, but the analytical structure that I'm

10  working from is one that says that the way you analyze a

11  problem of a lack of definiteness is the same whether

12  you're dealing with functional language or structural

13  language.  It is -- asks the question whether a person

14  reasonably skilled in the art would understand the,

15  sufficiently understand the disclosed structure.  The

16  only difference with functional claiming is, it doesn't

17  disclose directly structure.  It can do one of two

18  things.  It can either simply specify the function of

19  the previously disclosed structure, or it can imply some

20  additional structure.  That's what the function -- it

21  can do one of those two things.

22          MR. GLITZENSTEIN:  And --

23          THE COURT:  And do you agree with that much at

24  least, that's what functional language can do, it

25  doesn't --

1            MR. GLITZENSTEIN:  Yes, your Honor.  But

2    functional language can either just recite sort of

3    what's inherently part of a generic structural

4    component, or it can go beyond, which is our case here

5    we would submit.  It can go well beyond that and it can

6    add --

7            THE COURT:  We will get to that, we will get

8    to that, but it can do one of those two things.

9            MR. GLITZENSTEIN:  Yes, sir.

10           THE COURT:  And if it merely recites the, if

11    it merely specifies a function that's inherent in the

12    disclosed structure, it's not indefinite for that

13    reason.

14           MR. GLITZENSTEIN:  No, your Honor.

15           THE COURT:  It may be invalid for other

16    reasons, but it's not indefinite for that reason.

17           MR. GLITZENSTEIN:  That would not be a

18    circumstance of indefiniteness.

19           THE COURT:  And so if it -- but if it does

20    imply structure, then the question, you answer the

21    question of whether the claim is indefinite because of

22    the functional claiming by asking yourself whether a

23    person reasonably skilled in the art would understand

24    that functional claiming to specify a sufficiently

25    definite structure to satisfy the definiteness

1    requirement.

2            MR. GLITZENSTEIN:  In that situation, your

3    Honor, yes, and in this case -- as a general

4    proposition.  In this case, that issue has been

5    addressed.  And I have again --

6            THE COURT:  Okay, let me stop you, okay.  You

7    have said that, I thought you were saying earlier in the

8    argument that, judge, they've conceded in prior

9    positions that their functional language doesn't imply

10   any additional structure.  They've taken the position,

11   you've told me, I thought on prior arguments, that their

12   functional claiming doesn't have any additional

13   structure other than the controller and the monitor.

14           MR. GLITZENSTEIN:  Yes, your Honor.

15           THE COURT:  Okay.  And if that's so, that

16   doesn't make it invalid for lack of definiteness.  If

17   that's true, then the validity of the patent has to rise

18   or fall on the structures disclosed, the monitor.  And

19   you would make a -- but I think your argument really is

20   not that that's what we have here, that's not the

21   situation we have here, judge.  I think your argument is

22   that implies an additional structure, and we can't

23   identify what that structure is.  We don't know whether,

24   if this monitor is a circuit, how does a person

25   reasonably skilled in the art take a circuit and make a

1    particular energize, calculate, control.  If it's a

2    general purpose computer, what's the algorithm by which

3    they do A, B and C.  And the first part of Katz is an

4    interesting discussion, if you remember, about a

5    computer essentially, and when you need to have an

6    algorithm and when you don't need to have an algorithm

7    when you specify a computer.  I think the issue is very

8    similar to that here, it's just that they substituted

9    functional language for an undisclosed structure.  And

10   the question we ought to be asking is not all this

11   silliness about General Electric and -- we ought to be

12   asking what does the record in this case tell the judge

13   about how a person reasonably skilled in the art would

14   understand this functional language.  Would they

15   understand it to necessarily disclose a sufficient

16   structure to render the patent not indefinite.

17            MR. GLITZENSTEIN:  And at the Markman hearing

18   your Honor asked Mr. Jakes's the question, quote, you

19   cover every controller, so no matter how the software is

20   written, whether somebody can up with a hardware device

21   that controls it, every possible controller in the world

22   that can do that function is covered by your patent,

23   close quote.  Mr. Jakes's response to you, quote, yes, I

24   believe so as long as it's a controller, that's the

25   structural limitation.

```
 1              THE COURT:  And if that's all that -- so then

 2   that argument has to be, then we have to be arguing is

 3   it an inherent function of the monitor here, controller

 4   rather, to do these things.  If it is, then it's not

 5   indefinite.  It might be invalid for other reasons, but

 6   it's not indefinite.

 7              MR. GLITZENSTEIN:  But that question has been

 8   answered as well.  You've construed controller and

 9   monitor and you've identified passages from the IEEE

10   dictionary for each.  A controller is a special purpose

11   computer.  Those definitions didn't say anything about,

12   anything close to the level of --

13              THE COURT:  I said a control -- I used the

14   IEEE to say it's not the equivalent of control means.

15   That's all that I said.  I said it identifies a class of

16   structures and it doesn't identify, it's not simply a

17   nonce word for a control means.  And, so, that's what I

18   have said about controller.  I haven't gone further than

19   that.  It may be that controller -- and that's why I

20   think the argument ought to be focusing on controlling,

21   energizing and calculating, and asking what structures

22   does a controller have to have to do those things, what

23   would a person reasonably skilled in the art know about

24   it.  I mean, could I take this desktop computer here and

25   plug it into this device and make this thing work, or is
```

1    there some special program that needs to be written or

2    some special circuit design that needs to be done in

3    order for this to happen and that those aren't disclosed

4    and therefore they're trying to capture all of the means

5    by which this can be done now or could be done in the

6    future as long as the patent is in effect and bar

7    everybody who is practicing it in any way possible.

8         MR. GLITZENSTEIN:  And they've conceded

9    exactly that point, your Honor.  They've conceded that

10   it covers every controller, every possible controller in

11   the world.  That's exactly the problem here.

12        THE COURT:  And that could be okay if, that

13   could be okay under Katz, for example, if the controller

14   is a general purpose computer and the general purpose

15   computer can perform the function.  I thought the

16   Federal Circuit said in Katz that's just fine, it's only

17   if there's a, if a person reasonably skilled in the art

18   would understand that there is a need for a specific

19   algorithm.  Let me see if I can find Katz here.  Man, I

20   find working on this case so frustrating.  And I like

21   patent cases, I really enjoy them, but I'm just

22   frustrated unbelievably with this case.

23        (Pause.)

24        THE COURT:  Yeah, I thought the discussion in

25   Section 1 of Katz dealing with computers and general

1    computers and special computers is a really interesting

2    discussion that sort of helped me think about this

3    problem.  I recognize our problem is a somewhat

4    different one, but the court talks about by claiming a

5    process or program to perform a specialized function

6    without disclosing the internal structure of that

7    processor in the form of an algorithm, Katz's claims

8    exhibit the overbreadth inherent in open-ended

9    functional claims.  Then, but then the court goes on to

10   say we reach a different conclusion with respect to the

11   district court's analysis of claims, and they list a

12   number of claims there.  Absent a possible narrower

13   construction of the terms processing, receiving and

14   storing discussed below, those functions can be achieved

15   by any general purpose computer without special

16   programming.  As such it was not necessary to disclose

17   more structure than the general purpose processor that

18   performs those functions.

19          Now, these were 112.6 and we were looking at

20   going into the specification.  But the general point,

21   the distinction there I think is a very useful one for

22   me in trying to figure out this problem.  I've said this

23   is not a 112.6 situation.  I'm not limiting it to the

24   specification.  I'm talking about the general principles

25   underlying that distinction that the court made.  And I

 1   think that that distinction is one that I have to

 2   analyze here and I have to ask myself whether there were

 3   terms like processing, receiving and storing.  Our terms

 4   are energizing, controlling and calculating.  You know,

 5   calculates, I'm not using the exact form but you

 6   understand what I'm saying.  Energizes, controls,

 7   calculates.  And what the court was saying there is, in

 8   that case those functions could be performed by a

 9   general purpose computer and you didn't need to specify

10   anything more than that.

11           And so what I'm trying to figure out is, is

12   the function of energizing, the function of calculating,

13   the function of controlling, are those -- what does the

14   record tell me about whether those are things that can

15   be done by a general purpose controller, or are they

16   something that need require a special purpose

17   controller.  If they do, then you would ordinarily --

18   you'd have to ask whether this tells you enough

19   disclosure of structure.  And there's a real question

20   whether it does.  And if they can't -- if these are

21   things that a reasonable person skilled in the art would

22   understand are performed by a general purpose

23   controller, then you arguably don't need to disclose any

24   additional structure.  And that's what the question

25   turns on in the end.  Not all these other things that

1    you have spent the last two hours talking to me about.

2              MR. GLITZENSTEIN:  Your Honor, so when I was

3    referring, just to sort of reset the table on this from

4    my perspective, when I was referring to the exchange

5    that you had with Mr. Jakes, that's captured on slide 70

6    our of presentation materials, that was of course

7    against the background of this very question.  Our

8    position throughout Markman was precisely this.  That

9    the functional language in these claim terms at issue is

10   not sufficiently definite, conveys no sufficient

11   structure to a person skilled in the art to perform the

12   functions recited in those claims.  That was our

13   position --

14             THE COURT:  But why don't I have from each of

15   you an expert in this field that has testified that a

16   controller is understood to be A, B and C, and a

17   controller performs this function in the art, and this

18   energizing a motor, you know, that's something -- that's

19   nothing fancy, special.  That's what a controller does,

20   one of many things a controller does, a general purpose

21   controller, it energizes motors.  It calculates from a

22   table something.  That's what general purpose

23   controllers do.  And so this functional language isn't

24   disclosing any implied additional specialized structure

25   like an algorithm, because we don't need one to do this.

1   And that's what I -- that's what they should be arguing.

2   And then you should be arguing we need more to know what

3   -- there are five million ways in which one could

4   energize something and a general purpose controller

5   doesn't do that.  You need to have some specific

6   programming or you need to have some circuit diagrams,

7   and that's what people in the art understand, and this

8   doesn't tell us anything.  That's what the dispute

9   should be.  But that's not what it is.

10          MR. GLITZENSTEIN:  Well, your Honor, we have

11   presented all of that in connection with the claim

12   construction briefing, you know, from the perspective of

13   what the intrinsic record teaches and whether there is

14   sufficient structure.  We went through the myriad

15   functional details of these claims.  Their response was

16   simply all we need to do is disclose the modest amount

17   of structure of controller and monitor.

18          THE COURT:  And they're right if a person

19   reasonably skilled in the art would understand that this

20   is a general controller and that this is a function that

21   a general controller performs.  That's why I'm looking

22   to this, do you see why I'm looking to this analogy to

23   Katz even though it involves specification, even though

24   it's a 112.6 and involves construing language in the

25   specification, the underlying principle seems to apply

1    here.

2            MR. GLITZENSTEIN:  We have, for example,

3    definitions of controller, just to use that example,

4    because I think that's where the bulk of the functional

5    language is found in the claims at issue here.  There

6    was some evidence that was exchanged on that as part of

7    Markman, and we made the point as part of Markman that

8    the structure that is reflected in those ordinary

9    meanings is simply not enough to perform these

10   functions.  It doesn't turn -- these are not inherent

11   properties of a controller that, for example, I have

12   claim one of the '572 up, that it calculates a length of

13   tape to be added or subtracted.  I mean, that's

14   self-evident.  And if I recall the exchange with your

15   Honor correctly, at the Markman hearing your Honor was

16   making the observation in substance that the Federal

17   Circuit authority, you know, may not require very much

18   structure, and so the issue turned on whether there was

19   any structure at all in these claim terms, I'm

20   acknowledging I'm oversimplifying a little bit to make a

21   point, but the argument that we strenuously made

22   throughout was that the words even adopting Zipher's

23   experts definitions of these terms just simply doesn't

24   convey the structural meaning that is so detailed -- I'm

25   sorry, the functional meaning that is so detailed in

1  these claims.

2          THE COURT:  Did you read -- are you familiar

3  with the Aristocrat --

4          MR. GLITZENSTEIN:  I have, your Honor, read

5  it.

6          THE COURT:  -- Technologies case?  Again, this

7  is another case that I think is useful.  The parties

8  don't seem to rely on it to any extent, but, thus the

9  district court will need to define the relevant art and

10  the level of ordinary skill in the art, then it will be

11  presented upon remand with two questions in construing

12  the limitation control means.  First, would a person of

13  ordinary skill in the art understand the word controller

14  alone in the context of this invention to refer to a

15  particular structure such as a microprocessor.  If the

16  answer is yes, further inquiry into additional details

17  of the specification is unnecessary because there would

18  be adequate structure in the specification.  Second, if

19  the answer to the first question is no, one must ask

20  whether a person of ordinary skill in the art would

21  understand the word controller in the context of other

22  statements and descriptions in the specification to

23  identify a particular structure, in which case again

24  there would be adequate structure and the claim would

25  not be indefinite.  The district court might consider

1  whether the controller must include writable memory that

2  is capable of storing the randomly ordered set of game

3  results, et cetera, et cetera.  In considering these

4  questions the court should consider how the reference to

5  the use of pointers, et cetera.  And so what the court,

6  the court's laying out in a 112.6 case where control

7  means to specify and a controller is identified in the

8  specification what has to be done at remand to talk

9  about what a controller is, and I think it's suggesting

10  that it use a similar process such as the one that I'm

11  talking about here.

12          MR. GLITZENSTEIN:  And I believe we've done

13  that, your Honor.  I believe that that was the record

14  that was developed over the course of the Markman

15  proceeding, and that's why I underscore the exchange

16  that was had at the Markman hearing about this very

17  issue of whether a controller conveys the requisite

18  level of structure in and of itself to satisfy these

19  detailed requirements of the claim.  I mean, a general

20  purpose controller or a special purpose controller

21  doesn't inherently calculate a length of tape.  That is

22  plainly an algorithm and they've never suggested to the

23  contrary.  It doesn't calculate the length of tape or

24  control two motors in order to maintain tape within an

25  acceptable range of tension.  I'm paraphrasing the

1    claim.  It doesn't carefully position the tape for

2    efficient use of tape.  Those are all algorithms.  Those

3    are all things that come out of programming a

4    controller.  They've never suggested to the contrary,

5    and I don't think the record would substantiate it here

6    if they tried to.  They have identified controller and

7    monitor, and they've said there is a modicum of

8    structure conveyed by that, and that's all we need to

9    show.  They've never gone the additional length of

10   saying, and, the structure that is inherent in a

11   controller performs all of the many functions in all of

12   these asserted claims, because it's just not true.  I

13   mean, it's plain on the face of these claims --

14           THE COURT:  Okay, again, at the lunch break

15   you folks reread Aristocrat and I'll reread it, but why

16   I think it's potentially useful to me is it's a 112.6

17   case that deals with what control means, and then -- so

18   we go to the specification.  The specification discloses

19   a controller.  The Federal Circuit said I can't resolve

20   the case on appeal because the district court has to go

21   back and look at what a controller is.  And it

22   identified the analytical framework that I think applies

23   in this case because, again, you tell me if you disagree

24   with this, in a 112.6 case, the specification provides

25   the structure that determines the claim.  Do you agree

1    with that?

2              MR. GLITZENSTEIN:  Scope of the claim term,

3    yes, your Honor.

4              THE COURT:  And whether the -- the

5    specification itself can be indefinite and therefore in

6    a 112.6 case you can have an invalidity for lack of

7    definiteness if the specification itself is indefinite.

8              MR. GLITZENSTEIN:  If it fails to provide

9    adequate corresponding structure for performing the

10   function recited in the claim, yes.

11             THE COURT:  And the test for indefiniteness in

12   that case is the same as it is to a regular patent

13   that's not a 112.6.  You look at the structures

14   disclosed in the specification and analyze them for

15   definiteness the same way you would analyze a

16   definiteness challenge to an apparatus patent that's not

17   subject to 112.6.  So, if that is true, and Aristocrat

18   involved control means and therefore was 112.6, and the

19   disclosed structure was a controller, and the Federal

20   Circuit, that perform certain functions, and the Federal

21   Circuit gave guidance as to how one ought on remand to

22   go about analyzing the questions of whether the

23   specification of a controller was indefinite, the

24   analytical model would be the same one that we would use

25   here if I reject your point that per se function at the

1    point of novelty renders the claim invalid.  If you get

2    beyond that, it would seem that Aristocrat would be a

3    roadmap for how to analyze a problem of a controller.

4            So, let's take a lunch break.  You read it and

5    think about it and come back and answer that question

6    for me.  And, you know, I'm sorry that we have to take

7    so long, but it's that I'm a very stubborn person as you

8    have known from dealing with me for many years.  I try

9    to think about things as hard as I can, and I try to

10   figure them out, and sometimes my way of thinking just

11   is not, maybe because I'm completely wrong which I will

12   acknowledge is a possibility, but the lawyers don't seem

13   to be able to even communicate with me, and it doesn't

14   happen often but this seems to be one of those cases

15   where we can't work together to solve this problem

16   because both of you have such radically different

17   agendas that in my mind don't involve solving the

18   problem, they involve creating problems that further

19   complicate the situation, that we just aren't even

20   really able to communicate.  And I know you're very

21   smart and sophisticated and expert, but we aren't even

22   talking the same language, you know, we're just going

23   back and forth on things that -- there's a legitimate

24   question in my mind how to deal with this problem of the

25   functional claiming, but it's not to call it a method

1    step, it's not to adopt a per se rule of invalidity at

2    the point of novelty.  It focuses on this.  And, so, I

3    would like to finish up with the kind of analytical

4    framework thing quickly after lunch and then give each

5    of you a chance, under my analytical framework, right or

6    wrong, to show me why you should each prevail because

7    probably I'm going to do it the way I think it should be

8    done, whether you guys agree with it or not, and that's

9    why we have the Federal Circuit to correct me, they are

10   much more than expert than I am.  But I'm not going to

11   try to let you dictate for me how I should analyze

12   problems, either of you.  I'll analyze problems the way

13   I think the Federal Circuit law requires me to analyze

14   them, and I think I've figured out the way they want me

15   to analyze this, and that's -- so you need to try to

16   understand what I'm suggesting.  Point out to me where

17   it's wrong if you think I'm wrong, but then ultimately

18   try to use that model and come back and explain to me

19   why under that model you prevail and they can make their

20   argument that they prevail, because chances are good

21   that that's the model I'm going to use to decide the

22   case at my level.  Preserve what you need to to show

23   that I'm an idiot when you go to the Court of Appeals,

24   but I have to read the Federal Circuit cases faithfully

25   and try to apply them, and that's what I'm going to do,

94

1    okay?  So, let's break until 1:15.

2              MR. GLITZENSTEIN:  Thank you, your Honor.

3              (Lunch recess taken.)

4              THE COURT:  I should have given you the cite

5    to Aristocrat.  The decision I was referring to is a

6    Federal Appendix decision, not the one cited in Katz, so

7    you may not have been able to understand what I was

8    saying.

9              This is a case, Aristocrat Technologies

10   Australia Party, Limited versus Multimedia Games,

11   reported at 266 Fed. Appendix 942.  It involves the same

12   patent and it just has different language in it, and

13   that's the language that I was quoting.  So you probably

14   couldn't find the language that I was referring to and I

15   apologize for that.

16             So, in any event, why don't you just tell me

17   whether the structure, recognizing you have some

18   arguments that I don't find persuasive that you've

19   already identified, what's your comment on the

20   suggestion I have that in trying to analyze a claim when

21   there is functional language used, not subject to 112.6,

22   where the challenge is definiteness, that the way to go

23   about analyzing that is to ask first whether the

24   functional language is referring to a function of the

25   disclosed structure and does not imply any additional

1    structure, or whether it is a functional claim that

2    implies additional structure.  If it's a functional

3    claim that implies additional structure, you have to ask

4    whether that language is sufficient not just to be

5    understood by a person reasonably skilled in the art,

6    but to imply the existence of sufficient structure so

7    that a person reasonably skilled in the art would

8    understand that structure.  And that seems to be the

9    question that we're dealing with here, is that question,

10    that last question.

11         That's how I'm inclined to think about this

12    because I do think it is possible to have a claim that

13    claims something like a general purpose computer that

14    performs certain functions, and if what you're really

15    specifying is something that a general purpose computer

16    is capable of doing without any special programming,

17    that additional functional language is not indefinite

18    simply because it's in functional form.

19         On the other hand, if you're specifying a

20    computer as your controller and you, in order to perform

21    the specified function you need to program that computer

22    in a particular way, and the disclosure of functional --

23    the functional disclosure is not sufficient to cause a

24    person reasonably skilled in the art to understand what

25    the algorithm is that's required to effectuate the

1    function, then the claim would be indefinite because the

2    functional language doesn't give someone reasonably

3    skilled in the art sufficient information to understand

4    what it is that's prohibited.

5          So, that's the -- that's how I'm thinking of

6    this analytically.  So tell me why that's wrong.

7          MR. GLITZENSTEIN:  Your Honor, I think it's

8    largely the way that we've been approaching the issue as

9    well.  The one issue that I would want to address is the

10   last part of what your Honor said.  I did read the other

11   Aristocrat decision over the break.

12         THE COURT:  Which talks about similar things,

13   and Katz talks -- Katz really, that portion of Katz, not

14   the portion that you rely on but the portion that I

15   cite, I think has really affected my thinking about this

16   because I think the reasoning is the kind of reasoning

17   you could apply in this kind of a context.

18         MR. GLITZENSTEIN:  I think there are strong

19   analogies to the way that the Federal Circuit addressed

20   the issue of whether in the specification there is

21   enough structure for the function, to the question here

22   of whether in the claim there's enough structure for the

23   function.  The reason I wanted to single out the last

24   piece of what your Honor said was there's -- I think

25   this issue is actually addressed in the other

1    Aristocrat.  This is 521 F.3d 1328, and at 1334 the

2    patent owner there made a very similar argument with

3    regard to whether the person of skill in the art

4    essentially could fill in some gaps, you know, if the

5    specification only talks about the function.  The

6    Federal Circuit rejected that, a notion that the person

7    of skill in the art should have come in and fill in

8    those gaps, and the quote is at 1334 in Section A.

9         THE COURT:  If it's omitted entirely, you

10   can't fill it in with persons reasonably skilled in the

11   art, you can't fill in the complete absence of

12   something.

13        MR. GLITZENSTEIN:  They --

14        THE COURT:  Can I ask, let me stop you for a

15   second, can I ask my clerk.  I printed out a case.  It's

16   in the printer I believe.  Could you run up and get it

17   for me.  Go ahead.

18        MR. GLITZENSTEIN:  They state the premise at

19   1334, they being the Federal Circuit, that in rejecting

20   the patentee's argument that, quote, devising an

21   algorithm to perform that function would be within the

22   capability of one of skill in the art, close quote --

23   I'm sorry, and continuing, and therefore it was not

24   necessary for the patent to designate any particular

25   algorithm for the claim function, close quote.  The

1    Federal Circuit then in the next sentence says, quote,

2    as we've noted above, however, that argument is contrary

3    to this court's law, close quote.  So --

4            THE COURT:  Well, go on and say why that is.

5            MR. GLITZENSTEIN:  Well, they actually -- the

6    difference, really, that they're drawing between

7    enablement, which we touched on a little bit earlier

8    very briefly, enablement and a written description or

9    specificity.  So it's not enough.  We're talking here

10   about what the claim means --

11           THE COURT:  See, I didn't read it that way.  I

12   read it as what, I thought what they were trying to say

13   was that if the function requires some kind of

14   algorithm, and there's no reference to an algorithm at

15   all.  You can't fill that in by simply producing

16   evidence that a person reasonably skilled in the art

17   would understand that you need to have an algorithm,

18   that the complete absence of something, a specification

19   of structure is not going to be sufficient.  And I just

20   printed out another case that I think describes that,

21   I'll come back to it, but how do you understand it

22   because I'm not --

23           MR. GLITZENSTEIN:  Well, in reading the case

24   further it discusses this distinction at 1336 where they

25   say, quote, although the examples given in the patent --

1    excuse me, quote, although the examples given in the

2    '102 patent might enable one of ordinary skill to make

3    and use the invention, they do not recite the particular

4    structure that performs the function and to which the

5    means-plus-function claim is necessarily limited, close

6    quote.  And I think that's important because we're

7    talking here, and we're going to touch on this -- or not

8    touch, we're going to talk about this a lot in

9    connection with the insolubly ambiguous issue, the point

10   here is definiteness and where the claim starts and

11   ends.  And so that obligation is fundamentally on the

12   patent owner to specify.  And so this is why the Federal

13   Circuit is saying, as I understand Aristocrat, it's

14   saying it's not enough if a person could read the

15   functional language and come up with an algorithm that

16   would perform the function.  You have to actually

17   disclose it.  And that's what's missing here.

18           THE COURT:  That's the point I was trying to

19   make.  I guess I wasn't sufficiently clear.

20           MR. GLITZENSTEIN:  Well, I may have

21   misunderstood it.  But here we actually have, and I went

22   back on the break, your Honor, as well, and I wanted to

23   take a look at the record in this case already on the

24   issue of controller.  I reread your Honor's claim

25   construction on that.  But I also read the declaration

1    of Zipher's expert in this case on claim construction,

2    Dr. Kuc who is here actually for the earlier case and

3    gave a little demonstrative, and he addresses this issue

4    of what a controller means to a person of ordinary skill

5    in this particular art.  And this is docket 40-9, it was

6    filed as Exhibit K on February 2nd, 2011.  In paragraph

7    four he sets out his opinion as to what a controller

8    denotes to the person of ordinary skill in the art, and

9    that it's an electrical device that can be programmed or

10   adjusted to energize an actuator to perform a function

11   has inputs that indicates the actuator's state, and

12   three, includes wires, pins or leads for input or output

13   connections.  And he goes on to say that one of ordinary

14   skill in the art would understand that the controller or

15   transfer printers included the class of structures

16   including micro-controllers, application specific

17   integrated circuits and field programmable gate arrays.

18   But what he doesn't say, your Honor, I think what's key

19   here and sort of applying the guidance that we get in

20   Aristocrat, what's key is that their own expert has

21   never said that the controller isn't something that

22   people of skill in the art know as something that

23   inherently performs this function, or I should say the

24   many, many detailed functions recited in the claims

25   themselves.  So just to put a claim up on the screen on

1    this.  I've got the '094 claim up, slide 77, claim two.

2    Everything shown in red here on slide 77 is functional

3    language in this claim.  It has very little structure.

4    It has two motors, both stepper motors, two tape spool

5    supports and a controller, and then everything else is

6    function.  And the functions here go from not just

7    energizing the motors, but also monitoring the motors,

8    I'm sorry, monitoring the tension in the tapes, so the

9    controller itself has to monitor tension in the tape.

10   It then has to control the operation of the motors to

11   maintain tension at an acceptable level.  So this is not

12   just a matter of a motor that causes motors to spin,

13   this is a controller that has, as its required

14   operational characteristics, the programming sufficient

15   to allow it to control a path of tape extending between

16   two spools so that the tension in that tape is

17   maintained at an acceptable level.

18          And the examples of this sort of detailed

19   functional specificity are found throughout the asserted

20   claims in this case.  As noted earlier some require the

21   ability to perform a calculation.  Others require the

22   ability to position the tape in close adjacent positions

23   on successive prints.  The list goes on and on and on.

24   And fundamentally they use the same generic term

25   controller as the sole structure for this whole array of

1    claims that require all of these different

2    functionalities, and Dr. Kuc's own declaration in this

3    case shows that that --

4            THE COURT:  I think that, to me that's fine if

5    a controller is -- functions like a general purpose

6    computer.  And I'm now quoting from a case called Ergo

7    Licensing versus CarFusion decided March 26th of this

8    year by the Federal Circuit.  In other words, a general

9    purpose computer is sufficient structure if the function

10   of a term such as means for processing requires no more

11   than merely processing which any general purpose

12   computer may do without any special programming.  If

13   special programming is required for a general purpose

14   computer to perform the corresponding claim function,

15   then the default rule requiring the disclosure of an

16   algorithm applies.  It is only in the rare circumstances

17   where any general purpose computer without any special

18   programming can perform the function, then an algorithm

19   need not be disclosed.  And that's referring to Katz.

20   To me that's what I think this, I mean obviously the

21   cases are different, they're 112.6 cases.  They involve

22   a computer rather than a controller.  But I'm trying to

23   use the reasoning of that case to inform my analysis of

24   this particular problem.  And the reasoning of that case

25   suggests to me that the Federal Circuit requires for a

1    claim to be sufficiently definite in cases where you

2    have something that works like a controller or a general

3    purpose computer, that ordinarily you have disclosure of

4    structure for performing a particular function unless

5    there is a -- unless the general purpose computer is

6    capable of performing that function without any special

7    programming.  And so the question for me here really is,

8    we have a monitor that has certain -- excuse me, a

9    controller that has certain functions, and the question

10   I need to be asking is not any of these other things we

11   talked about in the morning, it really is a question of

12   is this a case that from the record that's been built up

13   here, it is the case that a monitor is -- excuse me, a

14   controller is capable of performing this without any

15   special additional structure other than identifying a

16   general class of structure, which is what this does.  It

17   identifies a general class of structures, called

18   controllers, and then specifies a function that that

19   general class of controllers performs.  And if that

20   general class of controllers can perform those functions

21   without any special adaptations to them, then the

22   functional language is not indefinite for that reason.

23   But if it requires certain additional structure such as

24   if the controller is a computer, an algorithm, or if

25   it's a circuit, a particular circuit patent imprinted,

1  then that has to be disclosed.  And I would, the point I

2  would be making, if I were in your position is, judge,

3  there's no way in this case you can conclude that a

4  controller, a general class of structures that you've

5  identified previously in response to our 112.6 argument,

6  is capable of performing any of these functions without

7  additional structure.  And when they choose to use

8  functional language like this, the only way that it can

9  be definite is if either the disclosed structure is

10  capable of performing the function without any special

11  additions, and I can demonstrate to you that it can't,

12  or there is some kind of, it is clear to someone skilled

13  in the art that there is only one way of performing this

14  function with a controller, and therefore we don't need

15  to spell it out with any greater specificity, and this

16  isn't one of those cases either.

17          MR. GLITZENSTEIN:  So, to be clear, our

18  position is that the failure of the claim terms at issue

19  here, the controller terms in particular to recite an

20  algorithm, that's the structure that is relevant --

21          THE COURT:  To the extent the controller is a

22  computer.  It could be a circuit according to Zipher I

23  believe.

24          MR. GLITZENSTEIN:  It says it can be

25  programmed.  That's what their expert says, can be

1  programmed.  And they --

2           THE COURT:  But he also lists categories of

3  things that aren't programmed.  Didn't he list a

4  circuit?

5           MR. GLITZENSTEIN:  Of micro-controllers,

6  ASICs, application specific integrated circuits which

7  are programmable.

8           THE COURT:  Those are programmable circuits?

9           MR. GLITZENSTEIN:  And field programmable gate

10  arrays.  So, I mean the broad, the very --

11           THE COURT:  So their expert, then, in your

12  view, makes clear that this controller is a programmable

13  device?

14           MR. GLITZENSTEIN:  Yes, your Honor, the very

15  first characteristic that Dr. Kuc identifies for a

16  controller is that it can be programmed or adjusted to

17  energize an actuator --

18           THE COURT:  Or adjusted, what's an adjustment

19  and how is that different from the program?

20           MR. GLITZENSTEIN:  Well, Dr. Kuc doesn't say,

21  but, you know, what is missing here are the algorithms,

22  the structure for performing these functions in Dr.

23  Kuc's declaration.  It says it has inputs that indicate

24  the actuator's state, and includes wires, pins or leads

25  for input and output.

1            THE COURT:  Have you included an affidavit

2    from your expert who has explained to me why it's not

3    possible for a general purpose computer to do these

4    things?

5            MR. GLITZENSTEIN:  Have I or will I, I'm

6    sorry?

7            THE COURT:  Have you.

8            MR. GLITZENSTEIN:  We have not, no, your

9    Honor, we've rested on their positions in this case.  We

10   opposed -- or we sought 112.6 treatment for these claim

11   terms pointing out all of these same arguments --

12           THE COURT:  I understand, but I don't think

13   you understand my ruling on the 112.6 issue.  It's very

14   limited.  It was you were arguing that the term

15   controller is the equivalent of control means and should

16   be treated just as if this had used the term control

17   means in it.  That was the effect of what you are

18   arguing and therefore it should be 112.6.  And the law

19   on 112.6 is where you don't use means language, it is

20   somewhat more difficult to bring that claim within the

21   scope of 112.6.  Do you agree with that?

22           MR. GLITZENSTEIN:  Oh absolutely, yes, your

23   Honor.

24           THE COURT:  Okay.  And this doesn't use means

25   language.  So you're effectively saying when they say

1   controller, they effectively -- it should be treated the

2   same way as if they had used control means for 112.6

3   purposes, and I was explaining to you why it doesn't

4   because controller is a recognized class of structures.

5   I didn't say anything more than that.  I didn't say how

6   narrow that class of structures was, and that's as far

7   as I went on that.  So I wouldn't attach too much

8   significance to the 112.6 ruling.

9             MR. GLITZENSTEIN:  The issue I was attaching

10  significance to was the development of the response by

11  Zipher to that, to the position that we took, which was

12  that the functional language in all of those controller

13  and monitor terms, but really the controller terms, that

14  the functional language -- sorry.  That the claim term

15  itself lacks sufficient structure to perform the

16  functional language.  It's the very question that we're

17  focused on here.  Their response to that was a

18  declaration from Dr. Kuc, and we would submit that where

19  their own expert fails to identify in a claim

20  construction declaration any characteristic of a

21  controller that comes even close to the specific

22  requirements of calculating tape lengths or adjusting

23  tape tension or positioning prints in adjacent spaces on

24  a tape, where their own expert sets out his view of what

25  the term controller means, that should be binding on

1    them.

2              And I would also point out that --

3              THE COURT:  Let's say that the controller is a

4    programmable device, all right, it's capable of

5    performing these functions.  Is there evidence in the

6    record that would allow me to conclude one way or the

7    other whether a programmable device is capable of

8    energizing, calculating and controlling the way these --

9    without special programming?

10             MR. GLITZENSTEIN:  The evidence, your Honor --

11   yes, is the answer.  It would be paragraph four of Dr.

12   Kuc's declaration where he does not identify the ability

13   --

14             THE COURT:  So his failure to state under oath

15   any general purpose computer can do these things without

16   any special programming, you think ends the issue.

17             MR. GLITZENSTEIN:  We would submit that, your

18   Honor.  I would add also, I mean, I kept this exchange

19   from the claim construction argument up on the screen

20   because it too ties in with the Aristocrat point.  On

21   this very issue, this is where, again, at really the

22   same basic question that we're discussing here arose,

23   and your question to Mr. Jakes's was, quote, you cover

24   every controller so no matter how the software is

25   written, whether somebody can come up with a hardware

1    device that controls it, every possible controller in

2    the world you can do that function covered by your

3    patent, close quote.  And his answer was, yes, I believe

4    so as long as it's a controller, that's the structural

5    limitation, close quote.  That's an express

6    representation in connection with achieving a result of

7    defeating 112.6 application of these claims.  And a very

8    similar exchange occurred, remarkably similar exchange

9    occurred actually in the Aristocrat case itself at 1336.

10   In that case the patent owner's counsel said, quote, in

11   response to a question from the court, Aristocrat's

12   counsel contended that in light of the breadth of the

13   disclosure and the specification, any micro-processor,

14   regardless of how it was programmed would infringe claim

15   one if it performed the claim functions recited in the

16   means-plus-function limitation of that claim.  That

17   response reveals that Aristocrat is in essence arguing

18   for pure functional claiming as long as the function is

19   performed by a general purpose computer.  This court's

20   cases flatly reject that position, close quote.

21            This is exactly the same thing that's happened

22   in this case.  They've resisted the application of 112.6

23   on the basis of saying there's one small piece, and one

24   piece only in those claim elements, and that's the word

25   controller, and that has sufficient structure, their

1    expert put forth a declaration where he recites what a

2    term means for the person skilled in the art, and yes,

3    we believe that it is dispositive in this case that

4    nowhere in here does he suggest that a controller, as

5    that term is understood by a person of skill in the art,

6    would be inherently capable without programming of

7    performing the very specific functional requirements of

8    all these claims which dominate, these requirements

9    dominate these claims.  This is not an instance where

10   there's a --

11            THE COURT:  The only thing that I'm still

12   unsure of in what you're saying is, you may not concede

13   this, but I think that Zipher, to the extent that this

14   controller was capable of performing these functions

15   without any special programming, it would seem to me

16   that your indefiniteness argument would fail on the

17   grounds you've stated it, because in that case the

18   functional language doesn't necessarily imply any

19   additional structure.  It simply specifies the function

20   of the disclosed structure, performed by the disclosed

21   structure without any additional structure.

22            So that part of it I think you will probably

23   disagree with me on because you disagree with anything

24   that might in any way help Zipher, but the only, the

25   part I'm having a little bit of trouble with is, are you

1    saying that the -- well, I've lost my train of thought.

2    I'm going to have to try to gather it here.

3          (Pause.)

4          I finding persuasive much of what you're

5    saying here.  I'm still having problems with one little

6    part of it and I'm trying to figure out now exactly what

7    it was.

8          MR. GLITZENSTEIN:  Your Honor, if I could make

9    an observation which is, you know, to the extent, and

10   I've got again slide 77 up, to the extent that their

11   position in this case is really that the functional

12   language is an inherent capability of any controller out

13   there, this claim is anticipated.  There's no question

14   about that.  Ms. Stoll before the lunch break suggested

15   there was --

16         THE COURT:  And that might or might not be but

17   we'd have to have additional briefing on that.

18         MR. GLITZENSTEIN:  Well, we actually did flag

19   this, and I don't want to belabor the point I was making

20   before lunch, but, you know, the notion, what we show

21   here on slide 77 is that the claim has a structural

22   component of two stepper motors, two tape spool supports

23   and a controller, you don't need to go even beyond --

24         THE COURT:  But how do I know whether

25   something, how do I make a judgment as to whether a

1    class of structures called controllers can energize,

2    control and calculate without any additional

3    programming, how do I make that determination?

4         MR. GLITZENSTEIN:  Well, I look to --

5         THE COURT:  I look to the record and I ask

6    what does the record disclose with respect to that.

7    There isn't anything in the patent itself that helps me

8    answer that question.  I'm not aware of any language in

9    the patent.  Nobody has cited me to anything in the

10   prosecution history.  So what it comes down to is this

11   extrinsic evidence in the form of an affidavit from one

12   or more experts, right, and they tell me whether -- I

13   know what the relevant art is here, here's the relevant

14   art, and I know when the term controller is used, here's

15   what a controller is, and I know what a controller does,

16   and I know that a controller can't do these things

17   without specialized programming.  And I know that this

18   patent doesn't disclose any of that specialized

19   programming, and accordingly this claim is indefinite.

20        So really you've pointed me to Dr. Kuc, and

21   that's one -- is there anything else in this record that

22   I can rely on in trying to answer that question?

23        MR. GLITZENSTEIN:  The two things being

24   Zipher's counsel's statements at the hearing plus Dr.

25   Kuc are the only two things that I can think of, your

1  Honor, and I would note, I mean --

2           THE COURT:  You think, though, that their

3  prior arguments to me, the way you've characterized

4  their position is, they have been arguing, you think,

5  that this functional language doesn't imply any

6  additional structure.  It merely is the function of the

7  disclosed structure, and that it's a function that the

8  disclosed structure can perform without any additional

9  programming.

10          MR. GLITZENSTEIN:  That's what they -- that's

11  how I understood the response --

12          THE COURT:  That's how you're understanding

13  their position.  If they were right about that, I'm

14  telling you, I don't think their claim would be

15  indefinite.  It might be anticipated, but it wouldn't be

16  indefinite.  If on the other hand their claim does

17  require in order to perform those functions, the

18  specification of those functions is not going to be

19  sufficiently definite because under the Katz reasoning

20  the court says where you disclose a general purpose

21  computer for doing something, unless the general purpose

22  computer is inherently capable of doing that thing, you

23  have to specify the algorithm by which it does that

24  thing.  And I think that reasoning would apply here.

25          MR. GLITZENSTEIN:  Where here the algorithm

1    would have to be in the claim.

2            THE COURT:  Right.

3            MR. GLITZENSTEIN:  Right.  Well, your Honor, I

4    think the, just to the issue of Dr. Kuc's declaration, I

5    think it is quite notable that he says that a controller

6    can be programmed or adjusted to energize an actuator to

7    perform a function.  We would submit that that is a

8    very, very generic recitation of the capabilities of a

9    controller, and when you compare that to the myriad

10   requirements of calculating length or positioning tape

11   --

12           THE COURT:  I would have been more comfortable

13   if I had some evidence from your side to support the

14   position that you can't do it without special

15   programming, and that's why the Aristocrat case that I

16   cited, what the Federal Circuit did was remand that one

17   to the district court for a specific determination about

18   whether you could perform this function with a general

19   purpose computer or not.  It's interesting that it was

20   decided within a couple of months of the Aristocrat case

21   that you cited and it seems to address the issue

22   somewhat differently.

23           MR. GLITZENSTEIN:  I mean, you know, the other

24   point, your Honor, is just this notion that by their own

25   concession at the claim construction hearing in response

1    to your Honor's question, that that amounts to pure

2    functional claiming, and that's the Federal Circuit's

3    language in Aristocrat, and they say there that their

4    cases flatly reflect that position, so there, too, is

5    another place where we see --

6           THE COURT:  I think what the court means by

7    pure functional claiming is they mean claiming a way of

8    accomplishing -- claiming all ways of accomplishing a

9    particular result without any disclosure of structure.

10   That's what the problem that they're getting at there

11   is, don't you think?

12          MR. GLITZENSTEIN:  But in that case there was

13   a microprocessor.  So it was all microprocessor enabled

14   ways of achieving that function.  And here --

15          THE COURT:  But what the Federal Circuit said

16   there was you've got to have, you've got to have a

17   disclosure of the algorithm, in that case in the

18   specification because it was 112.6, but in the my case

19   it would be in the patent -- in the claim.

20          MR. GLITZENSTEIN:  In the claim, in the claim.

21   Understood.  I mean, the very -- we're sort of reasoning

22   from the parallels of Aristocrat to say that a

23   microprocessor, you can't generically say, you can't

24   generically claim as your invention a microprocessor

25   that's programmed to perform a function without --

 1          THE COURT:  If it requires special

 2  programming, Katz and Aristocrat would say no.

 3          MR. GLITZENSTEIN:  And this one clearly

 4  requires special programming, your Honor, I mean there's

 5  just nothing in the record where they have ever

 6  suggested that in the absence of special programming,

 7  these many functions can't be carried out.  I mean,

 8  there are discussions about specific algorithms, for

 9  example, in the specification, the patent discloses a

10  particular control algorithm for doing the calculation

11  of lengths, things like that.

12          THE COURT:  Do you agree with me that it is

13  possible to craft a claim to disclose a structure and

14  specify a function that that structure performs in a way

15  that doesn't require any additional structural

16  disclosure?

17          MR. GLITZENSTEIN:  Yes, your Honor, I do.

18  And, I mean, the function has to be very, very closely

19  tied in that scenario to the inherent capability of the

20  structure, but sure.

21          THE COURT:  And it's also possible to draft a

22  claim to specify structure and to specify functional

23  language that implies an additional structure, but that

24  that -- but that ordinarily is going to have to be

25  addressed under a 112.6 scenario or it has to be, in my

1    mind, a very rare case where the functional language

2    identifies a sufficiently detailed structure to keep the

3    claim from being indefinite.  So that I do think there

4    are circumstances, though it seemed to me that they are

5    rare, that one can use functional language to imply the

6    the existence of structure if in the rare, it's a rare

7    case where the structure can be identified by the

8    functional claiming, in other words, given what you have

9    pled for structure and given the function that you've

10   identified, there may be, there may be the unusual case

11   where that function under these circumstances can only

12   be performed in a way that would be a sufficient

13   definite disclosure of structure to survive a

14   definiteness challenge.  But it's hard to construct that

15   case as an example because I don't know the technology

16   well enough, but I would acknowledge it's at least

17   possible.  But the problem here for them, from your

18   perspective is, judge, this is not the case where they

19   merely disclosed a structure and a function that that

20   structure performs without any additional implied

21   structure, it's not that case.  They've claimed that it

22   is but it isn't, because we've shown with their own

23   evidence that it's programmable and it requires

24   programs.  And this isn't that very unusual case where

25   the additional structure that's specified here,

1    controlling, energizing and calculating, a person

2    reasonably skilled in the art would understand the

3    structure that's implied by that and would understand

4    that that structure is sufficiently detailed to survive

5    the definiteness challenge, and accordingly it's

6    indefinite because of the way the functional language is

7    used in these claims.

8           That argument, to me, is the one that you

9    articulate that is most appealing to me I guess.  I

10   don't buy the more generalized approaches that you've

11   taken such as saying, well, it's at the point of novelty

12   and it's functional so it's, per se, it really requires

13   digging into what the facts this case are, what the

14   record of this case is and what that tells me about

15   whether this particular functional claiming can be

16   controlled by -- can be performed by a monitor -- excuse

17   me, a controller without any additional programming.

18          MR. GLITZENSTEIN:  One suggestion, your Honor,

19   for sort of harmonizing Aristocrat and Katz might be,

20   you know, it's a question really of specificity of

21   structure versus generality of function where you have a

22   fairly well specified structural recitation in a claim,

23   you know, that's the scenario where the additional

24   functional language might be okay because it's

25   inherently part of that specific structure, but where we

1    would submit as here, where you have a very broad almost

2    generic piece of structure coupled with some very

3    specific functions, that's where it breaks down and

4    where the indefinite issues arise.

5            THE COURT:  All right, let me hear what Zipher

6    has to say about this argument and then I'll hear a

7    response from you.

8            MS. STOLL:  Thank you.  At the outset I want

9    to note that our claims are entitled to a presumption of

10   validity.

11           THE COURT:  I understand that, and it requires

12   clear and convincing evidence, I accept that.

13           MS. STOLL:  And Markem hasn't raised any of

14   these arguments in their briefs or their expert reports

15   or their infringement contention.

16           THE COURT:  Well, they raise it although

17   obliquely, I agree with you.  I mean, unfortunately

18   their arguments are all sort of, they are off by like

19   30 degrees or I'm off 30, I mean, they may be completely

20   right and I may be completely off, but the way I'm

21   seeing the case is different from the way they're seeing

22   it, but I do think it is, here I do think we find the

23   core of the argument in their brief, it's just not

24   stated this way.

25           MS. STOLL:  With all due respect I think that

1    you're making their argument for them perhaps better,

2    but I don't think it was made in their brief.  And I

3    don't think that -- I think we've responded to the

4    arguments they made.

5              THE COURT:  All right, let me, then, I need to

6    call you out on that, so.

7              (Pause.)

8              THE COURT:  If you look at the bottom of page

9    31, they start, the claims do not describe a particular

10   controller; rather the claims purport to cover any

11   controller that performs the claimed functions of

12   energizing motors to transport tape, et cetera, et

13   cetera, and then they quote this language that they've

14   quoted to me in their argument here about every possible

15   controller in the world, it's a controller, that's the

16   structural limitation, and then they go on to discuss

17   the IEEE definition that I gave, and then they say in

18   the middle of page 33, a controller can only perform

19   these functions if it is specifically configured to do

20   so, but the asserted claims do not describe a particular

21   configuration for the controller, e.g., a controller

22   with particular software, hardware, firmware or

23   circuitry.  The fact that the asserted claims recite the

24   generic structure of a controller therefore does not

25   make them definite since the structure is not in and of

1    itself sufficient to perform the claimed operations of

2    the controller.

3              That, I thought that that's the argument

4    you're making, isn't it?

5              MR. GLITZENSTEIN:  Yes, your Honor.

6              MS. STOLL:  I think that that was to support

7    their point that the claims use purely functional

8    language to describe the point of novelty and that

9    therefore under the cases like Halliburton, Miyazaki, et

10   cetera, their claim was per se invalid.  But I --

11             THE COURT:  Well, let's assume -- I agree with

12   you.  I mean, would I have liked to be helped more than

13   I have been helped by the parties in this case?  I would

14   say almost every day that I pick up this case I answer

15   that question yes.  But let's assume that they've

16   adequately raised it.  Help me understand on the merits

17   why it's wrong.  And let me start with this.  I'd like

18   you -- do you understand or have I been sufficiently

19   clear to convey to you the analytical structure that I

20   think I'm inclined to use in the case?

21             MS. STOLL:  Yes, I do, but I would like to

22   start by telling you why I think you're wrong in your

23   analytical structure -- just let me, if you'll give me a

24   minute, I'll tell you, then I can move on to the other

25   question.

1                THE COURT:  Okay.

2                MS. STOLL:  Of whether even under the

3     framework there's a problem with our claims.

4                THE COURT:  Okay.

5                MS. STOLL:  So first, the cases that are being

6     relied on with this framework are cases that have

7     exclusively involved 112.6 paragraph claims.

8                THE COURT:  You understand I made that clear

9     at the very beginning and every single time I reference

10    it.

11               MS. STOLL:  I understand.  I want to let you

12    know my view.

13               THE COURT:  I don't have to be reminded of it,

14    I know.

15               MS. STOLL:  Okay.  I want to just let you know

16    my view on why I think that it should be limited.  There

17    is not a single case where the Federal Circuit or any

18    other court has applied that framework to claims that

19    aren't written in meaningful function format.

20               THE COURT:  Explain to me why the reasoning

21    should not apply.

22               MS. STOLL:  In 112.6 paragraph says that you

23    look to the specification to identify the corresponding

24    structure.

25               THE COURT:  I agree.

1            MS. STOLL:  If you cannot find the

2   corresponding structure, the claim is indefinite under

3   112.2 paragraph.

4            THE COURT:  I agree.

5            MS. STOLL:  That is only for 112.6 paragraph

6   claims.

7            THE COURT:  And you use the exact same

8   standard in doing an ordinary 112.2 indefiniteness

9   argument whether -- show me the case law that says that

10  that's not true.

11           MS. STOLL:  I disagree and --

12           THE COURT:  Show me the case law that says

13  that that's not true.

14           MS. STOLL:  Young versus Lumenis.  This is the

15  type of standard that you apply when you're determining

16  whether a claim is indefinite.  You look at whether its

17  amenable to construction or insolubly ambiguous.  It

18  depends on whether the words can be given a reasonable

19  meaning.  You're not looking to the claim to see whether

20  you can identify structure that performs the function.

21  That's what you do in the 112.6 paragraph contest and if

22  you can't --

23           THE COURT:  Wait a minute.  So you're saying

24  there's a separate test of indefiniteness for a 112.6

25  claim?

1          MS. STOLL:  Yes, I am.

2          THE COURT:  Show me any case that so

3    recognizes that, any case ever decided in the history of

4    the Federal Circuit that says that, I'll be happy to

5    move on.  Do you have some?

6          MS. STOLL:  I think the Aristocrat case.

7          THE COURT:  That doesn't say that.  I've read

8    it, okay.  What else?  Anywhere in the history of the

9    Federal Circuit that said that.

10          MS. STOLL:  The first case to talk about

11    needing to have corresponding structure for a general

12    purpose computer was the WMS Gaming case decided in

13    1999.  From there you had the Aristocrat case that said,

14    oh, because in WMS Gaming we're going to limit you to a

15    particular algorithm.

16          THE COURT:  I understand the cases all deal

17    with 112.6.  I'm asking for something different,

18    something that's a case in which the Federal Circuit has

19    said the test of definiteness under 112.2 is different

20    when analyzing structure pursuant to a 112.6 analysis

21    than it is when analyzing claim language in a case not

22    subject to 112.6.

23          MS. STOLL:  I don't have a particular case

24    that says that --

25          THE COURT:  Okay.

1          MS. STOLL:  -- but I do think that if you look

2     at the cases that deal with 112.6 paragraph, there could

3     be two different kinds of insolubly ambiguous.  You

4     might --

5          THE COURT:  I'm not trying to figure out why

6     the difference.  Why would it matter, why would the

7     court want to have two different standards?

8          MS. STOLL:  Because under 112.6 you look to

9     the specification so you've got a means for doing

10     something.  You look to the specification to see what

11     the structure is that corresponds to that means, and

12     you're stuck to that structure and its equivalence for

13     the purpose of infringement.

14          But if you can't even figure out what that

15     structure is, then for some reason they've called that

16     112.2 paragraph indefiniteness.  I have to tell you when

17     I first read cases involving that I thought it was a

18     little confusing, but that is the test that has only

19     been applied to 112.6 paragraph claims.  They've never

20     done anything like that with non-means-plus-function

21     claims.  Instead they just look to see whether the term

22     can be given a reasonable construction.

23          THE COURT:  Isn't the --

24          MS. STOLL:  The kind of argument --

25          THE COURT:  If you look at the history of

1    112.6, isn't it quite clear that 112.6 was enacted to

2    address a specific problem in that the United States

3    Supreme Court had determined that means-plus-function

4    claiming would not be permissible.  And the way they

5    addressed that problem is to say we will specifically

6    countermand, overrule the Supreme Court on that issue,

7    and we are going to say that you may use general means

8    claiming, but when you do so, you have to be limited to

9    the structure disclosed in the specification.

10            MS. STOLL:  Congress did that.  What Congress

11    said is you're going to use means-plus-function claims.

12    The Halliburton case, just to make sure that it's clear,

13    that was actual means-plus-function, not controller for

14    doing something, it was means-plus-function.

15            THE COURT:  Well, you don't have to be clear

16    to me.  I basically have made that clear to you.  What

17    I'm saying to you is that was actually a

18    means-plus-function case.  Halliburton is directly

19    reversed by the Congress that dealt with that very

20    specific circumstance where it says you can plead a

21    general means plus a function, but when you choose to do

22    that you are limited to the structure disclosed in the

23    specification.  And if that is so, then why wouldn't,

24    and it is clear that the 112.6 cases where the structure

25    is inadequate, they say what, it's invalid because of

1   lack of definiteness, right, under 112.2.  So that

2   suggests that the 112.2 tests apply.  You shake your

3   head no, but you have no case ever cited in the history

4   of the Federal Circuit to the contrary.

5           MS. STOLL:  I have Young and a lot of other

6   indefiniteness cases that analyze claims and say that

7   the test here is --

8           THE COURT:  So I have to say even though in a

9   112.6 case where the structure is inadequately

10  disclosed, it's invalid because of indefiniteness under

11  112.2, we want judges to apply a different test to

12  indefiniteness to 112.6 than we do to regular 112.2

13  cases.  Never said it before.  Not in the statute.  No

14  basis for considering that.  But we, the Federal

15  Circuit, that's what we mean because that's what we're

16  thinking back in our offices by ourselves even though

17  we've never expressed that.  I mean, that's ridiculous.

18          MS. STOLL:  I don't know of any case where the

19  Federal Circuit has applied the test that it applied for

20  112.6.

21          THE COURT:  Well, when you apply the same

22  statute to two things, ordinarily you apply the same

23  test unless the Federal Circuit says different.  112.2

24  is the same, it's the same language that I would apply.

25  So why wouldn't I use the same test absent some either

128

 1  reason why I shouldn't or some declaration from the

 2  court that I shouldn't?

 3         MS. STOLL:  Because the reason is is that

 4  112.6 paragraph requires you to go to the specification

 5  to determine the scope of the claim.

 6         THE COURT:  I know that.

 7         MS. STOLL:  If you can't figure out what the

 8  corresponding structure is, you can't figure out the

 9  scope of the claim.

10         THE COURT:  You're just repeating things.

11  Let's move on because that's just repeating things.

12         MS. STOLL:  Okay.  Again, I just want to point

13  out that under either framework, whether it's the

14  framework of whether the claims can be given a

15  reasonable construction or it's this 112.6 paragraph

16  framework, this has not been in Markem's contention.  It

17  hasn't been in their expert reports.  They have argued

18  different terms are indefinite -- as being insolubly

19  ambiguous.  Efficient usage of the tape, acceptable

20  level of tension, but they haven't --

21         THE COURT:  But their whole argument is a

22  definiteness argument.  They make that clear right at

23  the very beginning, right at the first few pages of the

24  brief, all three arguments are indefiniteness arguments.

25  Can I ask my question?

1          MS. STOLL:  Yes.

2          THE COURT:  Okay.  Are you claiming here that

3   the disclosed structure of a controller can perform the

4   functions of controlling, energizing and calculating as

5   identified in these claims without any special

6   programming?

7          MS. STOLL:  I think that the algorithms and

8   description of how that controller performs those

9   functions are disclosed in the specification, and I can

10  point to you where that is.

11         THE COURT:  Okay, let's stop, let's stop,

12  okay.  My question didn't ask that.  I asked I thought a

13  simple question.  They, Markem, says your position is,

14  as expressed in past arguments in front of the court,

15  that the controller identified in your claim is capable

16  of monitoring, energizing and calculating the way

17  specified in the claims without any special programming,

18  and that you've taken that position in the past.  Is

19  that your position today?

20         MS. STOLL:  I'm not sure what that means.  So

21  I apologize for being evasive, but can I --

22         THE COURT:  Okay, they said it.  I understand

23  what they are saying.

24         MS. STOLL:  Okay, can I --

25         THE COURT:  Let me try to explain it to you

1    some more.

2              MS. STOLL:  I'll try to answer in a way that

3    answers your question.  I would say that it's not

4    inherent in the operation of the controller.  It doesn't

5    inherently perform these functions.

6              THE COURT:  So there needs to be an algorithm

7    in addition to being a controller in order to perform

8    those functions?

9              MS. STOLL:  Yes.

10             THE COURT:  Okay.

11             MS. STOLL:  There is more to it than --

12             THE COURT:  So, if that's the case, and using

13   the analytical structure that I've followed, we have to

14   ask, okay, this functional language, it carries some

15   weight, it does something more than simply say a

16   controller that does these things, and all controllers

17   can do them, it says a controller that has something

18   done to it so that it can do these things.

19             MS. STOLL:  I think it's a controller that

20   does these things and one of ordinary skill in the art

21   would understand --

22             THE COURT:  It doesn't by -- but something has

23   to be done to the controller.  You can't just order one

24   on line, put the power to it, attach it to your, the

25   rest of your machine and it starts working.  There has

1    to be programming.  Do you agree with the way they

2    characterize your expert report, that this requires

3    programming?

4          MS. STOLL:  Okay, let me make sure I give

5    context for Professor Kuc's report.

6          THE COURT:  Okay, can you just answer that

7    question first and then give me the context.  Does it

8    require programming?

9          MS. STOLL:  Professor Kuc is talking about

10    controller generically.  He was not talking about the

11    particular controller in the patent or the

12    particular controller --

13          THE COURT:  Does your controller require

14    programming?  I thought you told me yes.

15          MS. STOLL:  Yes.

16          THE COURT:  Okay.  So it is a controller, and

17    in order to perform the functions it requires

18    programming.

19          MS. STOLL:  Yes.

20          THE COURT:  Okay.  Now, the question is, if

21    that's true, do you think the analogy to Katz is an

22    appropriate one?

23          MS. STOLL:  No, I do not.

24          THE COURT:  Okay, why is Katz not an analogy?

25          MS. STOLL:  I think Katz is a

1    means-plus-function case, and I don't think the analysis

2    in Katz --

3              THE COURT:  I'm not going to get you off that,

4    okay, so let's abandon Katz because it doesn't help, you

5    aren't able to go there.

6              So, all right, let's assume -- forget that I'm

7    talking about any particular case.  You have conceded

8    that your controller does require programming that is

9    not inherent in the nature of the controller that's

10   disclosed.  It requires something more than the

11   controller that you disclosed.  So it requires

12   programming to allow energizing, to allow controlling

13   and calculating, right?

14             MS. STOLL:  Yes.

15             THE COURT:  Okay.  Where do you disclose

16   programming -- programs are algorithms, right?

17             MS. STOLL:  (Nods head affirmatively.)

18             THE COURT:  All right, where do you disclose

19   the algorithm that is -- performs the function?

20             MS. STOLL:  Can you look at document number,

21   it's 151-21.

22             THE COURT:  What is it?

23             MS. STOLL:  I think that it's the '094 patent

24   in this case.

25             THE COURT:  All right, I don't have it here,

1  but I can call it up on my screen if I need to.  Can you

2  put it up on yours by any chance?  Because I have to go

3  on line to ECF and pull down the exhibit, but I can do

4  it if we need to.

5          (Pause.)

6          THE COURT:  All right, I'll be able to get it

7  in a second.  I will just have to go on line here.

8          (Pause.)

9          THE COURT:  Okay, what document is it?

10         MS. STOLL:  This is the '094 patent, U.S.

11 patent.  It's U.S. Patent No. 7,682,094.

12         THE COURT:  Yeah, but what document number?

13         MS. STOLL:  151-21, and we do have it up on

14 the screen for you.

15         THE COURT:  Okay.  All right, go ahead.

16         MS. STOLL:  Okay, so if you'll see, I'm just

17 showing you first figure 18, and this shows you the

18 micro-controller 89.  As you can see, it sends pulses 91

19 and -- down to the stepper motors and spools.  The

20 stepper motors are indicated at 92 and 93, and there's

21 micro-controller 89 which is connected to them through

22 the motor drive circuits to control the spools.

23         If you could turn, please, to column 21.

24         THE COURT:  So you're saying --

25         MS. STOLL:  I'm going to show you where the

1    algorithms are.

2              THE COURT:  I just want to know, you weren't

3    saying that was the algorithm.

4              MS. STOLL:  No, I was showing you the

5    structure.  The specification has diagrams, circuit

6    diagrams for the micro-controller and the connections

7    between it and the motors and the spools and also

8    including motor drive circuits to tell one of ordinary

9    skill in the art how to energize the motors and how to

10   control the motors.  If you look here at the text that's

11   put up, if you could maybe go down a little bit further,

12   you'll see that tape, calculating the tape tension and

13   correction is disclosed.  For example, at column 21,

14   line 8 through column 22, line 63.

15             THE COURT:  Ah-hum.

16             MS. STOLL:  There's a lot of text.  Particular

17   formulas for how to perform these functions.  In

18   addition there's the algorithm for monitoring the tape

19   tension.  That's at column 21 -- excuse me, column 23,

20   line 21 through column 24, line 9, for example.  Also

21   column 24, line 60 through column 25, line 10, there's

22   specific formulas.  This is -- one of ordinary skill in

23   the art reading this specification would understand how

24   this operates.

25             THE COURT:  Where's the algorithm for

1    energizing the motors?

2         MS. STOLL:  For energizing the motors?  I

3    think that's within the skill level of one of ordinary

4    skill in the art.  It's also showing the --

5         THE COURT:  Well --

6         MS. STOLL:  -- figure 18.

7         THE COURT:  Can you do me a favor?  I know it

8    seems inconsiderate.  If I interrupt you and start to

9    ask you something, it's better if you stop what you're

10   doing and try to respond to me, because if you talk and

11   I don't understand you because I'm focused on something

12   else, it's like you're not even here, okay?  So your job

13   is to try to help me and persuade me, and so if I'm

14   talking, you're not going to be persuading me, all

15   right, so let's try to have an exchange.  And I'm sorry

16   that it's not like we're sitting in a coffee shop

17   somewhere, it's a courtroom, and I need to be able to do

18   things the way I need to do them, and that entails me

19   asking questions and you answering them, okay, so please

20   try to stop when I start to ask you questions, okay?

21        So, I'm trying to get back to where is the

22   algorithm for energizing the motors?

23        MS. STOLL:  Could you please go to column 21.

24   At the top of column 21 you will see that it talks about

25   figure 18 illustrates the calculation.  If you go down

1    to around line five it says current from the supply 80

2    to the motor drive circuit 81 is delivered through a low

3    resistance resistor 83, the potential developed across

4    the resistance being applied to level translator 84.

5    Current to motor drive is delivered through low

6    resistance value resistor.  If you continue on it talks

7    about how the outputs of the level translators are

8    applied to analogue digital converters, the outputs of

9    which are applied to a micro-controller 89.  The micro-

10   controller delivers a pulsed output to the first motor

11   drive 81 and a pulsed output 91 to the second motor

12   drive.  The motor drives energize separate motors

13   schematically.

14           THE COURT:  But that doesn't tell me anything

15   about the way the micro-controller is programmed to

16   deliver the --

17           MS. STOLL:  To energize?

18           THE COURT:  Yeah.

19           MS. STOLL:  I think it's just a matter -- that

20   is probably something that's more inherent in the

21   operation of the micro-controller in the context of this

22   invention being connected to these motors.

23           THE COURT:  Okay.

24           MS. STOLL:  But there is an algorithm here, as

25   you can see, for calculating the tape tension.  Sorry

1    for interrupting you.

2              THE COURT:  No, tape tension, it does seem

3    that there's a formula for calculating tape tension, and

4    I don't, I'm less clear on where the algorithm is for

5    calculating -- excuse me, for energizing and

6    controlling.

7              MS. STOLL:  I don't think there is one.  I

8    think that that is a routine operation that one of

9    ordinary skill in the art would be familiar with and

10   details like that need not be disclosed in the

11   specification.

12             THE COURT:  Okay.  One of the things that I'm

13   wondering about here, and as much as I hate to slow this

14   thing down, is whether I should each give you an

15   opportunity to submit a, re-brief this thing based on

16   the way I'm thinking about it because I don't think

17   either of the briefs do a great job of addressing this

18   and I don't know that you've each had a full opportunity

19   to develop your extrinsic evidence about this.  What

20   you're really saying is that, hey, judge, any

21   microprocessor can energize a motor, and while there's

22   programming that's required, anybody who's reasonably

23   skilled in the art would know exactly what kind of

24   programming is required, right?

25             MS. STOLL:  I apologize, I don't think that's

1    what I'm saying.  I think that one of ordinary skill in

2    the art looking at column 21 and seeing the formula

3    would understand how to calculate the tape tension.  For

4    energizing, I think that is a more routine function, but

5    calculating the tape tension -- can I point out that

6    there's also a PID controller that's disclosed and

7    describing the algorithm for that is in column 22, line

8    8.  That's also an algorithm for calculating the spool

9    diameter at the bottom of column 22 at line 66.

10           THE COURT:  Yeah, I just -- all right, so what

11   else do you want to tell me?

12           MS. STOLL:  I want to tell you again going

13   back to Professor Kuc, the question that was being

14   addressed at the claim construction hearing was the

15   meaning of the word controller in terms of whether it

16   connotes structure, because whether 112.6 paragraph

17   applies or not depends on whether there's structure in

18   the claim, and so Professor Kuc was talking about what

19   one of ordinary skill in the art would understand by the

20   word controller in a vacuum, not in the context of the

21   patent or the claims.  So I just want to make sure

22   that's clear.

23           THE COURT:  Okay.  Thanks.  What do you say to

24   her argument that there are algorithms disclosed in here

25   corresponding to the functions that are identified in

1    the claim language?

2            MR. GLITZENSTEIN:  There's two responses, your

3    Honor.  At a higher level she didn't point to anything

4    in the claims themselves.  And we're applying in the

5    Aristocrat type framework, the question is whether

6    there's a sufficient structure in the claims to have the

7    --

8            THE COURT:  I don't think I'm buying that

9    because I do think that she's right about

10   indefiniteness.  You can look to other language in the

11   patent itself to give meaning.  It's a claim

12   construction issue.  You use anything you need to use to

13   give construction to the claim language, and I'm not

14   sure that I have to disregard, I mean, if they had

15   specified precisely what the algorithm was and it wasn't

16   in the claim language and it says the function we've

17   identified as controlling is performed through the

18   following algorithm, you would say that would still be

19   indefinite?

20           MR. GLITZENSTEIN:  If they said in the claim

21   it's performed?

22           THE COURT:  Yeah, in the patent itself, if

23   they said in the patent, the description of the

24   invention -- where does this come up, where does this

25   formula that they've put up, where is that in the

1  patent?  Where is it?

2          MS. STOLL:  Column 21.

3          THE COURT:  Yeah, what is that?  What do you

4  call column 21, part of what?

5          MR. GLITZENSTEIN:  Specification, your Honor.

6          THE COURT:  Okay.  So if, let me finish my

7  point, if we had this claim language and in the

8  specification we had a paragraph that said essentially

9  the following, we have specified a function performed by

10  the controller, the way in which that function is

11  performed by the controller is through the following

12  algorithm, you would say I would disregard that in

13  determining whether the claim is sufficiently definite?

14          MR. GLITZENSTEIN:  Well, I would have to say,

15  your Honor, no, if the claim were going to be construed

16  to embrace that algorithm, but that's the 112.6 issue

17  right there.  Our point is, look, the stuff that they're

18  pointing to now, I'll turn to the substance of that in

19  just a moment because they're formulas, they're

20  mathematical formulas, they're not algorithms.  I'll

21  address the court's question directly in just a moment.

22  But at a high level, you know, what's going on here is

23  they want on the one hand to avoid any connection of

24  these claims to the specification when it comes to their

25  construction.  And they vigorously resisted application

1   under 112.6 and stipulated straight up that the 112.6

2   doesn't apply.  Now what they're trying to do is embrace

3   all of the savings provisions of 112.6 without being

4   saddled with any of the claim construction implications

5   of it.  You know, they can't get both the benefits of

6   sort of being able to point to the specification to say

7   what is a purely functional claim term --

8           THE COURT:  Well, that's always the case with

9   nonfunctional claim terms.  You use the specification to

10  interpret the claim terms, you do, but you don't use the

11  specification to limit the claim terms.  Isn't that sort

12  of basic claim construction?

13          MR. GLITZENSTEIN:  For nonfunctional claim

14  terms that's true, but functional --

15          THE COURT:  Okay.  Show me cases that say with

16  functional claim language you must ignore the

17  specification unless you invoke 112.6.

18          MR. GLITZENSTEIN:  Halliburton.

19          THE COURT:  That doesn't say that.  Show me

20  where.

21          MR. GLITZENSTEIN:  Well, it's pre-112.6 so

22  it's not going to say that, but what it says is you've

23  used functional claim language in a means-plus-function

24  framework, and that's permissible.  And that's what

25  112.6 exists to deal with in the first place.  But your

142

1    Honor, with regard to the very passages here, this, too,

2    is addressed in Aristocrat.  These are mathematical

3    formulas.  And the --

4         THE COURT:  Help me understand.  I understand

5    an algorithm is a set of instructions or steps, and

6    that's what an algorithm is.  Is that right or wrong?

7         MR. GLITZENSTEIN:  Yes, that's my view.

8         THE COURT:  And how is a formula different

9    from an algorithm?

10         MR. GLITZENSTEIN:  A formula is really just a

11    different way of expressing a functional result.  It's

12    not a particular way of carrying it out.  And Aristocrat

13    deals with this --

14         THE COURT:  Well, a mathematical formula

15    ordinarily would be broken down and you could take a

16    mathematical formula and convert it into an algorithm.

17    So, I'm not understanding -- again, I'm not a scientist

18    or a mathematician, but I understand -- I've always

19    understood formulas to be essentially a set of

20    instructions which are equivalent to an algorithm.

21         MR. GLITZENSTEIN:  I think the algorithm is

22    going to be more specific, and this is the --

23         THE COURT:  Well, even in the cases that we're

24    citing, Aristocrat and Katz and those cases to the

25    extent they're applicable, they make clear you don't

1    actually have to have the source code for your

2    programming, you can do it through a diagram as long as

3    the diagram is sufficiently specific to inform a person

4    reasonably skilled in the art as to what the algorithm

5    is.  So it doesn't have to be code to be sufficient.

6         So I don't know whether this is sufficient but

7    it covers tape tension, it doesn't cover energization or

8    otherwise controlling.

9         MR. GLITZENSTEIN:  Right, or a lot of other

10   things in these functional aspects of the claims like,

11   you know, how does one come about efficient use of the

12   tape which is the third issue --

13        THE COURT:  I assume you would argue, Zipher

14   would argue that in construing this functional language

15   against a claim of indefiniteness you should use the

16   same approach to solving the indefiniteness problem that

17   you do in an ordinary indefiniteness problem.  That is

18   you construe the language generously, you try to find

19   any saving construction that's reasonable, you consider

20   not only the claim language but the specification

21   language, you can consider dictionaries, you can

22   consider extrinsic evidence, what a person -- it's

23   essentially a claim construction exercise.

24        MS. STOLL:  Yes.

25        THE COURT:  Right?  And so you're saying

1    something different.  You're saying functional language

2    doesn't get dealt with that way against an

3    indefiniteness challenge.  You're saying is that the

4    functional language has to be construed how?  If you

5    don't use normal claim construction approaches, how do

6    you construe that language?

7              MR. GLITZENSTEIN:  So the language of the

8    particular words are used to define the function.  Those

9    words can be construed in light of the ordinary

10   collection of --

11             THE COURT:  And if they said in the

12   specification when we say this function, we mean a

13   function performed using the following algorithm, you're

14   saying I should ignore that?

15             MR. GLITZENSTEIN:  It doesn't provide definite

16   disclosure where on the same, at the same time they are

17   not limiting the claim to that algorithm.  That's really

18   where this creeps in, is the fact that they're saying

19   our claim covers not just that algorithm for performing

20   that function, but every single possible algorithm ever

21   that can be programmed --

22             THE COURT:  Well, if they said that their

23   claim would be indefinite.

24             MR. GLITZENSTEIN:  They have.  They've said it

25   at the claim construction hearing.  That's the purely

1    functional problem with this claim.  They on the one

2    hand want the benefits of a narrow disclosure, which we

3    would submit doesn't disclose an algorithm in any event,

4    but they want the benefits of pointing to a narrow

5    disclosure without being bound by that.  And this is

6    exactly what -- this is the dilemma that Congress

7    resolved in 1952.  They said if you want to claim

8    functionally, okay.  And as the Belmont case that they

9    cite --

10            THE COURT:  The logical flaw in your argument

11   has been recognized by the federal because that they

12   have enacted 112.6 did not mean that they by implication

13   barred all functional claiming nor did it mean that the

14   Supreme Court precedence preceding barred all functional

15   claiming.  I thought we were beyond that because the

16   Federal Circuit has said multiple times there's nothing

17   wrong with functional claiming.  It doesn't have to be

18   undone, only in the context of 112.6, it can be done

19   other ways.  So that's wrong.  I mean --

20            MR. GLITZENSTEIN:  What this amounts to is

21   something that the Federal Circuit has identified as

22   pure functional claiming, and that's where it becomes an

23   issue with the Federal Circuit.  I mean, that's what

24   Aristocrat says.  If you've got it, if you say on the

25   one hand that we cover every --

    1              THE COURT:  I can already picture how my

    2    remarks are going to be portrayed in the Federal Circuit

    3    now.  The judge mistakenly thought that this court's

    4    opinions dealings with 112.6 applied to functional

    5    claiming language that isn't subject to 112.6.  That's

    6    not what I'm saying.  I hope someone, when this case

    7    gets to the Federal Circuit, as it will, at least

    8    correctly represents what I am doing and saying, trying

    9    to do, because I'm just trying to do the right thing

   10    here, you know, the parties are going to misrepresent

   11    things that I have said, twist things that I have said

   12    to try to create false impressions.  I've been clear

   13    about this.  I understand Katz and Aristocrat are

   14    112.6 cases.  They're not cases dealing with our

   15    situation.  I'm trying to use those cases as a way to

   16    understand the thinking that underlies the Federal

   17    Circuit opinions that deal with our area because the

   18    Federal Circuit opinions that deal with our particular

   19    problem are few and they don't go into extensive

   20    reasoning other than Swinehart and Halliburton, and

   21    those are really the only two that I think address this

   22    particular issue, but.

   23              MR. GLITZENSTEIN:  Your Honor, if I could make

   24    just one further observation.

   25              THE COURT:  Yeah.

 1            MR. GLITZENSTEIN:  If in fact as Zipher had

 2    said during claim construction that one needs to look to

 3    the specification in the way that they're suggesting

 4    now, we would have argued that as a separate basis for

 5    construing the claim in light of the specification.  I

 6    mean, that would have been something that was available

 7    to us.  But they steadfastly distanced themselves from

 8    that specification in the context of the claim

 9    construction.

10            THE COURT:  Well, I think we got an admission

11    out of them that's useful today.  That admission is that

12    they acknowledge that the functional language that is at

13    issue here does require special programming.  I think

14    that's important.  If for nothing else in these four

15    hours that I've been here, understand that that is their

16    position, which is arguably inconsistent with some

17    things they've said in the past, that helps us narrow it

18    down, you know, beyond that we'll have to see.

19            What else did you want to say about this

20    particular issue.  Anything else?

21            MS. STOLL:  I don't have anything else, your

22    Honor, except that I do think that I don't think we've

23    been inconsistent.  I think that the claims require that

24    you have a controller and the controller be able to

25    perform the stated claimed functions and our

1    specification teaches one of ordinary skill in the art

2    properly how to do that.  Thank you.

3           THE COURT:  All right, what do you want to say

4    on the third argument?

5           MR. GLITZENSTEIN:  Your Honor, if we could get

6    the monitor for up, please.

7           THE COURT:  Yup.

8           MR. GLITZENSTEIN:  And at tab three of your

9    binder, slide 81.  The first issue, your Honor, just to

10   sort of set the table here on slide 82, we do have

11   agreement on some of the baseline issues on these two

12   terms.  Number one, we do have agreement that they are

13   at least terms of degree.  They disagree with us that

14   they are also subjective terms, but I think just getting

15   it into that analytical bucket is helpful because the

16   law on this is certainly clear.

17          THE COURT:  I think of them as terms of degree

18   and I don't think of them as purely subjective.

19          MR. GLITZENSTEIN:  On this issue when we are

20   talking about a term of degree, the patent specification

21   must provide some standard for measuring that degree to

22   be definite.  On that we seem to have a dispute and I'll

23   address that.

24          THE COURT:  It doesn't have to be quantified,

25   though, does it?

1          MR. GLITZENSTEIN:  It has to be a standard

2    that a person skilled in the art can understand in order

3    to apply metes and bounds.

4          THE COURT:  It has to be objective, not

5    subjective, and it has to be understandable to a person

6    reasonably skilled in the art.  But say somebody, a

7    person reasonably skilled in the art could eyeball it

8    and all people who are reasonably skilled in the art

9    could eyeball it and determine whether the standard has

10   been satisfied, that it is not quantified does not

11   render the patent claim indefinite.

12         MR. GLITZENSTEIN:  We would submit, your

13   Honor, on that standard it would.  I mean, the --

14         THE COURT:  Why?

15         MR. GLITZENSTEIN:  Well, because it doesn't

16   delineate the metes and bounds.  The cases do say --

17         THE COURT:  It does.  Everybody who is

18   reasonably skilled in the art can look at this and

19   eyeball it and see that in this device, if there's a

20   loop that's dragging down this much, it's going to be a

21   problem, and why isn't that a, that's objective, it's

22   just not quantified.

23         MR. GLITZENSTEIN:  The issue here, and we're

24   talking --

25         THE COURT:  You agree the cases don't require

1  quantification?

2          MR. GLITZENSTEIN:  Cases do not require

3  quantification, but they do require precision.  And

4  where we're talking -- so they don't require

5  quantification as a matter of rule for terms of degree.

6  For the terms that we're talking about here, we're

7  talking numerical terms, efficiency and acceptable

8  levels of tape tension.  That would certainly suggest

9  some ability to quantify to the extent that you can

10  delineate the scopes of the claim.  You have to

11  distinctly identify the boundaries of the claim.

12          I just want to address, there is some

13  suggestion in their reply brief, your Honor, that we

14  didn't have the standard right when it comes to terms of

15  degree.  That's something that does come out of the

16  Datamize case itself.

17          THE COURT:  Yeah, Datamize is the

18  quintessential subjective case, and it's distinguishable

19  entirely from the vast majority of cases that deal with

20  terms of degree that don't involve subjectivity but

21  don't necessarily have quantification, so, I mean,

22  Datamize says what it says because in that case what's

23  aesthetically pleasing, which I believe was what was at

24  issue in data Datamize, is purely subjective, and that

25  was the basis for the court's holding, wasn't it?

1          MR. GLITZENSTEIN:  It was -- in Datamize it

2    was a purely subjective claim term.  Subsequently the

3    Federal Circuit did confirm or clarify, I don't know how

4    best to say it, I think it was always clear from

5    Datamize, but I've got up here --

6          THE COURT:  Well, here's what the court said

7    in Exxon.  So long as the meaning of the claim is

8    discernible even though the task may be formidable and

9    the conclusion may be one over which reasonable people

10   will disagree, the claim is sufficiently clear to avoid

11   invalidity on the definiteness grounds.  I mean, that's

12   it's pretty clear that -- and in the Ortho Kinetics

13   case, a term of degree is not indefinite if a skilled

14   artisan would be able to discern through circumscribed

15   measurement or experimentation the limits of the claim.

16   It doesn't have to be quantified.  A patentee need not

17   define his invention with mathematical precision or to

18   comply with the definiteness requirement.

19         MR. GLITZENSTEIN:  There has to be some

20   standard in the specification.  I've quoted here on

21   slide 88 -- Zipher has disputed the legal standard here

22   that the requirement of having a standard in the patent

23   specification is also present when there's a term of

24   degree at issue.  The Federal Circuit made that clear in

25   the Star Scientific case.  They said when a  word of

1    degree is used, the patent specification must provide

2    some standard for measuring that degree to be definite.

3    And it's interesting.  This quote is taken directly from

4    Star Scientific, the Federal Circuit inserted the must

5    in brackets there, I didn't do that.  So they actually

6    in that case took pains to note that that is a

7    requirement to find a standard measuring the degree in

8    the patent specification.  That's key, your Honor,

9    because that's simply what's missing here.  And even

10   going on and they applied that standard, and they said

11   below that the intrinsic record provides a standard for

12   measuring that degree and assessing the bounds of

13   anaerobic condition as required by Datamize, namely the

14   level of TSNA formation.  Then it goes on there to talk

15   about what the nature of that standard was that was set

16   out actually in the claims of that case that the --

17              THE COURT:  Was it the standard quantified?

18              MR. GLITZENSTEIN:  No, but it was controlled

19   environment to prevent an anaerobic condition in order

20   to substantially prevent the formation of at least

21   one --

22              THE COURT:  And that someone skilled in the

23   art wouldn't know that.

24              MR. GLITZENSTEIN:  And there's nothing even

25   close to that in this specification, your Honor, that

1    really is why these claims fail on both these terms.

2              I've got a collection of the cases that are

3    cited in the briefing, your Honor, just to sort of

4    capture this.  But in the cases where they do find that

5    the definiteness standard is satisfied, there is a

6    common denominator here, they do refer to things in the

7    patent specification.  The Exxon case that your Honor

8    cited to was the substantial absence of slug flow.  And

9    where a claim term is talking about something that's

10   substantially not there, okay, I think people of skill

11   in the art can figure out where that range might be, and

12   in that particular case the specification tied it to

13   reactor efficiency.  And the cases go on and on in this

14   regard in terms of identifying things in the patent

15   specifications that actually will give guidance as to a

16   standard to a person of skill in the art.  You know,

17   there are, in these cases there are often examples.

18   Those are missing here.  There are often references that

19   can be read to sort of refer to industry standards or

20   FDA standards, that too is missing here.

21              And that's why these two claim terms really

22   clearly fail this task of something in the specification

23   to set forth a standard by which anybody can go in and

24   determine whether the performance or capability of a --

25   excuse me, whether the performance of a printer is

  1    providing acceptable levels of tape tension, whether the

  2    performance of a printer is operating efficiently.

  3            And so, again, I'm happy to talk about any one

  4    of these cases, but that is the common denominator on my

  5    review of the case law, is there's always something in

  6    the specification that provides that sort of standard

  7    with regard to terms of degree.

  8            THE COURT:  Well, I'm not sure that I -- you

  9    seem to suggest that the only means of giving meaning to

 10    the term is the specification.  I think you do claim

 11    construction.  You essentially look at the term and

 12    determine whether you can give it a construction that is

 13    reasonable under the circumstances.

 14            MR. GLITZENSTEIN:  Well --

 15            THE COURT:  You don't just look at the

 16    specification necessarily.  You can look at other

 17    things.

 18            MR. GLITZENSTEIN:  Well, Phillips does say

 19    that the specification is the single best guide to --

 20            THE COURT:  I absolutely agree with that.  I

 21    guess I'm saying, I'm not sure, to the extent you're

 22    suggesting that I must look only to the specification

 23    and may not consider extrinsic evidence or the patent

 24    prosecution history or anything like that in giving

 25    meaning to these claim terms, I don't agree with you

1   because that's not what the case law suggests I should

2   do.

3           MR. GLITZENSTEIN:  Well, the good news is

4   there's nothing in the prosecution history, so I don't

5   think anybody's pointed out.  But, your Honor, I mean,

6   the fact is that the courts do treat these terms of

7   degree in a different way.  I mean, they call them out

8   as such when they are terms of degree, which is why I

9   wanted to focus on the Star Scientific case which does

10  impose that as a requirement, as they must, and that's

11  the Federal Circuit's direction.

12          THE COURT:  But that very case affirmed the

13  use of something that wasn't quantified.

14          MR. GLITZENSTEIN:  Well, again, it doesn't

15  have to be quantified but it has to be a standard.  I

16  think we agree that the cases clearly support that

17  proposition, but what's missing in this case is any sort

18  of standard, any guidance whatsoever, be it in the form

19  of examples, be it in the form of some direction as to

20  what to look at.  And my point is, they can't now, I

21  don't think the extrinsic record supports them anyway,

22  but in any event they can't now point to the extrinsic

23  record and say, well, one of skill in the art would do

24  these various things.  That doesn't provide the

25  important notice giving function.  There are many of

1    these cases that talk about the importance of putting

2    the burden on the party drafting the claim to get it

3    clear, and if they felt that there was some standard in

4    their specification, or some standard, excuse me, that

5    would support these notions of efficiency and acceptable

6    tape tension, it was incumbent upon them to put it in

7    the specification.  That's what they didn't do.  They

8    chose these words, not us.

9              And the specification, just to, I'm happy to

10   talk about the case law, but just to cut to the issues

11   of efficient usage of tape, there's nothing in the

12   specification that defines the standard.  Again, I think

13   I'm on slide 100.  I think there's no dispute that these

14   are terms of degree.  And they suggest at the outset of

15   their argument that these aren't structural limitations

16   but they are statements of the intended purpose or

17   desired results of the claim structure, you know, I

18   don't know what they're intending by that, but if

19   they're intending to eliminate the requirements from the

20   claim, they can't do that.

21             THE COURT:  All right, okay, yeah, I'll have

22   to ask about that, I'm confused.  You're saying you

23   think that they're suggesting that these aren't claim

24   limitations?

25             MR. GLITZENSTEIN:  I didn't know what to make

1  of it in that context that they're not structural

2  limitations because that was either their first or their

3  second answer to our challenge that these terms were

4  indefinite.  The implication that I took away from that

5  is that we don't have to, you know, that the terms are

6  somehow less important for their indefiniteness, less of

7  a problem because they're allegedly only statements of

8  the intended purpose or desired result.

9         They offer up a construction, at least I

10  understood it to be a construction in their

11  specification -- in their reply brief, excuse me, that

12  we would submit as meaningless.  They say that efficient

13  tape usage means minimizing or limiting the consumption

14  of tape.  I don't know if that's what they intend to say

15  because of course tape is always consumed in the process

16  of using these printers, so if they're talking about

17  minimizing or limiting the waste of tape, well, that's

18  just not born out in the record.

19         And again, just to revert back to the

20  Halliburton Energy case, they say that, look, even if

21  you can set a construction down in words, it's still

22  indefinite if a person of ordinary skill in the art

23  can't translate that into meaningful precise claim

24  scope.  In Halliburton Energy the court was provided

25  with a specification that was fairly rich in discussion

1    about what it was to be a fragile gel.  There were

2    examples in the specification.  There were a couple of

3    definitions that the patent owner offered up.  None of

4    them passed muster in light of the specification.  The

5    metes and bounds of the claims were unclear even

6    considering the extensive disclosure in that

7    specification.

8              Here there's just nothing in the

9    specifications that provides any standard for measuring

10   the degree of efficiency, quantified or qualitative,

11   there's nothing in here whatsoever.

12             Zipher cites -- so first off, we're talking

13   about the claims of the '605 patent.  I'll get to a

14   slide on this in a minute.  But it's important to note

15   that these claims are directed to the notion of printing

16   adjacent one another.  You've got a print operation one

17   and a print operation two.  And it talks about

18   positioning so that the second print operation is

19   adjacent to the first print operation.

20             The passageway, the passages, excuse me, of

21   the specification that Zipher cites to don't concern

22   printing adjacent at all.  They actually, I'll get to

23   this, but one talks about overlap printing and the other

24   two talk about avoiding tape waste by rewinding the tape

25   onto the spools.  But even with that, as I'll show in

1   just a moment, none of these passages provide the

2   standard for measuring efficiency.

3           So, with regard to slide 104, this is the

4   language from claims 1 and 12 of the '605 patent and

5   this is where this requirement of efficient tape usage

6   is found, and I've colored in red here the language that

7   shows that what we're talking about here is a second

8   region of tape that is adjacent to a first region of

9   tape where those are the regions that you're going to

10  print from.  I'm paraphrasing here obviously.  But the

11  notion here is adjacent.  And it says you've got to

12  position this second region.  The next region you're

13  going to print from, you've got to position it adjacent

14  the region you just printed from for efficient usage of

15  the tape.  And so that appears to be saying that you've

16  got to have them close enough that you're not wasting a

17  lot of tape in that gap between the two prints.  But it

18  doesn't say anything about how much of a gap is

19  efficient or inefficient, how somebody would determine

20  that.

21          Turning to slide 105, this is the first

22  passage that Zipher cites, and this concerns a different

23  aspect of the specification.  This concerns overlap

24  printing where there's a sort of different disclosure

25  that surrounds these figures 13 through 16, and that's

1    where you, instead of printing one region next to one

2    another you actually overlap by interleaving them in

3    certain ways, and that's another way to get more prints

4    out of a given spool of ribbon.

5              And this is shown a bit in the figures that

6    I've got here on slide 106, figures 13 through 16 of the

7    patent.  And generally speaking, what these are directed

8    to are overlap printing, not adjacent printing.

9              So, back to slide 105, you know, we've got a

10   very broad statement of different methods of making

11   efficient use of the printer ribbon.  That's not a

12   standard as required by the Federal Circuit authority,

13   but moreover it's not even directed to the notion of

14   adjacent printing which is what the claims at issue are

15   really concerned with.

16             And then there's the second and third passages

17   that Zipher cites which I've got here in slide 107, and

18   that's the issue of rewinding.  In certain types of the

19   print operation you wind up having to accelerate the

20   tape to match the speed of the potato chip bag that's

21   passing by, for instance, and so you wind up with a lot

22   of unused tape just as a consequence of trying to catch

23   up to the thing you're going to print on.  And so what

24   these two passages are directed to is rewinding that to

25   avoid what the bottom passage calls gross wastage of

1    ribbon.  It doesn't use the term efficient at all.  It

2    just says you don't want to waste all of that long

3    length of unused ribbon.  So, again, here too there's

4    nothing in the way of a standard for at all giving

5    guidance to a person with skill in the art as to what

6    would be efficient and what not.

7           I may be reading too much into their brief,

8    but I took their statement at page 33 as sort of a tacit

9    concession that there is no such specification -- no

10   such standard in the specification for measuring

11   efficiency.  They dispute that there's any need to find

12   a standard for measuring efficiency for terms of degree

13   in the specification.  And as we talked about a moment

14   ago, Star Scientific clearly holds to the contrary and

15   that authority goes all the way back to the Seattle Box

16   case that Datamize relies on.  Seattle Box case was a

17   term of degree case, and they said look at the

18   specification.  Star Scientific was a term of degree

19   case and they said you must look at the specification

20   for standard.

21           So, they're just simply incorrect, we submit

22   on that, on that very key legal point.

23           THE COURT:  I'm not sure I agree with you

24   either on that.  I don't see any cases that say you must

25   look to the specification and only to the specification.

1                MR. GLITZENSTEIN:  Oh, I'm not suggesting only

2      the specification, your Honor.  I think that you're

3      right, your Honor, that it's certainly fair to look

4      elsewhere to understand what's in the patent

5      specification.  We certainly see that in some of these

6      cases.  But the Federal Circuit's language has been

7      clear in requiring a standard in the specification for

8      terms of degree.  It is true that in, for example, the

9      Datamize case they looked at the prosecution history,

10     they also looked at, you know, some testimony and things

11     like that, but --

12                THE COURT:  I just think it would have been

13     better for you if you had come in with an affidavit from

14     somebody that says, you know, I know this art and one

15     can't, to the extent they claim that a person reasonably

16     skilled in the art can tell you what these things mean,

17     they're wrong, you can't discern that from this claim

18     language or this specification or -- you can't determine

19     it at all and nobody reasonably skilled in the art can

20     do that.

21                MR. GLITZENSTEIN:  We have two forms of

22     evidence on that.  I mean, one, we have their admissions

23     which I would submit are even more powerful than an

24     affidavit or declaration, but we have the admissions of

25     their 30(b)(6) witness who is also their inventor, one

1   of their inventors of this patent at his deposition.  We

2   also do have testimony that they took of our witnesses

3   that go to this same issue.  So that evidence is in the

4   record really from both sides.

5          And I've got up here on slide 110, this is the

6   testimony of their inventor, Martin McNestry, who is

7   also their 30(b)(6) witness, I took his deposition on

8   these very issues, and I gave him, your Honor, a full

9   and fair opportunity to explain to me what it is that

10  divides an inefficient printer operation from an

11  efficient printer operation.

12         THE COURT:  He said there is no standard for

13  determining the efficient use of tape that I know in his

14  deposition.

15         MR. GLITZENSTEIN:  That's right, as their

16  30(b)(6) witness.  And that applies to both determining

17  if something is inefficient and determining if something

18  is efficient.  And it's an important issue for us in

19  determining issues of validity and infringement in this

20  case.  The claim should be clear enough so that we know

21  which side of the line we fall on.  And when their own

22  inventor and 30(b)(6) witness cannot articulate a

23  standard, I mean, I put to him a hypothetical question

24  where it turned out that if you only use 50 percent of

25  the tape, he offered his subjective opinion that that

1    would be an efficient usage of the tape.  But what the

2    law requires here is a standard.  And it's not a term of

3    art that he's aware of or that Zipher has identified.  I

4    think we've certainly done more than discharge our

5    burden to show that, you know, nobody of skill in the

6    art, their own people, our people, simply cannot define

7    standard for this term.

8            THE COURT:  Okay, let me get Zipher's

9    response.  Why don't you pick up with that last point

10   and explain why I shouldn't rely on this excerpt from a

11   deposition for anything.

12           MS. STOLL:  Oh, I think there's other

13   testimony from Mr. McNestry that would be helpful to

14   review.  This is just a portion of what he said and it's

15   more helpful to look at his testimony in context.  And

16   so if we could have -- thank you.  He talked about

17   measures of efficiency of the ribbon.  He said you can

18   look at the gaps between the prints.  You can look at

19   the prints per role of ribbon.  I have some ribbon here

20   if you would like to look at it.

21           THE COURT:  Just an eyeball test essentially?

22           MS. STOLL:  Eyeball, but objective eyeball

23   criteria.

24           THE COURT:  Okay, yeah, let's --

25           MS. STOLL:  He said you can count the number

 1   -- go ahead, sir.

 2              THE COURT:  Let me understand that.  So it's

 3   an eyeball test, it's objective so that I could bring in

 4   50 experts and they'd all know what this means.

 5              MS. STOLL:  Well, I want to back up and go

 6   through the claims, but yes, I do think that everybody

 7   would know what it means and I've got a lot of evidence

 8   to show that.  So I would like to start, if I could,

 9   with the claim.

10              THE COURT:  Okay.

11              MS. STOLL:  And walk through it like you would

12   with claim construction.  But just addressing Mr.

13   McNestry's testimony, he didn't just say I don't know

14   what this is.  He talked about objective measures for

15   determining it.

16              Could you go to slide 23, please.  24, sorry.

17              Okay, Markem's counsel had said that we were

18   trying to say that this limitation doesn't have any

19   meaning in the claim.  That's not what we're saying.

20   What we are saying is that when you look at the claim,

21   the claim itself helps you understand what efficient

22   usage of the tape means.  The claim doesn't just say

23   efficient usage of the tape or a controller for

24   providing efficient usage of the tape.  It says a

25   controller that does these things, performs all these

1    functions, for efficient use of the tape.  One of things

2    is what does it do.  It positions a region of tape from

3    which material has been transferred that is adjacent to

4    a first region of tape from which material has

5    previously been transferred.  And then it puts them at

6    the print head for transferring at least some material

7    from the second region of the tape for efficient use of

8    the tape.  In other words, one of ordinary skill in the

9    art, we look at this from one of ordinary skill in the

10   art, not how I think efficient use of the tape means,

11   but from a person who works in the TTO industry and what

12   they think it means.  And looking at this claim, it

13   tells you what we're talking about for efficient usage

14   of the tape.

15           THE COURT:  Is there some reason why this

16   can't be quantified?

17           MS. STOLL:  Well, I think it's a breadth

18   issue.  We don't want to say it's one millimeter gap,

19   two millimeter gap.  I mean, I think that the claims

20   don't have to be in a numerical value --

21           THE COURT:  I agree with you.  I'm just trying

22   to figure out, I mean, why couldn't you say within a

23   range of 1 to 3 millimeters or 1 to 5 or 1 to 100 or 1

24   to 1000?

25           MS. STOLL:  That would be, I think that that

1    would make the claim, that would be one way to make the

2    claim definite, but there's other ways to make the claim

3    definite and we satisfied the standard for definiteness

4    without providing such a numerical range.

5            THE COURT:  What would a person reasonably

6    skilled in the art, what would the range be that they

7    would say?  So, for example, there's no evidence, is

8    there, that somebody raised their hand and said I

9    understand a reasonable use, efficient use of tape in

10   this context and this circumstance, and people

11   reasonably skilled in the art would tell you any use of

12   tape that is more efficient than whatever, and a number.

13   There's nobody who says that's what we would all

14   understand this to mean.

15           MS. STOLL:  No, but I think that one of

16   ordinary skill in the art would understand what

17   efficient use of tape is based on --

18           THE COURT:  If we asked them, would they tell

19   us?

20           MS. STOLL:  Well, yes, they have said -- we

21   have the testimony of the inventor and other witnesses

22   to have --

23           THE COURT:  Did they give you a number, did

24   they give us a number?

25           MS. STOLL:  I don't think they gave a number.

1   They do try to have the print from one print be adjacent

2   to another print.  We do have a number of Markem's

3   documents, so I'd like to walk through that for a

4   minute.  Markem has a lot of marketing documents for

5   their own accused products, and my point here is simply

6   that one of ordinary skill in the art in this industry

7   knows what efficient use of tape means, and the document

8   you're looking at here gives you five reasons why

9   SmartDate5 is your first choice, reason number one is

10  efficiency, and they define that.  They say industry

11  leading 0.5-millimeter print gap delivering more prints

12  for the same length of ribbon.

13          There's about -- I could you go through --

14  could you show the next one.

15          THE COURT:  Yeah, ordinarily, though, I've

16  seen claims like this where in the specification it

17  would say, for example, that the industry standard is X

18  and this machine produces an improvement in the industry

19  standard.

20          MS. STOLL:  I think the way that this machine

21  really produces an improvement is the way in which it

22  achieves that print gap.  I think the print gap is, that

23  is one of the main points.  And if you go back, please,

24  to the specification.  The specification talks about

25  efficient use of the printer ribbon but defines it in

1    terms of minimizing ribbon wastage and tells you how to

2    achieve that goal.  Just like the claim does.  Put these

3    printing areas adjacent to one another to achieve

4    efficient usage of the tape.  It's not intended to be a

5    precise numerical range.  But more than that, one of

6    ordinary skill in the art would understand what that

7    means just based on their own knowledge.  Reading the

8    specification, looking at Markem's documents, we think

9    the extrinsic evidence shows that, for example, this

10   document of Markem says that if the image is

11   25 millimeters long, the ribbon is advanced by 26 or

12   27 millimeters suggesting a 1 to 2-millimeter gap.  I

13   think some of it depends a little bit on the tape you're

14   using, the print image that you're making could vary and

15   what for that application would be efficient, but the

16   key point here is that the claim tells you to place

17   these images adjacent to one another.

18             THE COURT:  Do you agree, excuse me, is it

19   your position that efficient use of tape is a claim

20   limitation rather than a statement of purpose that isn't

21   a limitation?

22             MS. STOLL:  I think it's a statement of

23   purpose that's accomplished by the controller performing

24   the function of the claim, but of course it's a claim

25   limitation.

 1          THE COURT:  Okay, so, to the extent you

 2   understood them to say that this wasn't a claim

 3   limitation, they've conceded that it is a claim

 4   limitation.  All right, go ahead.

 5          MS. STOLL:  Okay.  I think that your

 6   understanding of the law is consistent with our

 7   understanding of the law, which is that you look at the

 8   claims specification, the prosecution history, relevant

 9   extrinsic evidence to determine whether there can be a

10   reasonable construction of this term.

11          Do you have any specific questions for me on

12   this issue?

13          THE COURT:  No, I think you've covered it.  I

14   think there is in my mind efficient use of tape of the

15   two terms is the one that's more troubling for me.  But

16   I do think that your understanding of the relevant case

17   law here is similar to mine.  To the extent I tend to

18   disagree with Markem on this, I think they are maybe

19   trying to be a little too aggressive in characterizing

20   the case law in a way that isn't completely consistent

21   with my own understanding of that case law, but I don't

22   have any specific questions.

23          All right, let me just ask -- did you want to

24   say something very briefly?

25          MR. GLITZENSTEIN:  Your Honor, if you have

1   questions for me.  I would just comment that the

2   evidence that Zipher's counsel has identified, I mean,

3   even the extrinsic evidence if the court were to credit

4   that, still none of it sets out a standard for measuring

5   efficiency.  When you go through all of it they are, if

6   the fact you would look to gaps between prints doesn't

7   tell you how --

8            THE COURT:  I have a real issue with the

9   efficient use of tape part of it.  An acceptable level

10  seems to me to be an easier thing in light of what a

11  person reasonably skilled in the art would deal with,

12  acceptable level of tape tension, but the efficient use

13  of tape issue is a hard one.  It does hurt them that

14  their expert disclaimed any standard, and it's hard for

15  me to get a handle on what a person reasonably skilled

16  in the art would understand this to mean.  But the

17  standard is I think very generous and favorable to

18  Zipher here, and so I'll apply that standard in looking

19  at this.

20           MS. STOLL:  Can I make one additional point?

21           THE COURT:  Yeah.

22           MS. STOLL:  I would, if you haven't looked at

23  it, I would urge you to read the Star Scientific case.

24           THE COURT:  I've read it.

25           MS. STOLL:  Which is the 2011 case, not the

 1    2008 case that Markem's counsel was referring to.

 2             THE COURT:  Let me make sure I have it.  Hang

 3    on a second.  The one I've read is 655 F.3d.

 4             MS. STOLL:  That's the one.  And with

 5    involving controlled environment for tobacco curing

 6    where the court said you don't have to have specific

 7    numerical value.  The question is what one of ordinary

 8    skill --

 9             THE COURT:  That's the one I was questioning,

10    yeah, I was questioning him on that earlier because I

11    think that's probably the strongest case for you in that

12    it suggests that one can have an objective standard that

13    isn't necessarily quantified and can still be identified

14    with sufficient definiteness if a person reasonably

15    skilled in the art would understand what that standard

16    required.  And I think that's the strongest case for you

17    and I think they have kind of overstated the law in

18    their characterization of it in the way that they

19    present it.  But nevertheless, efficient use of tape is

20    a difficult concept to get a handle on and I'll have to

21    look over very carefully all of the relevant evidence to

22    see if I can give that a meaning that will keep it from

23    being insolubly ambiguous, and I will give it that

24    meaning.  But if I can't, then it will be insolubly

25    ambiguous.

1           All right, let me briefly ask about

2     consequences here.  If I reject your invalidity

3     challenge if its entirety, what would be the next step

4     from your perspective?

5           MR. GLITZENSTEIN:  We would begin to prepare

6     for trial.  We have a trial date set in November.

7     There's a schedule that starts to flow from that, or

8     backs up from that, not flows from that.

9           THE COURT:  If I were to invalidate the

10    claims, the functional claim language based on the

11    determination that that is indefinite functional

12    claiming and I were to determine that the two terms that

13    they have construed are insolubly ambiguous, what would

14    be the next step in the case from your perspective?

15          MS. STOLL:  So you're saying that you would

16    find under this --

17          THE COURT:  I would be persuaded by Markem's

18    claims that the functional claim language is improper

19    functional claiming, not that it's a method step but is

20    improper functional claiming, and that the two terms

21    that they've raised with me are insolubly ambiguous.

22          MS. STOLL:  I believe that that would find all

23    the asserted claims in the suit invalid and then we

24    would be on appeal.

25          THE COURT:  Okay.  All right, so, either I

1    will get out a decision rendering these claims in whole

2    or in part invalid.  What if I were to say that the

3    functional claim terms were improper functional claiming

4    but that the efficient use of tape and acceptable level

5    are not insolubly ambiguous, would there be anything

6    left to try in that case?

7            MS. STOLL:  I don't think so.  I think that

8    also, because there's functional language --

9            THE COURT:  And what if I said that the

10   functional claim language is not invalid but that the

11   two terms are insolubly ambiguous, would that leave

12   anything to be tried?

13           MS. STOLL:  No, we still would have one

14   patent.

15           THE COURT:  What if I said that -- oh, there

16   would be one.

17           MR. GLITZENSTEIN:  I think you meant to say

18   yes.

19           MS. STOLL:  Oh, sorry.  I answered

20   incorrectly.  We would still go to trial.

21           THE COURT:  Okay.  So in that event there

22   would still be something to try.

23           MS. STOLL:  Yes.

24           MR. GLITZENSTEIN:  The oldest patent,

25   actually, the one that issued back in 2006 would not be

1    subject.

2            THE COURT:  All right, good.  Well, that's

3    good to know.  I've been working on this for a very long

4    time.  It may not seem to you folks like I have because,

5    you know, we disagree so strongly about what I think

6    about the relevant law in the case, but I've been

7    working on this for a long time.  I've thought about it

8    a lot.  I've been working with my law clerk on it.  I've

9    rethought some of my views today as a result of oral

10   argument, but I don't see any reason why I can't get a

11   decision out here in the next couple weeks.  So, be

12   ready for a decision or/and either you can go ahead and

13   appeal or we will then schedule a conference to try to

14   get the case ready for trial, okay?

15           Anything else?

16           MS. STOLL:  Your Honor, I would just want to

17   let you know that the parties have been talking a little

18   bit about settlement and trying to work out issues, so

19   just to let you know.  I know that you've been

20   interested in that in the past and I just wanted to let

21   you know.

22           THE COURT:  Well, that's nice to know, I mean,

23   I'm not optimistic.  I just don't have a lot of faith in

24   you folks.  But, you know, anything is possible and

25   maybe you can find ways to work things out.  It just

176

 1  seems that you both have such radically different

 2  understanding of things, and I don't feel I've been

 3  particularly helpful to you.  In my view, a judge who is

 4  unable to help the parties identify what they are really

 5  fighting about and give them an answer to that in an

 6  expeditious way is not doing his job.  I feel like I

 7  haven't done my job in this case, but I don't feel like

 8  I've been well helped in that effort, and so I'm sorry

 9  that I have not been more helpful to you.  I wish you

10  had been more helpful to me.  I still would hope that

11  you can find ways to work this thing out, but I am

12  determined to do one thing, and that is get this case

13  off of my docket.  And I will do it either by issuing a

14  summary judgment ruling or by promptly trying the case.

15  So, understand this.  This case will be over by

16  November, at the end of November at the latest one way

17  or the other, and you'll go on to whatever phase you

18  want to go to the Federal Circuit.

19          I think there's some advantage in you both

20  thinking carefully about settlement because I think this

21  question of functional claiming has not been well

22  articulated by the Federal Circuit, and if the issue

23  applies in this case, I think it's a rather difficult

24  problem.  I think the question of insoluable ambiguity

25  with respect to these terms of degree is a difficult

1    problem.  The answer is not apparent.  I mean, I have

2    come to some ideas about how I want to answer those

3    problems, but I have no confidence that my answers would

4    be accepted by the Federal Circuit, and I don't think

5    you could predict necessarily what the Federal Circuit

6    is going to do here reliably, let alone try to predict

7    what a jury will do.  And in my mind it's cases like

8    that that cry out for settlement.

9          So, you know, you can take the all or nothing

10   approach and spend another couple hundred thousand

11   dollars on this case or you can try to resolve it.  I

12   think it would be good if you could, I really do, but

13   that doesn't affect my thinking.  I'm just going to push

14   ahead now because I'm well, well, well into this case

15   and I'm just going to grind through until I get it done,

16   okay?  Thank you.

17         MR. GLITZENSTEIN:  Thank you, your Honor.

18         (Court adjourned at 3:40 p.m.)

19

20

21

22

23

24

25

178

```
1                    C E R T I F I C A T E

2

3           I, Sandra L. Bailey, do hereby certify that

4    the foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9    Submitted: 8/9/12

10                          SANDRA L. BAILEY, LCR, CM, CRR

11                          LICENSED COURT REPORTER, NO. 15

12                          STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25
```